| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HAIGHTS CROSS COMMUNICATIONS, INC., et al., | ) | Case No. 10- |
| | ) | |
| | ) | (Joint Administration Pending) |
| Debtors.[1] | ) | |
| | ) | |

## DECLARATION OF PAUL J. CRECCA IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF

I, Paul J. Crecca, being fully sworn, hereby declare that the following is true to the best of my knowledge, information and belief:

1.     I am the President and Chief Executive Officer ("CEO") of Haights Cross Communications, Inc. ("Holdings") and Haights Cross Operating Company ("Haights") and the Manager of Recorded Books, LLC, Triumph Learning, LLC and SNEP, LLC, each of which is a direct or indirect subsidiary of Holdings (collectively, the "Debtors"). The Debtors and their non-debtor international affiliates, W.F. Howes Limited ("W.F. Howes") and Wavesound PTY Limited ("Wavesound"), are collectively referred to herein as the "Company." I have been employed by the Company since 1998 and, in my current capacity, I am familiar with the day-to-day operations, business, and financial affairs of the Company.

2.     I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases (collectively, the "Chapter 11 Cases") and in support of (i) the Debtors'

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Haights Cross Communications, Inc. (7398), Haights Cross Operating Company (7416), Triumph Learning, LLC (7400), Recorded Books, LLC (7163) and SNEP, LLC (f/k/a Sundance/Newbridge Educational Publishing, LLC) (1159). The address for each of the Debtors solely for purposes of notices and communications is 10 New King Street, Suite 102, White Plains, NY 10604.

voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and (ii) the relief, in the form of motions and applications, that the Debtors have requested of the Court (each, a "First Day Motion" and, collectively, the "First Day Motions"). Prior to the Petition Date, the Debtors solicited votes on the Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan"), through their Disclosure Statement, dated December 4, 2009 (the "Disclosure Statement") pursuant to sections 1125 and 1126(b) of the Bankruptcy Code. The Plan has been accepted by all classes entitled to vote in excess of the statutory thresholds specified in section 1126(c) of the Bankruptcy Code.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussion with other members of the Company's senior management, my review of relevant documents, or my opinion based upon my experience and knowledge of the Company's operations and financial condition. If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

4. This Declaration is intended to provide a summary overview of the Company's businesses and the Chapter 11 Cases. Sections I through IV of this Declaration provide a description of the Debtors' businesses, corporate history and organizational structure, significant indebtedness, and the circumstances giving rise to the commencement of the Chapter 11 Cases. Part V summarizes the First Day Motions and the relief they seek, which the Debtors believe is crucial to their successful reorganization. I have carefully reviewed each of the First Day Motions and hereby verify each of the facts set forth therein.

2

# I.
## THE DEBTORS' BUSINESSES

5.      The Debtors are leading developers and publishers of products for the Kindergarten through Grade 12 education and public library markets. Their products include state-specific test preparation materials, skills assessment and intervention books and unabridged audiobooks, and are sold primarily to schools and public libraries. The Debtors employ approximately 456 salaried and hourly employees, all of whose livelihoods depend in some significant measure upon the successful continuation of the Debtors' business enterprise, and 414 independent contractors. As detailed below, the Debtors' employees are dedicated to creating the finest books, audio products, software and online services, and providing high quality customer service in each of the markets they serve.

## A.      *Test-prep and Intervention*

6.      The Company's test-prep and intervention segment, Triumph Learning, LLC ("Triumph Learning") publishes test preparation materials for state standardized proficiency exams, such as the Maryland State Assessment (MSA) exams in reading and math, skills based instructional and assessment products, standards-based supplemental materials for students in grades K-12 in language arts, math, science and social studies, and intervention programs for struggling students based on educational principles and research. These products are published under the well-known imprints of *Coach, Buckle Down* and *Options Publishing*. The *Coach* and *Buckle Down* brands have been used in classrooms for over 21 years, and the *Options Publishing* brand for 17 years.

7.      Triumph Learning sold its products to approximately 41,000 customers, consisting mostly of schools and school districts, in 2008, with such customers accounting for substantially all of 2008 revenue. Triumph Learning's test-prep titles are highly customized and

3

precisely focused on each state's specific standards. Practice tests included in both *Coach* and *Buckle Down* books have the benefit of helping students become more familiar with the actual state standardized test they will be taking because they match the features – including format, typeface, lettering or numbering system, style of answer and question type – of each state's particular exam.

8. Under the *Options Publishing* imprint, the Company publishes and offers skills assessment products and standards-based supplemental materials for grades K-8 in reading, writing, science and literature, and intervention programs based on educational principles and research. The core focus of *Options Publishing*'s product strategy is to create and offer products with effective learning techniques and practice to assist students struggling with the current grade level curriculum. These products are often used in after-school, tutorial and summer school environments, otherwise known as intervention settings, by students who have not initially achieved required skill levels through the classroom. *Options Publishing*'s knowledge of classroom trends and teacher demands allows its extensive field sales network to create responsive product solutions for struggling school districts.

**B.** **Library**

9. The Company's library segment publishes unabridged audiobooks and other products for adults and children under the *Recorded Books* imprint, and markets these titles to public libraries, schools and consumers. Recorded Books, LLC ("Recorded Books") publishes and markets unabridged audiobooks in the United States, the United Kingdom and Australian markets across multiple genres of literature, including mystery, history, classics, inspirational, western, romance and sports, primarily in CD, digital and audiocassette format. The Company believes that Recorded Books publishes and markets more unabridged audiobooks titles than any other business in the United States.

4

10.     Recorded Books released over 700 new titles in 2008, and has over 7,500 titles on its backlist.  Recorded Books licenses the right to produce an unabridged audiobook for the public library market, nearly always on an exclusive basis, from the author or trade book publisher.  Recorded Books' unabridged audiobooks, which generally run 8 to 20 hours in length, are known for their high quality, from the engaging narration of the book performed by professional voiceover artists to the quality of recording and packaging materials used in the end product.  Recorded Books supplements its proprietary audiobooks by distributing non-proprietary titles.

11.     Approximately 43% of Recorded Books' revenue from public libraries is through its Continuous-Order-Plans ("COP").  In a COP, a public library agrees to purchase a specific number of new titles each quarter, with the size of such quarterly purchases ranging from 6 titles to over 400 titles.  The COP arrangement automatically renews each year and benefits from high customer renewal rates.  The new titles at each COP level are selected by Recorded Books and, while the library has the right to return COP titles, such returns have occurred at a rate of less than 4% of library sales historically.  The COPs represent a meaningful, recurring revenue stream for the Company.   As of December 31, 2008, over 3,000 public libraries held over 10,000 subscriptions to Recorded Books' numerous unique COP programs and such programs contributed approximately 30% of Recorded Books' total revenue in 2008.

12.     In addition to its extensive production of unabridged audiobooks, Recorded Books has leveraged its expertise in audio based products, and its reputation with the library market, by creating new product lines such as *The Modern Scholar* series, and licensing on an exclusive basis for sale to the library market such well known product lines as the *Pimsleur Language* series and a growing collection of independent films from *The Film Movement*. Beginning in 2004, Recorded Books began to offer a downloadable audiobook service to the

5

public library market, where libraries pay an annual subscription fee which allows their patrons to download audiobooks to their computers or portable music players. Recorded Books also offers proprietary and non-proprietary audiobooks to libraries and consumers under its *Audio Adventures* and *Landmark* brands.

13. Recorded Books sold its products to approximately 9,000 U.S. and U.K. public libraries, 14,000 schools and school libraries, and 24,000 consumers and consumer related distributors in 2008. Recorded Books' position in the public library audiobook market enables its dedicated employees to negotiate audiobook rights for public libraries for the majority of the best titles in the industry. Recorded Books' reputation for high quality, along with offering some of the best titles in the industry, has resulted in a very high level of customer satisfaction and brand loyalty.

14. W.F. Howes and Wavesound are non-debtor international subsidiaries of Recorded Books. W.F. Howes was founded in 1999 and is a specialist U.K.-based publisher committed to publishing unabridged audiobooks and large print books for the benefit of its customers. Wavesound was founded in 2009 and is an Australia-based sales agent committed solely to selling and servicing the Australian public library market with audiobooks and large print titles published by W.F. Howes and Recorded Books. Through these non-debtor international subsidiaries, Recorded Books is able to leverage licensed intellectual property and its business models to grow revenues.

## II.
## CORPORATE HISTORY AND ORGANIZATIONAL STRUCTURE

15. The Company was founded in 1997 with the mission of becoming a significant publishing business dedicated to creating outstanding products. Its corporate vision is to educate

6

and inspire educators, students and librarians to improve performance and succeed at life. To do this the Company provides innovative educational content, learning tools and information to its customers in a variety of media.

16.    Since 1997, the Company has been active in acquiring companies that focus on the Kindergarten through Grade 12 (K-12) supplemental education, medical education and library markets. Almost all of its businesses have had operating histories of more than fifteen years with established recognized brands and long-standing customer relationships in the markets they serve. The Company's first acquisition of medical education publisher, Educational Design, Inc., took place in 1997. With the acquisition and integration of Dreyfuss Hunt, a publisher of wellness newsletters, in 1998, and the acquisition of two legal publishers, one in 1998, and one in 1999, the business was re-branded under the *Oakstone Publishing* name. The two legal publishers were subsequently sold in 2003. Until its sale in 2008, Oakstone Publishing produced titles primarily for continuing medical education and personal wellness in audio, print and electronic formats. The first K-12 education business acquired by the Company was Newbridge Educational Publishing ("Newbridge") in 1997, followed by Sundance Publishing ("Sundance") in 1998 and Triumph Learning in 1999. Sundance and Newbridge were consolidated in 2000, becoming Sundance Newbridge. With the acquisitions of Buckle Down Publishing and Options Publishing in 2004, the Company continued to build its share in the supplemental education school market. Through a wide variety of high-quality products, these companies have established leading positions in supplementary reading, math, science and social studies and state-specific test-prep for Kindergarten through Grade 12. In 1999, the Company launched its library business with the acquisition of Recorded Books and library publisher Chelsea House, the latter of which was sold in 2005. In 2001, the Company acquired

7

Audio Adventures, an audiobook reseller to the library and consumer markets, which was merged into Recorded Books in 2002.

17.     On August 10, 2007, the Company consummated a recapitalization pursuant to which holders of its previously outstanding Series B Senior Preferred Stock ("Preferred B") converted their shares of Preferred B into approximately 82% of outstanding shares of common stock and warrants, holders of previously outstanding Series A Preferred Stock, Series C Preferred Stock and warrants converted their shares and warrants into shares of common stock and common stock warrants representing approximately 15% of the Company's shares of common stock and warrants, and certain members of management acquired new shares of common stock under the terms of management stock purchase agreements representing approximately 3% of the Company's outstanding common stock and warrants. In connection with the foregoing, all previously outstanding shares of common stock were effectively eliminated through the reclassification of such shares into one share of common stock in a reverse split and all outstanding warrants for common stock and options to purchase common stock were similarly effectively eliminated by the reverse split of common stock. The consummation of the recapitalization led to the reconstitution of the Board of Directors of the Company.

18.     After the consummation of the recapitalization, the Company undertook a review of its business units and strategic alternatives. Based on the results of that strategic review, in September 2007, the Board of Directors authorized an operational restructuring of Options Publishing and Triumph Learning, whereby the management of Options Publishing was consolidated with Triumph Learning; the accounting functions of Options Publishing were taken over by the Triumph Learning general accounting group located in New York City; customer services, warehousing and fulfillment were consolidated into the shared service facility in

8

Northborough, MA; and the manufacturing and product purchasing functions were consolidated into Triumph Learning. The purpose of this restructuring was to save operational costs and to improve the product development process. Also, certain functions of Triumph Learning were moved to other locations to improve processes, leverage shared resources, and take advantage of lower cost facilities. This restructuring process was completed during the first quarter of 2008. As a result of the strategic review, the Company also commenced a sale process for its Sundance Newbridge business in November 2007.

19.     Following further review, in January 2008, the Company announced its plans to offer for sale its three remaining operating units: Triumph Learning, Recorded Books and Oakstone Publishing. In June 2008, the Company sold the subsidiary that contained its Oakstone Publishing business, which operated its medical education segment, for a total purchase price of $47.5 million, as adjusted by certain closing adjustments and subject to a $4.75 million holdback from the purchase price to be held in escrow to satisfy any indemnification obligations. In August 2008, the Company sold substantially all of the assets of the subsidiary that operated the Sundance Newbridge business.[2] The purchaser paid approximately $5.9 million and agreed to pay (i) an earn-out based upon sales of Sundance/Newbridge titles above a threshold amount over a period of five years from the date of closing and (ii) additional amounts based upon excess collections of accounts receivable included in the sale. In July 2008, the Company announced the suspension of its sale process for the Triumph Learning and Recorded Books businesses.

---

[2]   Debtor SNEP, LLC (f/k/a Sundance/Newbridge Educational Publishing, LLC) holds certain contract rights under the asset purchase agreement pursuant to which it sold substantially all of its assets and is a guarantor of the Company's obligations under the prepetition term loan and the Senior Notes.

RLF1 3525250v.1

20.     The chart below provides a general overview of the Company's corporate structure:



*Non-debtor subsidiary of Recorded Books, LLC

### III.
### SIGNIFICANT INDEBTEDNESS

21.     On August 15, 2008, Haights entered into the Secured Credit Agreement with the Lenders,[3] which, as amended, is comprised of a term loan in the original principal amount of $108,200,000 bearing interest at a rate equal, at Haights' option, to either (a) the three month LIBOR rate (with a floor of 3.00%) plus 12.25% per annum, payable monthly in cash; or (b) the prime rate (with a floor of 5.25%) plus 11% per annum, payable monthly in cash; provided, however, that in lieu of making cash payments for the entire amount of interest accrued during

---

[3] Capitalized terms used but not defined herein have the meanings ascribed to them in Plan.

RLF1 3525250v.1

any month, Haights may elect to cause a portion not in excess of 2.00% per annum of the accrued interest to be "paid in kind" and added to the outstanding principal balance of the term loan on the last business day of the month in which such election is made (the "Prepetition Term Loan"). The Prepetition Term Loan refinanced the Company's prior secured debt and allowed the Company to pay down a portion of its obligations under the then outstanding Senior Notes. The obligations under the Secured Credit Agreement are guaranteed by all of the Debtors and secured by a first priority lien on substantially all assets of all of the Debtors. As of the date hereof, the outstanding principal amount due under the Prepetition Term Loan is $110,138,665.60, which amount includes payment in kind interest that has been capitalized and added to the balance of the Prepetition Term Loan prior to the date hereof.

22.     In addition to the foregoing, Haights is the issuer of Senior Notes due 2011 bearing interest at a fixed rate of 11.75% per annum. The Senior Notes are guaranteed on a joint and several basis by all of the Debtors and are unsecured. As of the date hereof, the outstanding principal amount due in respect of the Senior Notes is $138,800,000, plus accrued and unpaid interest thereon of approximately $15.5 million.

23.     Holdings is the issuer of Senior Discount Notes also due 2011 bearing interest at a fixed rate of 12.50%. The Senior Discount Notes are not guaranteed and are unsecured. As of the date hereof, the outstanding principal amount due in respect of the Senior Discount Notes is $135,000,000, plus accrued and unpaid interest thereon of approximately $16.9 million. As explained below, the Company is currently in default under the Secured Credit Agreement and the Prepetition Indentures.

RLF1 3525250v.1

# IV.
## CIRCUMSTANCES GIVING RISE TO THE DEBTORS' CHAPTER 11 FILINGS

*A.*     *Liquidity Constraints and Prepetition Restructuring Negotiations*

24.     The Secured Credit Agreement included financial covenants that projected certain levels of growth, based on information available as of August 2008, in the Debtors' businesses. Subsequent to August 2008, the worldwide financial turmoil and associated economic downturn resulted in the curtailment, delay or reduction of state and local government funding available to schools and public libraries, the primary customers of the Debtors' products. Despite the Debtors adoption of aggressive costs savings initiatives to mitigate decreases in revenue, the Debtors inability to assure compliance with these covenants throughout 2009 with a high degree of certainty caused the Debtors' certified public accountants to issue the Debtors a "going concern" opinion in the Spring of 2009. The receipt of this qualified opinion constituted a default under the Secured Credit Agreement.

25.     Beginning on April 15, 2009, the Company and the Lenders under the Secured Credit Agreement entered into a series of forbearance agreements (the "Forbearance Agreements") with respect to this default. Pursuant to the Forbearance Agreements, the Lenders agreed to forbear from exercising any rights and remedies relating to defaults, if any, resulting from the Company's inability to satisfy certain financial covenants under the Secured Credit Agreement, subject to certain conditions. The Forbearance Agreements allowed the Company and its financial advisors to develop a comprehensive financial restructuring plan in order to maximize enterprise value for stakeholders. The Secured Credit Agreement and the Forbearance Agreements prohibited the Company from, among other things, making interest payments on the Senior Notes and Senior Discount Notes while the Company remained in default under the

Secured Credit Agreement. The Company subsequently failed to make regularly scheduled interest payments on the Senior Notes and Senior Discount Notes in August 2009.

26.     During the forbearance, the Company at various times engaged the Lenders, the Informal Committee of Senior Notes and certain Holders of Senior Discount Notes in discussions in order to create a consensus on the appropriate restructuring of the outstanding debt.

27.     On June 8, 2009, the Company launched an exchange offer and consent solicitation for its Senior Discount Notes, pursuant to which the Company offered to exchange the Senior Discount Notes for shares of common stock (the "Exchange Offer"). On June 17, 2009, the Company executed a commitment letter with certain of the Lenders, pursuant to which such Lenders agreed to provide financing to replace the amounts outstanding under the Secured Credit Agreement (the "Commitment Letter"). The Company and its Lenders extended the expiration of the Forbearance Agreements, the Exchange Offer and the Commitment Letter during July 2009 and, also, the Company began discussing alternative restructuring plans with the holders of its Senior Notes. The Company was not able to obtain the requisite level of participation needed to consummate the Exchange Offer. On August 20, 2009, the Company terminated the Exchange Offer.

28.     On September 3, 2009 the Company entered into the Plan Support Agreement with the Informal Committee of Senior Notes, which parties collectively held or controlled 100% of the outstanding principal amount under the Secured Credit Agreement (including through certain debt transfers that occurred on August 20, 2009), approximately 80% of the outstanding principal amount of the Senior Notes and approximately 13% of the outstanding principal amount of the Senior Discount Notes. The debt restructuring contemplated by the Plan Support Agreement is designed to dramatically reduce the Company's indebtedness, and thereby,

13

improve the Company's competitive position and prospects for continued growth and future profitability.

29. Furthermore, in connection with discussions with the Holders of a substantial portion of the Senior Discount Notes with respect to the Exchange Offer, the Debtors agreed to pay certain fees incurred by Willkie Farr & Gallagher LLP as legal advisors to such Holders. Also with respect to the Plan Support Agreement, in connection with discussions with the Prepetition Agent, the Company agreed to pay certain fees incurred by McGuire, Craddock & Strother, P.C. as legal advisors to the Prepetition Agent and, in connection with discussions with the Informal Committee of Senior Notes, the Company agreed to pay certain fees incurred by Shearman & Sterling LLP and Young Conaway Stargatt & Taylor, LLP as legal advisors, and Peter J. Solomon Company, L.P. as financial advisors, to the Informal Committee of Senior Notes.

### B. The Proposed Financial Restructuring and the Prepetition Solicitation

30. The Plan, as proposed, would restructure the Company's obligations under the Secured Credit Agreement, the Senior Notes and the Senior Discount Notes to substantially reduce the Company's outstanding indebtedness from over $380,000,000 to approximately $180,000,000 of new secured term debt and extend the maturity of the Company's debt until no earlier than three years from the effectiveness of the Plan. It is intended to substantially reduce the Company's outstanding indebtedness and improve cash flows, including cash flows available for investing in the Company's product offerings. The Plan will otherwise leave unimpaired the Company's general unsecured claims, including those of the Debtors' employees and independent contractors, all customers, all vendors, and all suppliers of the Debtors. Upon emergence, the Debtors are anticipated to have a stronger balance sheet and be in a superior

14

competitive position than before, which will redound to the benefit of the Debtors, their employees, customers, vendors and other parties in interest.

31. To achieve an efficient and beneficial financial restructuring, the Debtors conducted a pre-filing solicitation of their Plan, which was then overwhelmingly accepted by the creditors entitled to vote on the Plan. Only three classes of claims and one class of interests are impaired under the Plan: (i) Class 2 – Secured Credit Agreement Claims, (ii) Class 4 – Senior Note Claims, (iii) Class 5 – Senior Discount Note Claims and (iv) Class 9 – Prepetition Holdings Equity Interests. The only classes that were entitled to vote on the Plan were (i) Class 2 – Secured Credit Agreement Claims, (ii) Class 4 – Senior Note Claims and (iii) Class 5 – Senior Discount Note Claims. Holders of interests in Class 9 – Prepetition Holdings Equity Interests are not receiving any distributions or retaining any interests under the Plan and, therefore, are deemed to have rejected the Plan and were not entitled to vote thereon.

32. The Debtors engaged Globic Advisors, Inc. (the "Voting Agent") to act as their voting and solicitation agent for purposes of distributing the Disclosure Statement and Ballots and calculating and tabulating votes on the Plan. On or about December 4, 2009, the Debtors caused the Voting Agent to commence the distribution of copies of the Disclosure Statement, the Plan and Ballots to each person or entity (or their nominee) that was a beneficial holder of a Secured Credit Agreement Claim, a Senior Note Claim or a Senior Discount Note Claim as of December 4, 2009, the voting record date. The Debtors established January 4, 2010 as the deadline by which completed Ballots had to be received by the Voting Agent.

33. As of the voting deadline, all or a vast majority of the creditors in each of the three classes entitled to vote on the Plan voted to accept the Plan. On the Petition Date, the Debtors filed with this Court the Disclosure Statement and the Plan, together with the certified results of the pre-bankruptcy solicitation as set forth in the voting affidavit submitted by the

Voting Agent (the "Voting Affidavit"). By separate motion filed on the Petition Date, the Debtors will request that this Court set a date for a hearing to approve the Disclosure Statement and the prepetition solicitation procedures and to confirm the Plan.

34.     The prepackaged Plan that the Debtors have jointly proposed, as specified in the Plan and accompanying Disclosure Statement, provides, in summary, for: (a) the Debtors to emerge from bankruptcy on a "fast track" pursuant to a prepackaged filing; (b) continuation of the Debtors' business operations as a going concern and in the ordinary course; (c) payment in full of all Allowed General Unsecured Claims, including payment in the ordinary course of all obligations to customers, employees, vendors and suppliers; and, absent consummation of an Alternative Financing, (d) issuance to the Lenders under the Secured Credit Agreement of New First Lien Notes, together with Cash equal to the difference between the aggregate amount of Secured Credit Agreement Claims and the aggregate principal amount of the New First Lien Notes; (e) issuance to holders of Senior Note Claims of New Second Lien Notes, Senior Note Stock Consideration, Senior Note Cash Consideration and any Rights Offering Proceeds; (f) issuance to holders of Senior Discount Note Claims of a *pro-rata* distribution of shares of New Common Stock in an amount equaling approximately 8% of the total number of shares of New Common Stock issued under the Plan, together with Exit Warrants; and (g) cancellation of all prepetition equity interests in Holdings.[4]

35.     More specifically, under the terms of the Plan Support Agreement, previously agreed to by the Debtors, the Lenders under the Secured Credit Agreement and certain holders of Senior Notes and Senior Discount Notes, the Plan seeks to impair not less than $110,138,665.60

---

[4] All descriptions in this Declaration of the Plan and the Disclosure Statement are qualified in their entirety by the actual filed Plan and the Disclosure Statement, which govern in the event of any inconsistency and should be read in their entirety.

16

in principal amount of Secured Credit Agreement Claims (Class 2), the approximately $138,800,000 in principal amount of Senior Note Claims (Class 4) and the approximately $135,000,000 in principal amount of Senior Discount Note Claims (Class 5). Holders of Administrative Expense Claims and Priority Tax Claims (unclassified) as well as Holders of Other Priority Claims (Class 1) will have their allowed claims paid in full in Cash. Holders of Other Secured Claims (Class 3) will have their allowed claims paid in full in Cash or reinstated or the collateral securing their allowed claims will be released. Holders of General Unsecured Claims (Class 6) will have their allowed claims paid in full in Cash or reinstated. Intercompany claims (Class 7) will be reinstated, except to the extent that Holders of such claims agree to less favorable treatment. Holders of Prepetition Holdings Equity Interests (Class 9) will receive no distributions and Holders of Surviving Equity Interests (Class 8) will have their interests reinstated.

36.     The result is that the Plan provides for no impairment of virtually all the going-concern obligations of the Debtors, as well as the conversion of the existing secured debt to new secured debt, the conversion of senior note debt to new secured debt and common stock and the conversion of senior discount note debt to common stock and warrants. The conversion of over $200 million of debt to equity results in a greatly reduced debt service and a largely deleveraged balance sheet.

## V.
## SUMMARY OF FIRST DAY PLEADINGS

37.     Concurrently with the filing of the Chapter 11 Cases, the Debtors have filed, for the Court's approval, a number of First Day Motions, which the Debtors believe are necessary to enable them to operate in chapter 11 with a minimum of disruption and loss of productivity. The

Debtors respectfully request that the relief requested in each of the First Day Motions be granted as they are a critical element in stabilizing and facilitating the Debtors' operations during the pendency of the Chapter 11 Cases. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.[5]

## Motion of the Debtors for Entry of an Order Directing Joint Administration of Cases ("Joint Administration Motion")

38.     The Debtors seek, pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the joint administration of these Chapter 11 Cases, five in total, for procedural purposes only. Joint administration will obviate the need for duplicative notices, motions, applications, and orders and thereby save considerable time and expense for the Debtors and their estates.

39.     The rights of the Debtors' respective constituencies will not be adversely affected by the proposed joint administration of the Chapter 11 Cases and, in fact, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration. The Court also will be relieved of the burden of entering duplicative orders and maintaining redundant files. Finally, joint administration will facilitate oversight of the administrative aspects of the Chapter 11 Cases by the Office of the United States Trustee for the District of Delaware.

40.     I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

---

[5] In this Section V, any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

RLF1 3525250v.1

**Application of the Debtors for Entry of an Order Authorizing the Retention and Employment of EPIQ Bankruptcy Solutions, LLC as Claims and Noticing Agent**

**("EPIQ Retention Application")**

41.     The Debtors seek, pursuant to 28 U.S.C. § 156(c), that this Court enter an order authorizing the retention of Epiq Bankruptcy Solutions, LLC ("Epiq") as claims processing and noticing agent for the Debtors in these Chapter 11 Cases upon the terms and conditions set forth in the services agreements between Epiq and the Debtors.

42.     The Debtors seek to engage Epiq as noticing agent in order to assume responsibility for, among other things, the distribution of notices in the Chapter 11 Cases. The Debtors anticipate that there will be thousands of entities that the Debtors will be required to serve with certain of the notices, pleadings and other documents filed in their bankruptcy proceedings. The appointment of Epiq will expedite the distribution of notices and relieve the Clerk's office of the administrative burden of processing such notices. The Debtors' estates will benefit as a result of Epiq's experience and cost-effective methods.

43.     I understand that the actions and procedures Epiq will undertake, as claims processing and noticing agent, will include, but not be limited to the following:

(a)     notifying all potential creditors of the filing of these Chapter 11 Cases;

(b)     filing affidavits of service for all mailings, including a copy of each notice, a list of persons to whom such notice was mailed, and the date mailed;

(c)     maintaining an official copy of schedules (to the extent filed), listing creditors and amounts owed;

(d)     maintaining a case specific website for the Chapter 11 Cases; and

(e)     providing any other distribution services as are necessary or required.

RLF1 3525250v.1

44. If necessary, despite the fact that the Debtors do not anticipate establishing a claims bar date in light of the prepackaged nature of these Chapter 11 Cases, Epiq may undertake certain claims-related duties, including, but not limited to:

(a) receiving and recording proofs of claim and proofs of interest filed;

(b) creating and maintaining official claims registers;

(c) recording all transfers of claims and providing notice of such transfers as required pursuant to Federal Rule of Bankruptcy Procedure 3001(e);

(d) maintaining the official mailing list for all entities who have filed proofs of claim;

(e) implementing necessary security measures to ensure the completeness and integrity of the claims registers;

(f) transmitting to the Clerk's Office a copy of the claims registers upon request and at agreed upon intervals;

(g) providing access to the public for examination of copies of the proofs of claim or interest without charge during regular business hours;

(h) providing temporary employees to process claims, as necessary;

(i) promptly complying with such further conditions and requirements as the Clerk's Office or the Court may at any time prescribe; and

(j) performing such other administrative and support services related to noticing, claims, docketing and distribution as the Debtors or the Clerk's office may request.

45. As set forth in the Epiq Retention Application, Epiq has considerable experience in providing identical or substantially similar services in other chapter 11 cases in this jurisdiction. I believe the retention of Epiq is in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

RLF1 3525250v.1

**Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Use Existing Cash Management System, Bank Accounts and Business Forms and (B) Perform Intercompany Transactions; and (II) Extending the Time for the Debtors to Comply with the Requirements of 11 U.S.C. § 345(b)**

### ("Cash Management Motion")

46.     The Debtors request, pursuant to sections 105(a), 345, 364(b) and 503(b)(1) of the Bankruptcy Code, that this Court enter an order (i) authorizing the Debtors to (a) continue to use their existing cash management system, bank accounts and business forms, and (b) perform intercompany transactions, and (ii) extending the time for the Debtors to comply with the requirement of section 345(b) of the Bankruptcy Code. The Debtors also request that the Court authorize the banks at which the Debtors maintain bank accounts to continue to maintain service and administer such accounts. Without the requested relief, the Debtors would be unable to maintain their financial operations effectively and efficiently, which would cause significant harm to the Debtors and their estates.

47.     The Debtors' business and financial affairs are complex, requiring them to collect, disburse and move funds through numerous bank accounts. Any disruption of the Debtors' cash management system, including closing bank accounts and ceasing transfers made by wire, debit, ACH or other similar method, would cause delays in the collection and disbursement of funds. Such delays could cause the Debtors to default in their postpetition accounts payable obligations to other parties, which, in turn, could cause vendors and other third parties to cease providing goods and services to the Debtors. Such a result would have a severe and adverse impact upon the Debtors' reorganization efforts. Moreover, if the Debtors were required to close their existing bank accounts and terminate their cash management system, it would be difficult and expensive to promptly establish new bank accounts and a new cash management system with sufficient sophistication to fulfill the Debtors' business needs.

RLF1 3525250v.1

48. The Debtors use various correspondence and business forms, including but not limited to, preprinted checks, invoices, letterhead, envelopes, promotional materials and other business forms (collectively, as they may be modified, the "Business Forms"). The Debtors seek to continue to use the Business Forms substantially in the form existing immediately prior to the Petition Date, without reference to their status as debtors in possession. To the extent the Debtors' resort to new check stock, once existing check stock has been depleted, any future checks ordered by the Debtors will include the legend "Debtor-in-Possession." The requested relief will save the Debtors' estates a potentially significant expense, which the Debtors respectfully submit is unwarranted given the anticipated short duration of these Chapter 11 Cases.

49. Under the cash management system, cash may flow from one Debtor to another in the ordinary course of business or, payments may be made by one Debtor on account of obligations owed by another Debtor. If these intercompany transactions are discontinued, a number of services provided by and to the Debtors could be disrupted. Moreover, the interruption of intercompany transactions could preclude the Debtors from receiving certain tax benefits.

50. The Debtors invest certain funds in the ordinary course of operating their cash management system. The Debtors believe that these funds are secure and that obtaining bonds to secure those funds, as required by section 345(b) of the Bankruptcy Code, would be unnecessary and detrimental to the Debtors' estates and creditors. The Debtors therefore respectfully request that the Court enter an order extending the Debtors' time to comply with section 345(b) of the Bankruptcy Code for forty-five (45) days, without prejudice to the Debtors' ability to seek a further extension or final waiver of the statute's requirements.

51.     I believe that the continued operation of the Debtors' cash management system and the balance of the relief sought in the Cash Management Motion are in the best interests of the Debtors, their estates and all parties in interest, and should be granted in all respects.

**Motion of the Debtors for Entry of an Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay and (IV) Scheduling a Final Hearing**

**("Cash Collateral Motion")**

52.     The Debtors request, pursuant to sections 105(a), 361, 362, 363 and 507 of the Bankruptcy Code, that this Court enter an interim order (a) authorizing the Debtors to use cash collateral (as defined in 11 U.S.C. § 363(a), "Cash Collateral") of the Prepetition Agent and Prepetition Secured Lenders; (b) providing adequate protection to the Prepetition Agent; and the Prepetition  Secured Lenders for any diminution in value of their respective interests in the Prepetition Collateral (as defined in the Cash Collateral Motion), including the Cash Collateral; (c) vacating and modifying the automatic stay imposed by 11 U.S.C. § 362(a) of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the interim order; and (d) scheduling a final hearing to consider the relief requested in the Cash Collateral Motion and the entry of a final order, and approving the form of notice with respect to the final hearing.

53.     Access to cash collateral will allow the Debtors to operate in chapter 11 in a manner consistent with their ordinary course practice.  To this end, the Debtors must have access to cash that is encumbered by the liens of their secured lenders.  Cash collateral will be used to make payments to vendors and employees and to satisfy the other ordinary costs of operations, including rent, taxes and insurance.  In the absence of authority to use cash collateral, the continued operation of the Debtors' businesses even for a limited period of time, while possible,

23

may be prohibitively expensive and cumbersome and serious and irreparable harm to the Debtors and their estates would occur. The use of cash collateral is therefore critical to preserve and maintain the going concern value of the Debtors.

54. To protect from any diminution in value of their respective interests in the cash collateral, the Debtors propose to provide adequate protection to the Prepetition Agent, for the benefit of itself and the Lenders. Specifically, as adequate protection of prepetition liens on prepetition collateral, the Debtors seek to provide (a) adequate protection liens, (b) an adequate protection superpriority claim, and (c) adequate protection payments, each as more fully explained in the Cash Collateral Motion.

55. I believe the relief requested with respect to use of cash collateral is essential to a successful restructuring and therefore in the best interests of the Debtors, their estates and all parties in interest and will enable the Debtors to continue to operate and reorganize their businesses during the pendency of this prepackaged bankruptcy without significant interruption.

### Motion of the Debtors for Entry of Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Adequate Assurance; and (III) Approving Procedures for Resolving Requests for Additional Adequate Assurance

### ("Utilities Motion")

56. The Debtors request, pursuant to sections 105(a) and 366 of the Bankruptcy Code, that this Court enter an interim order (and ultimately a final order) (a) prohibiting utility providers (collectively, the "Utilities Providers") from altering, refusing, or discontinuing services; (b) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code pending the entry of a final order; (c) approving the Debtors' proposed procedures whereby the Utility Providers may

24

request additional or different adequate assurance; (d) determining that the Debtors are not required to provide any additional adequate assurance, beyond what is proposed in the Utilities Motion, pending entry of a final order and (e) if any objections are received with respect to the Utilities Motion, scheduling a final hearing to consider the relief requested on a final basis.

57.     In connection with the operation of their businesses and management of their properties, the Debtors obtain water, sewer service, electricity, natural gas, telephone, internet services and/or other similar services from a number of Utilities Providers.  Annexed to the proposed final order is a nonexclusive list of approximately 21 Utilities Providers that provide utility services to the Debtors as of the Petition Date (the "Utility Service List").  The relief requested in the Utilities Motion is for all Utility Providers providing utility services to the Debtors and is not limited to those listed on the Utilities Service List.

58.     Uninterrupted utility services are essential to the Debtors' ongoing operations and the success of the Chapter 11 Cases.  Should any Utilities Provider refuse, or discontinue service, even for a brief period, the Debtors' business operations would be disrupted severely, and such disruption would jeopardize the Debtors' reorganization efforts.  It is essential that utilities services continue uninterrupted during the Chapter 11 Cases.

59.     I believe granting the Debtors the authority to deposit into a segregated account $27,996.16, an amount equal to 50% of the Debtors' estimated aggregate monthly cost of utility services, for the benefit of any Utilities Provider, together with the other procedures set forth in the Utilities Motion, is in the best interests of the Debtors, their estates and all parties in interest. Setting aside this deposit should provide the Utilities Providers with the assurance they need and enable the Debtors to continue to operate their businesses in chapter 11 without disruption to

RLF1 3525250v.1

their utilities services. I further believe that the procedures for requesting additional assurance as set forth in the Utilities Motion will protect the Debtors' operations while also giving each Utilities Provider the ability to evaluate the Debtors' adequate assurance, and the ability to seek additional assurance.

**Motion of the Debtors for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Wages, Salaries, Commissions and other Compensation, Reimbursable Employee Expenses and Employee Medical and Similar Benefits and (II) Authorizing and Directing Financial Institutions to Honor all Related Checks and Electronic Payment Requests**

**("Wage Motion")**

60.     The Debtors request, pursuant to sections 105(a), 363(b) and 507(a) of the Bankruptcy Code, that this Court enter an order (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business certain prepetition (i) wages, salaries, commissions and other compensation, (ii) reimbursable employee expenses and (iii) employee medical and similar benefits, and (b) authorizing and directing financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests relating thereto.

61.     The continued operation of the Debtors' businesses and their successful reorganization depends upon the retention and cooperation of the Debtors' employees and other personnel. The Debtors' employees and other personnel maintain the Debtors' daily operations and the Debtors cannot successfully reorganize without their continued support and the historical knowledge, experience, and industry relationships that are vital to the Debtors' businesses. Any failure to pay outstanding obligations may lead to the deterioration of employee morale, which, at this juncture, could negatively affect the value of the Debtors' assets and businesses and their ability to reorganize successfully under chapter 11. Accordingly, the Debtors have requested

RLF1 3525250v.1

authority to satisfy their employee-related obligations and continue their ordinary course employee-related benefits and programs as in effect prior to the Petition Date.

62.     Moreover, if the checks issued and fund transfers requested in payment of prepetition employee obligations are not honored and paid, the Debtors' employees may suffer personal hardship. It is inequitable to place employees in such an untenable position given that the Plan, which has been accepted by all classes entitled to vote, provides for payment in full of all Allowed General Unsecured Claims.

63.     Based upon the foregoing, I believe the relief requested in the Wage Motion is in the best interests of the Debtors, their estates and all parties in interest, and will enable the Debtors to continue their businesses in an economic and efficient manner without disruption and should be granted.

**Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Maintain Insurance Programs and Pay all Prepetition and Postpetition Obligations in Respect Thereof and (II) Directing Financial Institutions to Honor and Process Postpetition Checks and Transfers Related to Such Obligations**

**("Insurance Motion")**

64.     The Debtors request, pursuant to sections 105(a), 362(d), 363(b) and 503(b) of the Bankruptcy Code, that this Court enter an order authorizing, but not directing, the Debtors to (i) continue their workers' compensation program and their liability, property and other insurance programs, and (ii) pay all obligations in respect thereof, on an uninterrupted basis, consistent with their practices in effect prior to the commencement of the Debtors' Chapter 11 Cases, including the payment of all premiums, claims, deductibles, excess, administrative expenses and all other charges incurred, whether relating to the period prior to or after the commencement of

27

these Chapter 11 Cases. To the extent that any of the Debtors' employees hold valid claims under the Workers' Compensation Program, the Debtors seek authorization pursuant to section 362(d) of the Bankruptcy Code to permit these employees to proceed with their claims under the Workers' Compensation Program. In furtherance of these requests, the Debtors request that the Court authorize their banks to receive, honor, process and pay any and all checks drawn, or electronic fund transfers requested, on the Debtors' applicable bank accounts to the extent that such checks or electronic fund transfers relate to any of the Debtors' workers' compensation or insurance programs.

65. The nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their insurance programs on an ongoing and uninterrupted basis. The nonpayment of any premiums, deductibles, or related fees under one of the insurance programs could result in one or more of the insurance carriers declining to renew the Debtors' insurance policies or refusing to enter into new insurance agreements with the Debtors in the future. If the insurance programs are allowed to lapse without renewal, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely negative impact on the Debtors' ability to successfully reorganize. Indeed, if such a lapse were to occur, the Debtors would be faced with acquiring replacement policies on an expedited basis at a significant cost to the estates. Accordingly, the Debtors must make all payments in respect of the insurance programs as continuation of these policies is essential to the ongoing operation of the Debtors' businesses.

66. I believe the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates and all parties in interest, and will enable the Debtors to continue their businesses in chapter 11 without disruption and should be granted.

**Motion of the Debtors for Entry of an Order Authorizing the Debtors to Pay Prepetition Claims of Trade Creditors in the Ordinary Course of Business**

**("All Trade Motion")**

67.     The Debtors request, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, that this Court enter an order authorizing but not directing the Debtors, subject to the procedures set forth in the All Trade Motion, to pay, in the ordinary course of business, the allowed, fixed, liquidated, noncontingent, and undisputed prepetition claims (the "Payable Claims") of holders of trade and other unsecured claims (collectively, the "Prepetition Creditors").

68.     The Chapter 11 Cases are the culmination of a lengthy and detailed process designed to restore financial vitality to the Debtors while at the same time providing an appropriate treatment for the Debtors' creditors.  The Debtors believe that a seamless transition into and through bankruptcy will preserve the value upon which the Plan is based.  A fundamental aspect of the Debtors' efforts to minimize disruption during the Chapter 11 Cases is the Debtors' ability to maintain their relationships with essential vendors that supply goods and provide services to the Debtors in the ordinary course of the Debtors' businesses.

69.     The relief sought in the All Trade Motion preserves the value of the Debtors' estates by (i) ensuring that the Debtors have access to the goods and services that they need to remain stable and (ii) enabling the Debtors to maintain good relationships with their trade creditors for the benefit of the reorganized debtors when they emerge from chapter 11.  The Debtors do not seek authority to pay all Payable Claims immediately, but only to pay in the ordinary course of business undisputed amounts that come due on terms consistent with

29

prepetition practice. Thus, the relief requested is narrowly tailored to facilitate the fast-tracked chapter 11 reorganization process.

70.     The relief sought is vital for the Debtors' successful reorganization. The Debtors' good relations with their trade creditors is essential to the continued operation of their businesses during the pendency of the Chapter 11 Cases. Furthermore, if the Prepetition Creditors agree to continue supplying the Debtors postpetition under current trade terms, the Debtors will avoid unnecessary expenses during the Chapter 11 Cases. Current trade terms will help the Debtors maintain their liquidity, and will facilitate their ability to sustain operations while reorganizing. Such terms also allow the Debtors to avoid the inherent operational inefficiencies of paying cash on demand and managing billing processes for numerous vendors that require cash in advance or shorten their trade terms.

71.     Finally, paying the Prepetition Creditors in the ordinary course of business minimizes disruption to the Debtors' operations by preventing the initiation of reclamation claims, adversary proceedings, and other motions filed by the Prepetition Creditors seeking payment of their prepetition claims. Because the Chapter 11 Cases are intended to advance under a compressed schedule, and because the Payable Claims are unimpaired under the Plan, paying the Payable Claims in the ordinary course of business renders a savings to the Debtors' estates both monetarily and operationally by preserving liquidity, and enabling the Debtors to operate smoothly during the Chapter 11 Cases. Such relief enables the Debtors to focus on consummating the Plan.

72.     In light of the prepackaged nature of the Chapter 11 Cases, the short duration of time which the Debtors expect to be in bankruptcy, and the fact that the Plan, which was

30

overwhelmingly accepted by creditors entitled to vote thereon, provides that general unsecured claims will be unimpaired and that administrative and priority claims will be paid in full, I believe the relief requested in the All Trade Motion is in the best interests of the Debtors, their estates and all parties in interest and, therefore, the All Trade Motion should be granted.

**Motion of the Debtors for Entry of an Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue in the Ordinary Course of Business their Customer Programs and Practices**

**("Customer Programs Motion")**

73.     The Debtors request, pursuant to sections 105(a), 363, 1107(a) and 1108 of the Bankruptcy Code, that this Court enter an order authorizing the Debtors to (a) continue to perform and honor their obligations under Customer Programs (described below), and (b) continue, renew, replace, implement new and/or terminate Customer Programs as they deem appropriate, in the ordinary course of business, without further order of the Court, in order to maximize the value of the Debtors' estates for the benefit of creditors and other parties in interest.

74.     The Customer Programs include billing adjustments, a replacement policy and the COP. Billing adjustments arise despite the Debtors' best efforts, from time to time, and in the ordinary course of business, when customers are invoiced in error for amounts that they do not actually owe or overpay their obligations to the Debtors. When a customer pays for amounts that are billed in error, the Debtors correct the billing errors through billing adjustments which generally take the form of reimbursements or credits. The Debtors respond to billing adjustment requests on a rolling basis as such requests are received, and rarely are amounts outstanding for extended periods of time.

RLF1 3525250v.1

75. The Debtors' replacement policy provides for replacement of damaged or defective CDs, cassettes or digital players for up to a year from purchase. After the one year window closes, the Debtors replace CDs for $6.95 and cassettes for $5.95 plus shipping. Under the replacement policy the Debtors will also accept returns of any product for a full credit and will replace any audiobook as long as they still retain rights in the audiobook.

76. As more fully described above, approximately 43% of Recorded Books' revenue from public libraries is through its COP. The COP arrangement automatically renews each year and benefits from high customer renewal rates. The new titles at each COP level are selected by Recorded Books and, while the library has the right to return COP titles, such returns have occurred at a rate of less than 4% of library sales historically. The COPs represent a meaningful, recurring revenue stream for the Company. As of December 31, 2008, over 3,000 public libraries held over 10,000 subscriptions to Recorded Books' numerous unique COP programs and such programs contributed approximately 30% of Recorded Books' total revenue in 2008.

77. If the Debtors are prohibited from honoring and maintaining the Customer Programs in a manner that is consistent with their past business practices, then customers' lost confidence in the Debtors will damage the Debtors' businesses to an extent that far exceeds the costs associated with honoring and continuing such practices. At this critical time, the Debtors cannot afford to lose the loyalty of their customers or to be placed at a competitive disadvantage with respect to prospective customers.

78. The relief requested in the Customer Programs Motion is designed to protect the Debtors' goodwill and going concern value during the Chapter 11 Cases. Moreover, I believe the relief requested will enhance the Debtors' ability to generate revenue, thereby directly

32

benefitting the Debtors, their estates and all parties in interest. I, therefore, believe the relief in the Customer Programs Motion should be granted.

**Motion of the Debtors for Entry of an Order Modifying the Automatic Stay to Permit All Pending Litigation to Proceed**

**("Motion to Waive Automatic Stay")**

79.     The Debtors request, pursuant to sections 105(a) and 362(a) of the Bankruptcy Code, that this Court enter an order modifying the automatic stay to permit all pending litigation against the Debtors to proceed.  The Debtors are parties to certain disputes concerning intellectual property rights, as set forth in Exhibit A to the Motion to Waive Automatic Stay. Absent the relief requested, the related actions would be stayed by operation of section 362(a) of the Bankruptcy Code, which could result in delayed adjudication.

80.     The Debtors wish to waive the protections of the automatic stay so that their prepackaged chapter 11 proceedings do not delay the adjudication of their intellectual property rights. I believe the requested relief is not prejudicial to any party in interest and, in fact, benefits the Debtors, their estates and all parties in interest. I, therefore, believe the relief in the Motion to Waive Automatic Stay should be granted.

**Motion of the Debtors for Entry of an Order (I) Authorizing Payment of Certain Prepetition Taxes and (II) Authorizing and Directing Financial Institutions to Honor and Process Related Electronic Transfers and Checks**

**("Tax Motion")**

81.     The Debtors request, pursuant to sections 105(a), 507(a)(8) and 541 of the Bankruptcy Code, that this Court enter an order authorizing, but not directing, the Debtors to pay sales and use taxes, personal and real property taxes, and other similar governmental assessments to various state and local taxing authorities, including all taxes subsequently

RLF1 3525250v.1

determined upon audit, or otherwise, to be owed for periods prior to the Petition Date, and including any penalties and interest thereon. The Debtors also request an order directing all relevant financial institutions to honor related requests.

82.     Payment of these taxes is critical to the Debtors' continued, uninterrupted operations. Nonpayment of these obligations may cause taxing authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the applicable jurisdictions, seeking to modify the automatic stay, and subjecting the Debtors' directors and officers to lawsuits or criminal prosecution, any of which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates.

83.     I believe the authority to pay the taxing authorities in accordance with the Debtors' prepetition business practices should be granted because such relief is in the best interests of the Debtors, their estates and all parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

**Motion of the Debtors for Entry of an Order Establishing Notice and Hearing Procedures for Trading in Equity Securities of the Debtors' Estates**

**("Equity Trading Motion")**

84.     The Debtors request, pursuant to sections 105(a), 362(a) and 541 of the Bankruptcy Code, that this Court enter an order (i) establishing notice and hearing procedures that must be satisfied before certain transfers of equity securities in Holdings ("Holdings Stock") or of any beneficial interest therein are deemed effective and (ii) allowing for any party with proper standing to raise a timely objection.

34

85. The Debtors have recently incurred and are currently incurring, significant net operating losses ("NOLs"). As a result of past and current operations, the Debtors have valuable tax attributes, including, without limitation, available NOL carryforwards in excess of $112 million (not including NOLs resulting from 2009) (collectively, the "Tax Attributes"). These Tax Attributes could translate into potential future tax savings for the Debtors of approximately $39.2 million based on a federal income tax rate of 35% (excluding savings from the use of NOLs resulting from 2009). Such NOL's may also be available to the Debtors to offset taxable income generated by transactions completed during the Chapter 11 Cases.

86. Unrestricted trading of Holdings Stock could adversely affect the Debtors' Tax Attributes if too many 5% or greater blocks of Holdings Stock are created or too many shares are added to or sold from such blocks, such that, together with previous trading by any person holding five percent or more of the stock of Holdings at any time during the preceding three-year or shorter period, as applicable, an "ownership change" within the meaning of section 382 of title 26 of the United States Code, the Internal Revenue Code of 1986, as amended, is triggered prior to consummation and outside of the terms of a confirmed chapter 11 plan.

87. The relief requested in the Equity Trading Motion will enable the Debtors to monitor and object to changes in ownership of Holdings Stock to preserve and maximize the Debtors' ability to reduce federal income taxes by offsetting their income earned after reorganization with Tax Attributes. If no trading restrictions are imposed by this Court, unrestricted trading or transfers of Holdings Stock could severely limit or even eliminate the Debtors' ability to use their Tax Attributes, a valuable asset of the Debtors' estates, and could have significant negative consequences for the Debtors, their estates and the overall reorganization process. Moreover, in the absence of the relief requested in the Equity Trading

35

Motion, the Debtors could be irreparably harmed by the mere filing of said First Day Motion because trading in stock of the Debtors could immediately follow. Parties holding such stock might rush to transfer their stock before the restrictions on such trading are imposed by this Court. Such trading would put the Tax Attributes in jeopardy and would therefore harm the Debtors' ability to utilize the Tax Attributes as part of a successful reorganization. Accordingly, I believe that there is an immediate need to establish the notice and hearing provisions regarding trading in equity securities, as detailed in the Equity Trading Motion.

## VI.
## CONCLUSION

88.     The relief requested in the each of the First Day Motions is necessary, appropriate and in the best interests of the Debtors and their estates, employees, customers, vendors, creditors and other parties in interest. This relief is further supported by the prepackaged nature of the Chapter 11 Cases. As set forth above and in the Voting Affidavit, the Debtors' successful prepetition solicitation of votes, and the overwhelming support for the Plan by the creditors, as demonstrated by their votes, speaks to the merit of the proposed financial restructuring that is contemplated by the Plan. The Plan not only achieves a dramatic reduction of the Debtors' debt, it also provides for the reinstatement and payment in full of claims of trade vendors, common carriers, service providers, customers, employees, and the vast majority of other unsecured creditors.    Thus, the most critical and complex task involved in effecting a successful restructuring pursuant to chapter 11 – the negotiation and formulation of a chapter 11 plan – has already been accomplished to the satisfaction of the parties voting in favor of the Plan.

RLF1 3525250v.1

I respectfully request that the Court grant all relief requested in the First Day Motions and such and other further relief as may be just.

Dated: January 11, 2010

Paul J. Crecca
President and Chief Executive Officer of Haights
Cross Communications, Inc. and Haights Cross
Operating Company and Manager of Recorded
Books, LLC, Triumph Learning, LLC and SNEP,
LLC