THIS SOLICITATION IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF A PLAN OF REORGANIZATION *BEFORE* THE FILING OF VOLUNTARY REORGANIZATION CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. HAIGHTS CROSS COMMUNICATIONS, INC. AND ITS DIRECT AND INDIRECT U.S. SUBSIDIARIES HAVE NOT FILED FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR APPROVED BY THE BANKRUPTCY COURT OR THE SECURITIES AND EXCHANGE COMMISSION. IN THE EVENT THAT THESE COMPANIES FILE PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND SEEK CONFIRMATION OF THE JOINT PREPACKAGED PLAN OF REORGANIZATION DESCRIBED HEREIN, THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL.

## DISCLOSURE STATEMENT, DATED DECEMBER 4, 2009

Solicitation of Votes with Respect to the
Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of:

# HAIGHTS CROSS COMMUNICATIONS, INC.

and each of its wholly owned direct and indirect U.S. subsidiaries Haights Cross Operating Company, Recorded Books, LLC, Triumph Learning, LLC and SNEP, LLC from Lenders and Holders of:

Credit Agreement Dated as of August 15, 2008
11 ¾% Senior Notes Due 2011
12 ½% Senior Discount Notes Due 2011

THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PREPACKAGED
PLAN OF REORGANIZATION IS 11:59 P.M.,
NEW YORK CITY TIME, ON JANUARY 4, 2010,
UNLESS EXTENDED BY THE COMPANY.

| RECOMMENDATION BY THE COMPANY: |
| --- |
| The Boards of Directors (or the equivalent authorized body) of the Prospective Debtors have approved the solicitation, the Joint Prepackaged Plan of Reorganization, and the transactions contemplated thereby, and recommend that all creditors whose votes are being solicited submit ballots to accept the Joint Prepackaged Plan of Reorganization. |

The Prospective Debtors hereby solicit from (a) Lenders under that certain Credit Agreement, dated as of August 15, 2008, as amended, by and among Haights Cross Operating Company, as borrower, the guarantors party thereto, including Haights Cross Communications, Inc., and The Bank of New York Mellon, as administrative agent on behalf of the Lenders party

thereto from time to time, (b) Holders of Haights Cross Operating Company's 11 ¾% Senior Notes due 2011 and (c) Holders of Haights Cross Communications, Inc.'s 12 ½% Senior Discount Notes due 2011, votes to accept or reject the Prospective Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code. All capitalized terms used herein shall have the meanings ascribed to them in Annex II hereto.[1] A copy of the Plan is attached hereto as Exhibit A.

ONLY HOLDERS OF SECURED CREDIT AGREEMENT CLAIMS, SENIOR NOTE CLAIMS, SENIOR DISCOUNT NOTE CLAIMS AND EQUITY INTERESTS IN HOLDINGS ARE IMPAIRED UNDER THE PLAN.

**VOTES ON THE PLAN ARE BEING SOLICITED ONLY FROM HOLDERS OF SECURED CREDIT AGREEMENT CLAIMS, SENIOR NOTE CLAIMS AND SENIOR DISCOUNT NOTE CLAIMS – ONLY HOLDERS OF SUCH CLAIMS AS OF THE DECEMBER 4, 2009 VOTING RECORD DATE ARE ENTITLED TO VOTE ON THE PLAN. THE VOTING DEADLINE IS JANUARY 4, 2010. WE RESERVE THE RIGHT TO ESTABLISH A LATER VOTING RECORD DATE IN THE EVENT THAT WE DECIDE TO EXTEND THE VOTING DEADLINE. VOTES ARE NOT BEING SOLICITED FROM HOLDERS OF EQUITY INTERESTS IN HOLDINGS OR FROM ANY OF THE PROSPECTIVE DEBTORS' OTHER CREDITORS.**

**HOLDERS OF OTHER PRIORITY CLAIMS, GENERAL UNSECURED CLAIMS, INCLUDING HOLDERS OF PREPETITION TRADE CLAIMS, CUSTOMERS AND EMPLOYEES, AND INTERCOMPANY CLAIMS WILL NOT BE IMPAIRED BY THE PLAN, AND AS A RESULT, THE RIGHT TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS IS NOT ALTERED BY THE PLAN. DURING THE CHAPTER 11 CASES, WE INTEND TO OPERATE OUR BUSINESS IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL OF OUR GENERAL UNSECURED CREDITORS, INCLUDING ALL TRADE CREDITORS, CUSTOMERS AND EMPLOYEES, OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.**

**AS EXPLAINED BELOW IN GREATER DETAIL, THE PLAN SUPPORT PARTIES, WHICH ARE HOLDERS OF 100% OF THE OUTSTANDING PRINCIPAL AMOUNT UNDER THE SECURED CREDIT AGREEMENT, APPROXIMATELY 80% OF THE OUTSTANDING PRINCIPAL AMOUNT OF THE SENIOR NOTES AND APPROXIMATELY 13% OF THE OUTSTANDING PRINCIPAL AMOUNT OF THE SENIOR DISCOUNT NOTES, ALREADY HAVE AGREED TO VOTE TO ACCEPT THE PLAN, IN ACCORDANCE WITH THE TERMS OF THE PLAN SUPPORT AGREEMENT. THE BOARD OF DIRECTORS (OR THE EQUIVALENT**

---

[1] The Prospective Debtors, as defined in Annex II, shall be referred to herein collectively either as the "Debtors" or the "Prospective Debtors," and together with their non-Debtor affiliates as the "Company." The terms "we," "our" and "us" refer to the Company, the Debtors or the Prospective Debtors, as the context requires.

AUTHORIZED BODY) OF EACH OF THE PROSPECTIVE DEBTORS HAS APPROVED THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. THE BOARD OF DIRECTORS (OR THE EQUIVALENT AUTHORIZED BODIES) OF THE PROSPECTIVE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SUBMIT BALLOTS TO ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING MATERIALS ARE BEING SENT TO HOLDERS OF SECURED CREDIT AGREEMENT CLAIMS, SENIOR NOTE CLAIMS AND SENIOR DISCOUNT NOTE CLAIMS WHO WERE REGISTERED HOLDERS AS OF THE VOTING RECORD DATE.

# TABLE OF CONTENTS

GENERAL BACKGROUND ........................................................................................................ 1
I.     VOTING PROCEDURES AND REQUIREMENTS ............................................................. 26
    A.     *Ballots* ........................................................................................................... 26
    B.     *Procedures for Subscribing to Rights Offering* ........................................... 27
    C.     *Procedures for Casting and Deadlines for Voting on the Plan* .................... 27
    D.     *Parties Entitled to Vote on the Plan* ............................................................ 28
    E.     *Counting of Ballots and Master Ballots for Determining Acceptance of the Plan* .......... 29
II.     RISK FACTORS ................................................................................................................ 31
    A.     *Risks Relating to the Chapter 11 Cases* ..................................................... 31
        1.     *General* ............................................................................................. 31
        2.     *Failure to Satisfy Vote Requirement* ................................................ 31
        3.     *Method of Solicitation* ...................................................................... 31
        4.     *Risks Associated with Resolicitation* ................................................ 32
        5.     *Classification and Treatment of Claims and Equity Interests* .......... 32
        6.     *Nonacceptance of the Plan—Confirmation by Nonconsensual "Cram Down"* ........ 33
        7.     *Certain Risks of Nonconfirmation or Delay of Confirmation* ........... 33
        8.     *Alternatives to Confirmation and Consummation of the Plan* .......... 34
        9.     *Risk of Nonoccurrence of the Effective Date* ................................... 34
        10.     *Termination Rights Under Plan Support Agreement* ......................... 35
        11.     *Inability to Assume Certain Contracts* .............................................. 35
    B.     *Factors Affecting the Value of the Securities to Be Issued Under the Plan of Reorganization* .......... 35
        1.     *Capital Requirements* ....................................................................... 35
        2.     *Variances From Projections* ............................................................. 36
        3.     *Recovery Percentages May Differ From Estimates* .......................... 36
        4.     *Lack of Trading Market for New Securities and Restrictions on Transfer of New Securities* ........ 36
        5.     *Dividends on New Securities* ............................................................ 37
        6.     *Ownership of Voting Stock.* .............................................................. 37
        7.     *Collateral Securing New First Lien Notes and New Second Lien Notes* ........... 38
        8.     *Subordination of the Second Lien Notes* .......................................... 38
        9.     *Covenants under the indentures governing the New Notes and under any future debt agreements restrict our future operations.* ........... 40
        10.     *The imposition of certain permitted liens could adversely affect the value of the collateral.* ........... 41
        11.     *The collateral is subject to casualty risks.* ...................................... 41
        12.     *Rights of holders of New Notes in the collateral may be adversely affected by bankruptcy proceedings.* ........... 41
        13.     *Any future pledge of collateral might be avoidable in bankruptcy.* .................... 42
        14.     *Rights of holders of New Notes in the collateral may be adversely affected by the failure to perfect security interests in certain collateral acquired in the future.* ........... 42
        15.     *We will in most cases have control over the collateral, and the sale of particular assets by us could reduce the pool of assets securing the New Notes and the related guarantees thereof.* ........... 42

|  | 16. | There are certain categories of property that are excluded from the collateral. | 43 |
|  | 17. | Ranking of New Common Stock | 43 |
| C. | | Risks Relating to the Company's Financial Condition and Business | 43 |
|  | 1. | Leverage and Debt Service | 43 |
|  | 2. | Floating Rate Indebtedness | 44 |
|  | 3. | Enforcement of Defaults by Entities Not Party to the Plan Support Agreement | 45 |
|  | 4. | Treatment of Trade Vendors and Other Unsecured Claims in the Chapter 11 Cases and Risk of Failure to Obtain Authority to Pay Their Claims in the Ordinary Course of Business | 45 |
|  | 5. | Disruption of Operations and Retention of Key Customers and Key Employees | 46 |
|  | 6. | The recent U.S. financial turmoil and associated economic downturn has and may continue to harm our Test-prep and Intervention and Library businesses and prospects. | 46 |
|  | 7. | We may be unable to compete successfully in our highly competitive industry. | 47 |
|  | 8. | We have a history of losses, which we expect to continue, and we might not ever achieve or maintain profitability. | 47 |
|  | 9. | We may be required to reduce the value of our inventory, long-lived assets and/or goodwill, which could materially adversely affect our financial condition and results of operations. | 48 |
|  | 10. | Misuse, misappropriation or other loss of our proprietary rights could have a material adverse effect on our results of operations. | 48 |
|  | 11. | We may have to defend against intellectual property infringement claims and other claims that may cause us to incur significant costs and may divert management attention. | 48 |
|  | 12. | Growth of multimedia products may compete with and reduce our publishing activities. | 49 |
|  | 13. | Technological changes may reduce our sale of products | 49 |
|  | 14. | Our business may be adversely affected by an increase in paper or postage costs. | 50 |
|  | 15. | Our success depends in large part on our ability to update and expand the content of existing products and develop new products in a cost-effective manner and on a timely basis. | 50 |
|  | 16. | If the federal NCLB Act is materially changed, repealed, or found unconstitutional, our revenue and profitability could be adversely affected | 50 |
|  | 17. | If there is a substantial reduction in the emphasis placed by federal and state governments on assessment and remediation in K-12 education, our business may be adversely affected. | 50 |
|  | 18. | We are dependent on a limited number of suppliers and service providers, and any interruption of supply or services from these vendors could have a material adverse effect on our operations. | 51 |
|  | 19. | Disruption in our distribution centers could significantly lower our revenues and profitability. | 51 |
|  | 20. | We are dependent upon a central computer system and if we experience damage, service interruptions or failures in this system, or if our security measures are breached, our customer relationships and our ability to attract new customers may be adversely affected. | 51 |
| III. | | BACKGROUND AND EVENTS LEADING UP TO THE SOLICITATION | 52 |

|   | A. | Background | 52 |
|   | B. | Equity Ownership and Debt Structure | 55 |
|   |   | 1. Equity Ownership Structure | 55 |
|   |   | 2. Debt Structure | 55 |
| IV. |   | THE BUSINESS | 57 |
|   | A. | General | 57 |
|   | B. | Products | 57 |
|   |   | 1. Test-prep and Intervention | 57 |
|   |   | 2. Library | 60 |
|   | C. | Seasonality | 61 |
|   | D. | Customers | 61 |
|   |   | 1. Test-prep and Intervention | 61 |
|   |   | 2. Library | 61 |
|   | E. | Product and Content Development | 61 |
|   |   | 1. Test-prep and Intervention | 62 |
|   |   | 2. Library | 63 |
|   | F. | Sales and Marketing | 64 |
|   |   | 1. Test-prep and Intervention | 64 |
|   |   | 2. Library | 65 |
|   | G. | Competition | 65 |
|   |   | 1. Test-prep and Intervention | 65 |
|   |   | 2. Library | 66 |
|   | H. | Production and Fulfillment | 66 |
|   | I. | Intellectual Property | 66 |
|   | J. | Executive Officers | 67 |
|   | K. | Employees | 69 |
|   | L. | Properties | 69 |
|   | M. | Environmental Regulation | 70 |
|   | N. | Legal Proceedings | 70 |
| V. |   | THE PLAN – CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION | 71 |
|   | A. | Overview of Chapter 11 | 71 |
|   | B. | Administrative Expense Claims, Priority Tax Claims and Other Unclassified Claims | 71 |
|   |   | 1. Administrative Expense Claims | 71 |
|   |   | 2. Ordinary Course Liabilities | 71 |
|   |   | 3. Priority Tax Claims | 72 |
|   |   | 4. Professional Fees | 72 |
|   |   | 5. Prepetition Indenture Trustee Fees and Expenses | 72 |
|   | C. | Classification of Claims and Equity Interests | 73 |
|   | D. | Treatment of Claims and Equity Interests | 75 |
|   |   | 1. Treatment of Claims and Equity Interests | 75 |
|   |   | 2. Confirmation Pursuant to 1129(b) of the Bankruptcy Code | 80 |
|   |   | 3. Special Provision Regarding Unimpaired Claims | 80 |
|   |   | 4. Issuances Subject to Future Dilution | 80 |
|   | E. | Means of Implementation of Plan | 80 |
|   |   | 1. Compromise of Controversies | 80 |
|   |   | 2. Guarantees | 81 |
|   |   | 3. Vesting of Assets | 81 |
|   |   | 4. Continued Corporate Existence and New Constituent Documents | 81 |
|   |   | 5. Cancellation of Notes, Instruments, Debentures, Equity Interests and Liens | 82 |
|   |   | 6. Directors and Officers of the Reorganized Debtors | 83 |
|   |   | 7. Corporate Action | 83 |

|  |  | 8. | Sources of Cash for Plan Distribution | 84 |
|  |  | 9. | Restructuring Transactions | 84 |
|  |  | 10. | Voting Agreement | 84 |
| VI. | | THE PLAN – OTHER PROVISIONS | | 86 |
|  | A. | | Treatment of Executory Contracts and Unexpired Leases | 86 |
|  |  | 1. | Assumption and Cure of Executory Contracts and Unexpired Leases | 86 |
|  |  | 2. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 87 |
|  |  | 3. | Indemnification of Directors, Officers and Employees | 87 |
|  |  | 4. | Compensation and Benefit Programs | 88 |
|  |  | 5. | Termination of Prepetition Equity Agreements | 88 |
|  | B. | | Provisions Governing Distributions | 88 |
|  |  | 1. | Date of Distributions | 88 |
|  |  | 2. | Interest On Claims | 88 |
|  |  | 3. | Disbursing Agent | 89 |
|  |  | 4. | Mandatory Exchange Date | 89 |
|  |  | 5. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 89 |
|  |  | 6. | Setoff and Recoupment | 90 |
|  |  | 7. | Surrender of Cancelled Instruments or Securities | 90 |
|  |  | 8. | Lost, Stolen, Mutilated or Destroyed Debt or Equity Securities | 91 |
|  | C. | | Procedures for Resolving Disputed Claims | 91 |
|  |  | 1. | Prosecution of Objections to Claims; Distributions | 91 |
|  |  | 2. | Estimation of Claims | 92 |
|  | D. | | Conditions Precedent to Confirmation and Effective Date of the Plan | 92 |
|  |  | 1. | Conditions Precedent to Confirmation | 92 |
|  |  | 2. | Conditions Precedent to the Effective Date and Waiver of Conditions | 92 |
|  |  | 3. | Modification of Plan | 93 |
|  |  | 4. | Effect of Withdrawal or Revocation and Reservation of Rights | 94 |
|  |  | 5. | Substantial Consummation of Plan | 94 |
|  | E. | | Effect of Plan Confirmation | 94 |
|  |  | 1. | Binding Effect | 94 |
|  |  | 2. | Discharge of Claims | 94 |
|  |  | 3. | Releases | 95 |
|  |  | 4. | Exculpation and Limitation of Liability | 96 |
|  |  | 5. | Injunction | 96 |
|  |  | 6. | Term of Bankruptcy Injunction or Stays | 97 |
|  |  | 7. | Termination of Subordination Rights and Settlement of Related Claims | 97 |
|  |  | 8. | Preservation of Rights of Action | 97 |
|  | F. | | Retention of Jurisdiction | 98 |
|  | G. | | Miscellaneous Provisions | 100 |
|  |  | 1. | Payment of Statutory Fees | 100 |
|  |  | 2. | Section 1145 Exemption | 100 |
|  |  | 3. | Governing Law | 100 |
|  |  | 4. | Severability of Plan Provisions | 100 |
|  |  | 5. | Inconsistency | 101 |
|  |  | 6. | Section 1125(e) of the Bankruptcy Code | 101 |
|  |  | 7. | Exemption from Certain Transfer Taxes | 101 |
|  |  | 8. | Tax Reporting, Withholding and Compliance | 101 |
|  |  | 9. | Schedules and Exhibits | 102 |
|  |  | 10. | No Prejudice | 102 |
|  |  | 11. | Allocation of Payments | 102 |
|  |  | 12. | Terms of Injunctions Or Stay | 102 |

| VII. | | RIGHTS OFFERING | 103 |
|---|---|---|---|
| | A. | *Issuance of Senior Discount Note Rights* | 103 |
| | B. | *Solicitation of Institutional Accredited Investors Only* | 103 |
| | C. | *Rights Offering Amount* | 104 |
| | D. | *Exercise Price* | 104 |
| | E. | *Exercise of Senior Discount Note Rights* | 105 |
| | F. | *Transfer and Revocation of Senior Discount Note Rights* | 107 |
| | G. | *Use of Proceeds of the Rights Offering* | 107 |
| VIII. | | DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS RELATED TO THE PLAN | 107 |
| | A. | *Description of the New First Lien Notes* | 107 |
| | B. | *Description of the New Second Lien Notes* | 114 |
| | C. | *Description of New Common Stock, Exit Warrants and Reorganized Holdings Certificate of Incorporation* | 122 |
| | | 1. *Description of New Common Stock* | 122 |
| | | 2. *Description of Exit Warrants* | 123 |
| | | 3. *Description of Reorganized Holdings Certificate of Incorporation* | 124 |
| | D. | *Description of Registration Rights Agreement* | 126 |
| | E. | *Description of Intercreditor Agreement* | 126 |
| | F. | *Description of Voting Agreement* | 126 |
| | G. | *Description of Certain Retention Agreements with Financial Advisors* | 127 |
| | H. | *Effect of Proposed Restructuring Transactions on Management Agreements* | 128 |
| IX. | | POST-REORGANIZATION CAPITAL STRUCTURE | 129 |
| X. | | PROJECTIONS AND VALUATION ANALYSIS | 130 |
| | A. | *Consolidated Condensed Projected Financial Statements* | 130 |
| | | 1. *Responsibility for and Purpose of the Projections* | 130 |
| | | 2. *Pro Forma Financial Projections* | 130 |
| | | 3. *General Assumptions* | 132 |
| | B. | *Valuation* | 139 |
| | | 1. *Valuation Methodology* | 142 |
| XI. | | THE BEST INTERESTS TEST / LIQUIDATION ANALYSIS | 144 |
| | A. | *The Best Interests Test* | 144 |
| | B. | *Liquidation Analysis* | 145 |
| | | 1. *Hypothetical Ch. 7 Liquidation Analysis - Haights Cross Communications, Inc.* | 146 |
| | | 2. *Hypothetical Ch. 7 Liquidation Analysis - Haights Cross Operating Company* | 148 |
| | | 3. *Footnotes to Liquidation Analysis* | 149 |
| XII. | | CERTAIN OTHER LEGAL CONSIDERATIONS | 153 |
| | A. | *Solicitation of Votes Prior to Commencement of Chapter 11 Cases* | 153 |
| | | 1. *Section 3(a)(9) of the Securities Act* | 153 |
| | | 2. *Section 4(2) of the Securities Act* | 153 |
| | B. | *Sales of Securities and Section 4(2) of the Securities Act* | 153 |
| | C. | *Offers and Sales under Section 1145 of the Bankruptcy Code* | 153 |
| | | 1. *Initial Offer and Sale of Securities* | 153 |
| | | 2. *Subsequent Transfers of Securities* | 154 |
| | | 3. *Subsequent Transfers Under State Law* | 155 |
| XIII. | | CERTAIN FEDERAL INCOME TAX CONSIDERATIONS | 156 |
| | A. | *Tax Consequences to the Company* | 157 |
| | | 1. *Cancellation of Debt ("COD") Income* | 157 |

| | | 2. | Applicable High Yield Discount Obligations – Limitation on Interest Deductions | 158 |
| | | 3. | Section 382 Limitation | 158 |
| | | 4. | Alternative Minimum Tax | 160 |
| | B. | | Tax Consequences to the Impaired Lenders and Impaired Noteholders | 160 |
| | | 1. | Exchange of the Secured Credit Agreement Claims for Cash or New First Lien Notes | 160 |
| | | 2. | Exchange of the Senior Note Claims for New Second Lien Notes, New Common Stock, Senior Note Cash Consideration, if any, Rights Offering Proceeds, if any | 162 |
| | | 3. | Exchange of the Senior Discount Note Claims for New Common Stock and Exit Warrants | 166 |
| | | 4. | Original Issue Discount ("OID") | 168 |
| | 5. | | Backup Withholding | 170 |
| XIV. | | | THE ANTICIPATED CHAPTER 11 CASES OF THE PROSPECTIVE DEBTORS | 171 |
| | A. | | First Day Orders | 171 |
| | | 1. | Provisions for Employees | 171 |
| | | 2. | Trade Vendors and Other Unsecured Creditors | 171 |
| | | 3. | Cash Management | 171 |
| | | 4. | Cash Collateral | 172 |
| | | 5. | Taxes | 172 |
| | | 6. | Net Operating Loss Trading | 172 |
| | | 7. | Insurance | 172 |
| | | 8. | Utility Service | 172 |
| | | 9. | Scheduling Order | 172 |
| | | 10. | Joint Administration | 172 |
| | | 11. | Relief from Filing Deadline for Schedules | 173 |
| | | 12. | Retention of Professionals | 173 |
| XV. | | | CONFIRMATION | 174 |
| | A. | | Confirmation Hearing | 174 |
| | B. | | Requirements for Confirmation | 174 |
| | C. | | Class Acceptance of the Plan | 174 |
| | D. | | Nonconsensual Confirmation | 175 |
| | E. | | Plan Meets Requirements for Confirmation | 175 |
| | | 1. | Best Interests of Creditors—Liquidation Analysis | 175 |
| | | 2. | Feasibility of the Plan | 176 |
| | F. | | Alternatives to Confirmation and Consummation of the Plan | 177 |
| | | 1. | Alternative Plans of Reorganization | 177 |
| | | 2. | Dismissal of the Prospective Debtors' Chapter 11 Cases | 177 |
| | | 3. | Liquidation Under Chapter 7 or Chapter 11 | 177 |
| | | | RECOMMENDATION AND CONCLUSION | 179 |

ANNEXES

    I.  List of Prospective Debtors
   II.  Definitions


EXHIBITS

    A.  Plan of Reorganization
    B.  Plan Support Agreement (Redacted)
    C.  Reorganized Holdings Certificate of Incorporation
    D.  Term Sheet for the Registration Rights Agreement
    E.  Voting Agreement
    F.  New First Lien Note Indenture
    G.  New Second Lien Note Indenture
    H.  Third Quarter 2009 Financial Statements and Management Discussion & Analysis
    I.  Intercreditor Agreement
    J.  Projections

## GENERAL BACKGROUND

We negotiated the terms of the Plan with the Plan Support Parties. As a result of such negotiations, the Plan Support Parties entered into the Plan Support Agreement, pursuant to which, among other things, the Plan Support Parties agreed, subject to the terms of the Plan Support Agreement, to vote to accept the Plan. A redacted copy of the Plan Support Agreement is attached hereto as Exhibit B. The Plan Support Parties have informed us that, as of the date of the Plan Support Agreement, collectively they held or controlled 100% of the outstanding principal amount under the Secured Credit Agreement, approximately 80% of the outstanding principal amount of the Senior Notes and approximately 13% of the outstanding principal amount of the Senior Discount Notes. As a result, 100% of the dollar value and 100% in number of the Class 2 Claims, approximately 80% of the dollar value of Class 4 Claims and 13% of the dollar value of Class 5 Claims have agreed to vote in favor of the Plan in accordance with the terms of the Plan Support Agreement.

**THE PLAN SUPPORT PARTIES SUPPORT THE PROPOSED FINANCIAL RESTRUCTURING DESCRIBED HEREIN AND HAVE AGREED TO VOTE TO ACCEPT THE PLAN, SUBJECT TO THE TERMS OF THE PLAN SUPPORT AGREEMENT.**

If the Plan is confirmed and becomes effective, the Secured Credit Agreement Claims would be exchanged, in full satisfaction of all obligations thereunder, for Cash in an amount equal to the aggregate amount of such Claims; provided, however, that in the event the Prospective Debtors, notwithstanding their commercially reasonable best efforts, are unable to consummate the Alternative Financing, the Secured Credit Agreement Claims would be exchanged for (a) New First Lien Notes and (b) Cash equal to the difference between (x) the aggregate amount of Secured Credit Agreement Claims and (y) the aggregate principal amount of the New First Lien Notes. The Senior Note Claims would be exchanged, in full satisfaction of all obligations thereunder, for (a) New Second Lien Notes, (b) the Senior Note Stock Consideration (subject to adjustment for rounding of fractional shares), (c) any Senior Note Cash Consideration and (d) any Rights Offering Proceeds; provided, however, that if the class representing the Senior Discount Note Claims has not voted to accept the Plan, the Senior Note Claims would be exchanged, in full satisfaction of all obligations thereunder, for (a) New Second Lien Notes, (b) 9,000,000 shares of New Common Stock (subject to adjustment for rounding of fractional shares), which amount shall be equal to 100% of the total number of shares of New Common Stock issued under the Plan and (c) any Senior Note Cash Consideration. So long as the class representing the Senior Discount Note Claims has voted to accept the Plan, the Senior Discount Note Claims would be exchanged, in full satisfaction of all obligations thereunder, for a pro-rata distribution of: (a) 720,000 shares of New Common Stock (subject to adjustment for rounding of fractional shares), which amount shall be equal to approximately 8% of the total number of shares of New Common Stock issued under the Plan and (b) Exit Warrants. If, however, the class representing the Senior Discount Note Claims does not vote to accept the Plan, then the Holders of such Senior Discount Note Claims would receive nothing. On the Effective Date, all Equity Interests in Holdings will be cancelled or extinguished. All other classified Claims and Equity Interests that are Allowed will be Unimpaired.

All of the capital stock rights described above will be subject to dilution upon issuance of the Exit Warrants and/or future issuances, including management awards.

We do not believe that Reorganized Holdings will be immediately subject to reporting requirements under the Exchange Act following the Effective Date.

As of the date hereof, none of the Prospective Debtors are under the jurisdiction of the Bankruptcy Court. If we receive the requisite acceptances of the Plan from Impaired Lenders and Impaired Noteholders in number and dollar amount to satisfy the requirements for acceptance of the Plan in accordance with the Bankruptcy Code, we intend to commence the Chapter 11 Cases and to seek confirmation of the Plan by the Bankruptcy Court promptly thereafter. The confirmation of the Plan is subject to, among other things, judicial approval of this Disclosure Statement and the Plan. If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Impaired Lenders and Impaired Noteholders (including, in each case, those who do not submit Ballots, those who submit Ballots to reject the Plan and those whose Ballots are rejected because they are illegible, incomplete or unsigned) will be bound by the Plan and the transactions contemplated thereby.

**DURING THE CHAPTER 11 CASES, WE INTEND TO OPERATE OUR BUSINESS IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL OF OUR GENERAL UNSECURED CREDITORS, INCLUDING ALL TRADE CREDITORS, CUSTOMERS AND EMPLOYEES, OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.**

We believe that confirmation of the Plan is in the best interests of creditors and other parties in interest, and, therefore, that the Plan should be confirmed. **The Prospective Debtors recommend that all eligible parties vote to accept the Plan.**

This Disclosure Statement and the Plan (and all exhibits, schedules and appendices hereto and thereto), the accompanying forms of Ballot and Master Ballot, and the related materials delivered together herewith are being furnished to Impaired Lenders pursuant to section 4(2) of the Securities Act and section 1126(b) of the Bankruptcy Code and to Impaired Noteholders pursuant to section 3(a)(9) of the Securities Act and section 1126(b) of the Bankruptcy Code, in connection with the solicitation of votes to accept or reject the Plan (and the transactions contemplated thereby, as described herein).

The Voting Agent for the Plan is:

Globic Advisors, Inc.
One Liberty Plaza, 23rd Floor
New York, NY 10006
Attention: Robert Stevens
Banks and Brokers call: 212-201-5346
Toll-Free: 1-800-974-5771
Facsimile: 212-271-3252


The Company's legal advisor is Brown Rudnick LLP. They can be contacted at:

Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Attention: Steven D. Pohl, Esq.
Telephone: (617) 856-8200
Facsimile: (617) 856-8201


The legal advisor to the Informal Committee of Senior Notes is Shearman & Sterling LLP.
They can be contacted at:

Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
Attention:
Andrew V. Tenzer, Esq.
Michael H. Torkin, Esq.
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

The solicitation of votes on the Plan will be made in reliance on the exemption from the registration requirements of the Securities Act provided by section 3(a)(9) thereof with respect to Impaired Noteholders and section 4(2) thereof with respect to Impaired Lenders. The offer and sale of New Common Stock pursuant to the Rights Offering is and will be made in reliance on the exemption from the registration requirements of the Securities Act provided by section 4(2) thereof. Except for the New Common Stock issued pursuant to the Rights Offering, each of the new securities issued in accordance with the Plan (*i.e.*, the shares of New Common Stock, the Exit Warrants (and the shares of New Common Stock issued upon exercise thereof), the New First Lien Notes and the New Second Lien Notes), will be issued pursuant to the exemption from the registration requirements of the Securities Act provided by section 1145 of the Bankruptcy Code.

**THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE NEW SECURITIES TO BE ISSUED ON THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SEC OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER THE SECURITIES ACT OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.**

**AS A RESULT OF THESE FACTORS AND THE TRANSFER RESTRICTIONS DESCRIBED HEREIN THERE MAY NOT BE ANY LIQUID MARKET FOR THE NEW SECURITIES AND WE CANNOT ASSURE THAT ANY MARKET WILL EVER DEVELOP. THE REORGANIZED DEBTORS WILL NOT BE OBLIGATED TO COMPLETE ANY PUBLIC OFFERING FOLLOWING THE EFFECTIVE DATE OF THE PLAN (OTHER THAN AS MAY BE REQUIRED UNDER THE REGISTRATION RIGHTS AGREEMENT).**

**THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PARTY DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.**

**EACH IMPAIRED LENDER AND IMPAIRED NOTEHOLDER SHOULD REVIEW THIS DISCLOSURE STATEMENT AND THE PLAN AND ALL EXHIBITS HERETO AND THERETO BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. WE BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED; HOWEVER, SUCH SUMMARIES ARE**

QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THOSE DOCUMENTS AND AS OTHERWISE PROVIDED HEREIN.

THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING US AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS, INCLUDING THOSE SUMMARIZED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO EXCHANGE OR SELL, OR THE SOLICITATION OF AN OFFER TO EXCHANGE OR BUY, ANY SECURITIES THAT MAY BE DEEMED TO BE OFFERED HEREBY WITH RESPECT TO ANY HOLDER OF A SECURED CREDIT AGREEMENT CLAIM OR SENIOR DISCOUNT NOTE CLAIM (WITH RESPECT TO THE RIGHTS OFFERING) THAT IS NOT AN "ACCREDITED INVESTOR" AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT. ANY BALLOT SUBMITTED BY A HOLDER OF A SECURED CREDIT AGREEMENT CLAIM THAT IS NOT AN "ACCREDITED INVESTOR" WILL BE DEEMED A REJECTION OF THE PLAN FOR PURPOSES OF DETERMINING WHETHER REQUISITE VOTES FOR ACCEPTANCES OF THE PLAN HAVE BEEN RECEIVED. ANY SUBSCRIPTION FORM SUBMITTED BY A HOLDER OF A SENIOR DISCOUNT NOTE CLAIM THAT IS NOT AN INSTITUTIONAL "ACCREDITED INVESTOR" WILL BE DEEMED NULL AND VOID. IN ANY STATE OR OTHER JURISDICTION (DOMESTIC OR FOREIGN) IN WHICH ANY SECURITIES THAT MAY BE DEEMED TO BE OFFERED HEREBY ARE REQUIRED TO BE QUALIFIED FOR OFFERING IN SUCH JURISDICTION, NO OFFER IS HEREBY BEING MADE TO, AND THE RECEIPT OF BALLOTS OR SUBSCRIPTION FORMS WILL NOT BE ACCEPTED FROM, RESIDENTS OF SUCH JURISDICTION UNLESS AND UNTIL SUCH REQUIREMENTS, IN THE SOLE AND FINAL DETERMINATION OF THE PROSPECTIVE DEBTORS, HAVE BEEN FULLY SATISFIED. UNTIL SUCH TIME, ANY BALLOT SUBMITTED WITH RESPECT TO ANY SUCH CREDITOR WILL BE DEEMED NULL AND VOID AND WILL NOT CONSTITUTE A REJECTION OR ACCEPTANCE FOR PURPOSES OF DETERMINING WHETHER REQUISITE VOTES FOR ACCEPTANCE OF THE PLAN HAVE BEEN RECEIVED AND ANY SUBSCRIPTION FORM SUBMITTED WITH RESPECT TO ANY SUCH CREDITOR WILL BE DEEMED NULL AND VOID.

ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN, OR CONTEMPLATED BY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. SUCH PROJECTIONS AND STATEMENTS ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE COMPANY AND SHOULD NOT BE REGARDED AS REPRESENTATIONS BY US, OUR ADVISORS OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED. THERE CAN BE NO ASSURANCE THAT OUR ACTUAL

ABILITY TO COVER OUR FUTURE PRINCIPAL AND CASH INTEREST PAYMENT OBLIGATIONS WILL NOT DIFFER FROM THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

NEITHER OUR INDEPENDENT AUDITORS NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS, THE ENTERPRISE VALUATION OR THE LIQUIDATION ANALYSIS CONTAINED HEREIN, NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS ACHIEVABILITY, NOR DO THEY ASSUME ANY RESPONSIBILITY FOR OR CLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS, THE ENTERPRISE VALUATION OR LIQUIDATION ANALYSIS.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE HISTORY, BUSINESS AND OPERATIONS OF THE PROSPECTIVE DEBTORS AND THE HISTORICAL FINANCIAL INFORMATION REGARDING THE PROSPECTIVE DEBTORS IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE PROSPECTIVE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE PROSPECTIVE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.

FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PSLRA AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

SEE THE SECTION ENTITLED "RISK FACTORS" OF THIS DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN RISK FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PLAN.

---

All exhibits to this Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if fully set forth herein.

In addition to the information contained in this Disclosure Statement and the Plan, the Company will make available to each Holder the opportunity to ask questions and receive answers concerning the terms and conditions of the Plan. Paul Crecca, President, Chief Executive Officer and Director, and Mark Kurtz, Senior Vice President and Chief Financial Officer, as representatives of the Company, will each be available via telephone at (914) 289-9420 and (914) 289-9480, respectively, during normal business hours to answer questions with respect to the Plan. Other than these persons, no person has been authorized to give any information or make any representation on our behalf not contained, or incorporated by reference, in this Disclosure Statement or the Plan and, if given or made, such information or representation must not be relied upon as having been authorized.

The delivery of this Disclosure Statement shall not, under any circumstances, create any implication that the information it contains (or incorporates by reference from other documents or reports), is correct as of any time subsequent to the date hereof (or the date of a document or report incorporated by reference), or that there has been no change in the information set forth herein (or in a document or report incorporated by reference) or in our affairs since the date hereof (or thereof). All statements contained in this Disclosure Statement are made as of the date hereof unless otherwise specified.

## COMPANY INFORMATION

Our corporate headquarters are located at 10 New King Street, Suite 102, White Plains, New York 10604. Certain financial information can be found on our website at www.haightscross.com/dyncnt/financial.cfm. Information on our website is not a part of this Disclosure Statement, except to the extent that any such information expressly is incorporated herein.

On September 10, 2007, Holdings filed a Form 15 with the SEC terminating its reporting obligations under the Exchange Act. As a result, certain information contained in our earlier public reports may no longer be accurate and should not be relied upon. We are not obligated to update such information.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains statements relating to future results of the Company that are "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. The forward-looking statements included in this Disclosure Statement include statements concerning our plans, objectives, goals, strategies, projections, future events, future sales or performance, adequacy of capital, capital expenditures, financing needs, plans or intentions relating to business trends and other information that is not historical information. When used in this Statement, the words "estimates," "expects," "anticipates," "projects," "plans," "intends," "believes," "forecasts" and variations of such words or similar expressions are intended to identify forward-looking statements. All forward-looking statements, including, without limitation, projections and management's examination of business trends, are based upon our current expectations, beliefs, projections and assumptions. Our expectations, beliefs, projections and assumptions are expressed in good faith and we believe there is a reasonable basis for them. However, we cannot assure that our financial condition or results of operations will meet the expectations set forth in our forward-looking statements. The forward-looking statements that we make in this Disclosure Statement are subject to a variety of risks, uncertainties, and other factors known and unknown that could cause actual results to differ materially from such forward-looking statements.

Without limitation of the foregoing, among the important factors or risks that could cause our actual results to differ from those contained in our forward-looking statements are: (i) the effect of a continued weak economy on sales of our products; (ii) current or future defaults under our existing indebtedness as it pertains to our ability to complete the Solicitation; (iii) our inability to make required interest payments on our existing indebtedness and the continued effectiveness of forbearance agreements with respect to such payments during the solicitation period; (iv) our substantial leverage and indebtedness, even if the proposed restructuring is successful, which may adversely affect our ability to operate our business and place us at a competitive disadvantage in our industry; (v) our obligation to meet financial covenants and inability to take certain actions because of restrictions contained in our debt instruments, as they may be amended, which may adversely affect our operations; (vi) our history of losses, which we expect to continue; (vii) changes in funding of school systems and libraries by federal, state and local governments due to weaknesses in the United States economy that are or may continue to result in the curtailment, delay or reduction in federal, state and local government funding available to schools and libraries for the purchase of our products, which have and could continue to reduce our sales and adversely affect our results of operations; (viii) the effect that a substantial reduction in the emphasis placed by federal and state governments on assessment and remediation in K-12 education would have on our sales and operations; (ix) our inability to compete in the highly competitive industries in which we operate; (x) the effect that misuse, misappropriation or other loss of our proprietary rights could have on our results of operations; (xi) our need to defend against intellectual property infringement and other claims, which may cause us to incur significant costs and divert management attention; (xii) our dependence on key personnel; (xiii) a growth in multimedia products that may compete with and reduce our publishing activities; (xiv) technological changes that may reduce the sales of our products; (xv) the effect of an increase in paper or postage costs, which could adversely affect our business; (xvi) our ability to update and expand the content of existing products and develop new products in a cost effective manner and on a timely basis; (xvii) the effect that a material change to or

repeal of the federal government's NCLB Act would have on our revenue and profitability; (xviii) our dependence on a limited number of suppliers and service providers, the interruption of supply or service with which could have a material adverse effect on our operations; (xix) a disruption in our distribution centers could significantly lower our revenues and profitability; (xx) our dependence on a central computer system, which if damaged, or if service is interrupted or a failure occurs, could adversely affect our customer relationships and harm our ability to attract new customers; (xxi) the effect of changes in accounting, regulatory and/or tax policies and practices, including the additional professional and internal costs necessary for compliance with accounting rules; (xxii) limitations on our ability to utilize our net operating loss carryforwards; (xxiii) the seasonal and cyclical nature of sales of our products; (xxiv) changes in the competitive environment, including those which could adversely affect our cost of sales; (xxv) changes in the relative profitability of products sold; (xxvi) regulatory changes that could affect the purchase of our products; (xxvii) delays and unanticipated expenses in developing new programs and other products or in developing new technology products, and market acceptance and use of online instruction and assessment materials; (xxviii) the risk that our well-known authors will depart and write for our competitors; (xxix) various factors that may affect the value of the New Securities to be issued under the Plan; (xxx) our relationship with and payment terms provided by our trade creditors; (xxxi) additional financing requirements post-restructuring; (xxxii) the Rights Offering and the mechanics and commitments associated therewith; (xxxiii) the continued effectiveness of material restructuring agreements, including the Plan Support Agreement; (xxxiv) our ability to obtain relief from the Bankruptcy Court in order to facilitate our ability to operate smoothly under chapter 11; (xxxv) the confirmation and consummation of the Plan; and (xxxvi) each of the other risks identified in Article II "RISK FACTORS". Due to these uncertainties, we cannot assure readers that any forward-looking statements will prove to be correct.

Information included in this Disclosure Statement is made as of the date hereof. We undertake no obligation, and disclaim any duty, to update our forward-looking statements, including any financial projections we make; provided, however, we may be required to update or otherwise modify the information contained herein in order to comply with certain provisions of the Bankruptcy Code governing the solicitation of votes for acceptance of the Plan. We do not endorse any projections regarding future performance that may be made by third parties.

There may be events in the future that we are not able to predict accurately or over which we have no control. The risk factors listed in this Disclosure Statement under "Risk Factors," as well as any cautionary language contained in this Disclosure Statement, provide examples of risks, uncertainties and events that may cause actual results to differ materially from the expectations we describe in our forward-looking statements. Impaired Lenders and Impaired Noteholders should be aware that the occurrence of the events described in these risk factors and elsewhere in this Disclosure Statement could have a material adverse effect on our business, operating results and financial condition.

# SUMMARY OF THE SOLICITATION AND PLAN

*This summary does not contain all of the information that is important to you and is qualified in its entirety by the more detailed information included elsewhere in this Disclosure Statement and in the accompanying Plan.*

| | |
|---|---|
| **Background Information:** | The Plan Support Agreement comprises an initial agreement that was entered into on September 3, 2009. We intend to effectuate the proposed financial restructuring through a prepackaged plan of reorganization (referred to herein as the Plan) in the Chapter 11 Cases. |
| | The Plan Support Parties, who as of October 29, 2009 together held 100% of the outstanding principal amount of the loans under the Secured Credit Agreement, approximately 80% of the outstanding principal amount of the Senior Notes and approximately 13% of the outstanding principal amount of the Senior Discount Notes, have agreed, subject to the terms of the Plan Support Agreement, to vote to accept the Plan. We expect to commence the Chapter 11 Cases as soon as practicable after the Voting Deadline if we obtain the requisite number of votes for the Plan from Impaired Lenders and Impaired Noteholders who submit votes. The Bankruptcy Code requires acceptance by creditors in each of Class 2, Class 4 and Class 5 that hold at least two-thirds in dollar amount and a majority in number of allowed claims in their Class, in both cases counting only those claims actually voting to accept or reject the Plan. If such required votes are not obtained from the Impaired Lenders and the Impaired Noteholders, we may commence the Chapter 11 Cases and seek to "cram down" unconsenting creditors pursuant to section 1129(b) of the Bankruptcy Code. See Article XV. "CONFIRMATION." |
| **The Solicitation:** | We are soliciting votes to accept or reject the Plan from Lenders under the Secured Credit Agreement and beneficial owners (or their legal representatives or nominees) of Senior Notes and Senior Discount Notes. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS — Procedures for Casting and Deadlines for Voting on the Plan." |
| **Voting Record Date:** | Only Impaired Lenders and Impaired Noteholders that are beneficial owners (or their legal representatives or nominees) as of the Voting Record Date, which has been set as the close of business on December 4, 2009, will be entitled to vote on the Plan. We reserve the right to establish a later Voting Record Date in the event that we decide to extend the Voting Deadline. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS — Procedures for Casting and Deadlines for Voting on the Plan." |

| | |
|---|---|
| **Voting Deadline; Extension; Termination; Amendments:** | The Voting Deadline is 11:59 p.m., New York City Time, on January 4, 2010. If the Voting Deadline is extended, the term Voting Deadline will mean the latest time and date as to which the Solicitation is extended. Any extension of the Voting Deadline, which the Prospective Debtors reserve the right to do subject to any consents required by the Plan Support Agreement, will be followed as promptly as practicable by notice of the extension by press release or other public announcement. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS— Procedures for Casting and Deadlines for Voting on the Plan." |
| **Voting Procedures:** | If you are a Lender under the Secured Credit Agreement or a beneficial owner (or the legal representative of a beneficial owner) of Senior Notes or Senior Discount Notes as of the Voting Record Date, you should deliver a properly completed Ballot to the Voting Agent or your Nominee, as applicable. In the event that you deliver a Ballot to a Nominee, your Nominee will be required to complete and submit a Master Ballot to the Voting Agent, on or before the Voting Deadline. Ballots submitted directly to the Voting Agent by registered Holders must also be received on or before the Voting Deadline. See Article I. "VOTING PROCEDURES AND REQUIREMENTS." |
| **Revocation or Withdrawal of Ballots:** | Except with respect to a Plan Support Party, upon the expiration or termination of this Solicitation, Impaired Lenders, Impaired Noteholders and Nominees may not revoke or withdraw their Ballots and Master Ballots; provided, however, that prior to the expiration or termination of this Solicitation, Impaired Lenders and Impaired Noteholders may withdraw any votes cast even if such votes have been delivered to the Voting Agent. The rights and limitations of the Plan Support Parties with respect to revocation or withdrawal of a Ballot are governed by the Plan Support Agreement. See Article I.B. "VOTING PROCEDURES AND REQUIREMENTS—Procedures for Casting and Deadlines for Voting on the Plan." |
| **Voting Agent:** | We have retained Globic Advisors, Inc. as Voting Agent in connection with this Solicitation. Deliveries of Master Ballots and Ballots should be directed to Globic Advisors, Inc. at the address set forth on the back cover page of this Disclosure Statement or to your Nominee, pursuant to the instructions contained in the Master Ballots and Ballots. See Article I. "VOTING PROCEDURES AND REQUIREMENTS." |
| **The Plan:** | As a general matter, in order for the Plan to become effective and for any distributions to be made thereunder, the Plan must, among other things, be confirmed by the Bankruptcy Court. For the Plan to be confirmed, votes to approve the Plan must be received on or prior to the Voting Deadline from Holders of Impaired Claims that constitute (i) at least two-thirds in amount of the Claims of the Holders in each Impaired Class of Claims who actually cast votes in respect of the Plan and (ii) |

more than one-half in number of the Holders of each Impaired Class of Claims who actually cast votes with respect to the Plan, and the Plan must be confirmed by the Bankruptcy Court. See Article XV.C. "CONFIRMATION—Class Acceptance of the Plan." The Plan may be confirmed by the Bankruptcy Court, however, so long as one Impaired Class of Claims votes to accept the Plan and the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code (as further described under Article XV.D. "CONFIRMATION—Nonconsensual Confirmation"). The only Classes of Claims or Equity Interests Impaired under the Plan are Class 2 – Secured Credit Agreement Claims, Class 4 – Senior Note Claims, Class 5 – Senior Discount Note Claims and Class 9 – Prepetition Holdings Equity Securities. Holders of Claims or Equity Interests in Classes 1, 3, 6, 7 and 8 are Unimpaired and therefore are deemed to have accepted the Plan and therefore, are not entitled to vote on the Plan. Holders of Class 9 – Prepetition Holdings Equity Securities are not entitled to receive any distributions under the Plan, and, as a result, are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan. See Article I.C. "VOTING PROCEDURES AND REQUIREMENTS—Parties Entitled to Vote on the Plan." If the Plan is confirmed by the Bankruptcy Court:

(a) With respect to Class 2 Holders of Allowed Secured Credit Agreement Claims, if the Prospective Debtors consummate an Alternative Financing, each Holder of Allowed Secured Credit Agreement Claims will receive, in full satisfaction and discharge thereof, Cash in an amount equal to its Allowed Secured Credit Agreement Claims. If the Prospective Debtors are unable to consummate an Alternative Financing, then on, or as soon as practicable after, the Effective Date, each Holder of Allowed Secured Credit Agreement Claims shall receive, in full satisfaction and discharge thereof, (A) its Pro-Rata Share of the New First Lien Notes and (B) Cash equal to the difference between (x) the amount of its Allowed Secured Credit Agreement Claims and (y) the principal amount of its Pro-Rata Share of the New First Lien Notes. All Adequate Protection Payments will be applied against the Cash distributions contemplated under Section 3.2(b)(iii), and provided the Confirmation Order becomes a Final Order, no Holder of Secured Credit Agreement Claims will be required to disgorge or otherwise turn over any portion of such payments. See Article V.D.1. "THE PLAN — CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION — Treatment of Claims and Equity Interests — Treatment of Claims and Equity Interests."

(b) With respect to Class 4 Holders of Allowed Senior Note Claims:

| | |
|---|---|
| | (i) If Class 5 accepts the Plan, then each Holder of an Allowed Senior Note Claim will receive, in full satisfaction and discharge thereof, its Pro-Rata Share of (w) the New Second Lien Notes, (x) the Senior Note Stock Consideration (subject to adjustment for rounding of fractional shares), (y) any Senior Note Cash Consideration and (z) any Rights Offering Proceeds.<br><br>(ii) If Class 5 does not vote to accept the Plan, then each Holder of an Allowed Senior Note Claim will receive its Pro-Rata Share of (x) the New Second Lien Notes, (y) 9,000,000 shares of New Common Stock (subject to adjustment for rounding of fractional shares), which amount shall be equal to 100% of the total number of shares of New Common Stock issued under the Plan subject to dilution for the Exit Warrants and (z) any Senior Note Cash Consideration.<br><br>(c) With respect to Class 5 Holders of Allowed Senior Discount Note Claims:<br><br>(i) If Class 5 accepts the Plan, then each such Holder will receive, in full satisfaction and discharge thereof, its Pro-Rata Share of (x) 720,000 shares of New Common Stock (subject to adjustment for rounding of fractional shares), which amount shall be equal to approximately 8% of the total number of shares of New Common Stock issued under the Plan and (y) Exit Warrants.<br><br>(ii) If Class 5 rejects the Plan, then no such Holder will be entitled to, nor shall it receive or retain, any property or interest in property on account of such Senior Discount Note Claim.<br><br>(d) See Article V.D.1. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Treatment of Claims and Equity Interests—Treatment of Claims and Equity Interests."<br><br>All of the capital stock rights described above will be subject to dilution upon future issuances, including the Exit Warrants and any management awards. |
| **Effectiveness of the Plan:** | The Effective Date will not occur and distributions will not be made under the Plan unless the requisite votes to accept the Plan under the Bankruptcy Code have been received, the Plan has been confirmed by the Bankruptcy Court as satisfying the requirements set forth in section |

| | |
|---|---|
| | 1129 of the Bankruptcy Code and the other conditions to effectiveness set forth in Article VIII of the Plan have been satisfied. We cannot assure you that the requisite votes to accept the Plan under the Bankruptcy Code will be received, that the Plan will be confirmed by the Bankruptcy Court, or that the other conditions to effectiveness of the Plan will be satisfied. See Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases."<br><br>If the Plan is confirmed by the Bankruptcy Court and becomes effective, every Holder of a Claim against or Equity Interest in the Prospective Debtors will be bound by the terms of the Plan, whether or not such Holder voted to accept the Plan. See Article VI.E. "THE PLAN—OTHER PROVISIONS—Effect of Plan Confirmation." |
| **Treatment of Claims and Equity Interests:** | The table below summarizes each Class of Claims and Equity Interests in the Plan, the treatment of each Class and the projected recoveries of each Class. The projected recoveries (if the Plan is approved) are based upon certain assumptions contained in the valuation analysis as set forth in Article X hereof and, in the case of New Common Stock or Exit Warrants, are subject to dilution upon future issuances of capital stock of Reorganized Holdings, including management awards. See Article V.D. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Treatment of Claims and Equity Interests." |

| Class | Type of Claim or Equity Interest | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| Unclassified | Administrative Expense Claims | Paid in full in Cash. | N/A | 100% |
| Unclassified | Priority Tax Claims | Paid in full in Cash, or treated in accordance with Bankruptcy Code section 1129(a)(9)(C). | N/A | 100% |
| Class 1 | Other Priority Claims | Paid in full in Cash. | N/A | 100% |
| Class 2 | Secured Credit Agreement Claims | If Alternative Financing is consummated, paid in full in Cash; if Alternative Financing is not consummated, Holders will receive the New First Lien Notes and Cash equal to the difference between (x) the aggregate amount of Allowed Secured Credit Agreement Claims and (y) the aggregate principal amount of the New First Lien Notes. | Impaired/Entitled to Vote. | 100% |
| Class 3 | Other Secured Claims | At the election of the Applicable Debtor, either: (A) Paid in fill in Cash, (B) reinstated pursuant to section 1124(2) of the Bankruptcy Code or (C) receive the collateral securing such Claim. | Unimpaired/Deemed to Accept. | 100% |

| Class | Type of Claim or Equity Interest | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| Class 4 | Senior Note Claims | (X) If Class 5 accepts the Plan: will receive, on or as soon as practicable after the Effective Date: (A) the New Second Lien Notes *plus* (B) the Senior Note Stock Consideration (subject to adjustment for rounding of fractional shares) *plus* (C) any Senior Note Cash Consideration *plus* (D) any Rights Offering Proceeds. (Y) If Class 5 rejects the Plan: will receive, on or as soon as practicable after the Effective Date (A) the New Second Lien Notes *plus* (B) 900,000 shares of New Common Stock *plus* (C) any Senior Note Cash Consideration. | Impaired/Entitled to Vote. | Approximately 87.1%/90.2%[2] |

---

[2]   The projected recovery shall be 87.1% if the Holders of the Class 5 Senior Discount Note Claims vote to accept the Plan or 90.2% if the Senior Discount Noteholders do not vote to accept the Plan.

| Class | Type of Claim or Equity Interest | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| Class 5 | Senior Discount Note Claims | (X) If Class 5 accepts the Plan: will receive, on or as soon as practicable after the Effective Date, a Pro-Rata Share of (A) 720,000 shares of New Common Stock *plus* (B) Exit Warrants. (Y) If Class 5 rejects the Plan: no recovery. | Impaired/Entitled to Vote. | Approximately 4.2%/0%[3] |

---

[3] The projected recovery shall be 4.2% if the Holders of the Class 5 Senior Discount Note Claims vote to accept the Plan or 0% if the Senior Discount Noteholders do not vote to accept the Plan.

| Class | Type of Claim or Equity Interest | Plan Treatment of Allowed Claims in Class | Status/Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| Class 6 | General Unsecured Claims | Reinstated pursuant to section 1124(2) of the Bankruptcy Code. | Unimpaired/Deemed to Accept. | 100% |
| Class 7 | Intercompany Claims | Reinstated pursuant to section 1124(2) of the Bankruptcy Code. | Unimpaired/Deemed to Accept. | 100% |
| Class 8 | Surviving Equity Interests | Reinstated pursuant to section 1124(2) of the Bankruptcy Code. | Unimpaired/Deemed to Accept. | 100% |
| Class 9 | Prepetition Holdings Equity Interests | No recovery. | Impaired/Deemed to Reject/Not entitled to Vote. | 0% |

| | |
|---|---|
| **Distribution Date:** | Distributions to be made under the Plan generally will be made or become effective as of the Effective Date, or as soon as practicable thereafter. See Article VI.B.1. "THE PLAN—OTHER PROVISIONS—Provisions Governing Distributions—Date of Distributions." |
| **Plan Supplement:** | We will file the Plan Supplement no later than ten days prior to the first date on which the Confirmation Hearing is scheduled to be held. It is anticipated that the Plan Supplement will include, among other things, forms of the Exit Warrant, the Registration Rights Agreement and the New Constituent Documents. Pursuant to the Plan, each of these documents and agreements are required to be in form and substance reasonably satisfactory to certain parties specified in the Plan, including the Requisite Plan Support Parties. The Plan Supplement also will disclose the identity and compensation of the directors of the Reorganized Debtors, which will be selected in accordance with section 4.9 of the Plan. See Article V.E.6. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Means of Implementation of Plan—Directors and Officers of the Reorganized Debtors." |
| **Rights Offering:** | We will conduct the Rights Offering pursuant to which Eligible Holders of Senior Discount Note Claims, as of the Subscription Record Date, will be entitled to subscribe for shares of New Common Stock. The Rights Offering will only be consummated if the Plan is consummated and the Class 5 Senior Discount Notes Claims have approved the Plan. The Rights Offering is more fully described herein. See Article VII. "RIGHTS OFFERING." |
| **Subscription Record Date:** | Distributions of Senior Discount Note Rights will be made to Eligible Holders of Claims in Class 5 as of the Subscription Record Date. See Article VII.A. "RIGHTS OFFERING—Issuance of Subscription Rights." |
| **Reorganized Holdings Certificate of Incorporation:** | The Reorganized Holdings Certificate of Incorporation will be in substantially the form attached hereto as <u>Exhibit C</u>. See Article VIII.C.2. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of New Common Stock and Certificate of Incorporation—Description of Reorganized Holdings Certificate of Incorporation." |
| **Board of Directors:** | Section 4.9 of the Plan provides that the initial Reorganized Holdings Board of Directors will be composed of seven directors. See Article V.E.6. "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION—Means of Implementation of Plan—Directors |

|  | and Officers of the Reorganized Debtors." |
|---|---|
| **Non-Reporting Status:** | The Plan contemplates that Reorganized Holdings will not be a reporting issuer under the Exchange Act nor will shares of Reorganized Holdings Common Stock be registered under the Securities Act or Exchange Act immediately following the Effective Date. |
| **Registration Rights Agreement:** | On, or as soon as practicable after, the Effective Date, Reorganized Holdings will enter into the Registration Rights Agreement with certain recipients of shares of New Common Stock that will incorporate the terms described in Article VIII.D. herein and as further identified in the Term Sheet for the Registration Rights Agreement attached hereto as <u>Exhibit D</u>. See Article VIII.D. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Registration Rights Agreement." |
| **Voting Agreement:** | On, or as soon as practicable after, the Effective Date, Reorganized Holdings will enter into the Voting Agreement with the recipients of shares of New Common Stock that will incorporate the terms described in Article VIII.F. herein and as further identified in the form of Voting Agreement attached hereto as <u>Exhibit E</u>. See Article VIII.F. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of Voting Agreement." |
| **New First Lien Notes:** | The New First Lien Notes will be issued in an aggregate principal amount of $100 million and will have a three-year term (commencing on the Effective Date). Interest will accrue at a rate of LIBOR + 10.0% *per annum* (LIBOR floor of 3.0%) as more fully described herein. The New First Lien Note Indenture will be in substantially the form attached hereto as hereto as <u>Exhibit F</u>. See Article VIII.A. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of New First Lien Notes." The New First Lien Notes may be replaced with Alternative Financing, the terms of which would be disclosed in a Plan Supplement. |
| **New Second Lien Notes:** | The New Second Lien Notes will be issued in an aggregate principal amount of $80 million less the amount of any Senior Note Cash Consideration and will have a four-year term (commencing on the Effective Date). Interest will accrue at a rate of LIBOR + 13.0% *per annum* (LIBOR floor of 3.0%), of which 1.0% shall be permitted to be paid in kind, subject to a cash flow test which, if met, causes cash payment, as more fully described herein. The New Second Lien Note Indenture will be in substantially the form attached hereto as hereto as |

| | |
|---|---|
| | <u>Exhibit G</u>. See Article VIII.B. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN—Description of New Second Lien Notes." <br><br> The New Second Lien Notes will be expressly subordinated and junior in right of payment to the New First Lien Notes (and up to $25 million of other indebtedness we may incur under a senior credit facility) pursuant to the terms of the New Second Lien Note Indenture; and the lien on the collateral securing the New Second Lien Notes will be junior to the lien on the collateral securing the New First Lien Notes (and up to $25 million of other indebtedness we may incur under a senior credit facility) pursuant to the Intercreditor Agreement. |
| **Releases:** | In consideration for the contributions of certain parties to the Chapter 11 Cases, the Plan provides for certain waivers, exculpations, releases and injunctions. See Article VI.E.3. "THE PLAN—OTHER PROVISIONS—Effect of Plan Confirmation—Releases." |
| **Certain U.S. Federal Income Tax Consequences:** | For a summary of certain U.S. federal income tax consequences of this Solicitation to Impaired Lenders and Impaired Noteholders, see Article XIII. "CERTAIN FEDERAL INCOME TAX CONSIDERATIONS." |
| **Risk Factors:** | Prior to deciding whether and how to vote on the Plan, each Holder of Senior Note Claims and Subordinated Note Claims should consider carefully all of the information in this Disclosure Statement, especially the "Risk Factors" described in Article II hereof. See Article II. "RISK FACTORS." |

**The foregoing is only a brief summary of certain provisions of the Plan. You should read the full text of the Plan and the more detailed information and financial statements contained elsewhere in this Disclosure Statement.**

# SELECTED CONSOLIDATED HISTORICAL FINANCIAL DATA

The following table sets forth certain selected consolidated historical financial information of the Company. Historical financial information as of and for the years ended December 31, 2004, 2005, 2006, 2007 and 2008 has been derived from our audited consolidated financial statements. Historical financial data as of and for the nine months ended September 30, 2008 and 2009 have been derived from our unaudited interim consolidated financial statements. These audited annual and unaudited interim consolidated financial statements have been included in our periodic reports previously filed with the SEC except for financial data as of and for the nine months ended September 30, 2009, which are attached hereto as Exhibit H. Our unaudited interim consolidated financial statements, in the opinion of our management, include all normal recurring accruals necessary to state fairly the data included therein in accordance with generally accepted accounting principles for interim financial information. Interim results are not necessarily indicative of the results to be expected for the entire fiscal year.

| | Year Ended December 31, | | | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2008 | 2009 |
| | (Dollars in thousands) | | | | | (Dollars in thousands) | |
| **Consolidated Statements of Operations Data:** | | | | | | | |
| Revenue: | | | | | | | |
| Test-prep and intervention | $ 34,421 | $ 64,501 | $ 73,909 | $ 86,074 | $ 83,668 | $ 66,768 | $ 56,057 |
| Library | 68,878 | 76,626 | 81,328 | 84,529 | 87,411 | 68,319 | 60,777 |
| Total revenue | 103,299 | 141,127 | 155,237 | 170,603 | 171,079 | 135,087 | 116,834 |
| Cost of goods sold | 35,327 | 42,144 | 42,905 | 46,607 | 47,441 | 36,641 | 31,459 |
| Selling, general and administrative expense(1) | 43,697 | 60,135 | 67,591 | 80,895 | 81,422 | 61,246 | 57,606 |
| Amortization of pre-publication costs(2) | 5,781 | 8,845 | 12,043 | 14,279 | 19,359 | 12,065 | 14,477 |
| Goodwill impairment charges(3) | — | — | 10,419 | — | 31,600 | — | — |
| Asset impairment charges(4) | — | — | — | 565 | — | — | — |
| Depreciation and amortization | 1,770 | 3,571 | 3,696 | 3,727 | 4,241 | 3,177 | 2,930 |
| Income (loss) from operations | 16,724 | 26,432 | 18,583 | 24,530 | (12,984) | 21,958 | 10,362 |
| Gain on troubled debt restructuring(5) | — | — | — | 115,489 | — | — | — |
| Interest expense and other(6)(7) | (50,281) | (61,215) | (66,256) | (62,272) | (45,649) | (34,676) | (37,134) |
| (Loss) income before taxes, discontinued operations and cumulative effect of accounting change | (33,557) | (34,783) | (47,673) | 77,747 | (58,633) | (12,718) | (26,772) |
| (Provision) benefit for income tax | (2,331) | (3,356) | (2,086) | (3,508) | 6,075 | 2,639 | (1,517) |
| (Loss) income before discontinued operations and cumulative effect of accounting change | (35,888) | (38,139) | (49,759) | 74,239 | (52,558) | (10,079) | (28,289) |
| (Loss) income from discontinued operations | 9,474 | 3,902 | (23,096) | (10,689) | 14,551 | 15,933 | (9) |
| Cumulative effect of accounting change(7) | — | 2,213 | — | — | — | — | — |
| Net (loss) income | $ (26,414) | $ (32,024) | $ (72,855) | $ 63,550 | $ (38,007) | $ 5,854 | $ (28,298) |

| | Year Ended December 31, | | | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2008 | 2009 |
| | (Dollars in thousands) | | | | | (Dollars in thousands) | |
| **Other Financial Data:** | | | | | | | |
| Additions to pre-publication costs(2) | $ 7,907 | $ 15,470 | $ 17,108 | $ 17,985 | $ 19,003 | $ 15,547 | $ 10,408 |
| Additions to property and equipment | 2,202 | 2,071 | 1,506 | 1,545 | 1,248 | 839 | 1,427 |
| Interest expense(6) | 48,194 | 59,370 | 65,787 | 61,772 | 44,747 | 33,353 | 35,792 |
| Net cash provided by (used in): | | | | | | | |
| Operating activities | 3,643 | 13,225 | 11,401 | 14,954 | 11,051 | (1,597) | 5,483 |
| Investing activities | (87,994) | (19,217) | (18,130) | (19,553) | 29,621 | 33,489 | (11,839) |
| Financing activities | 116,569 | (1,802) | (1,393) | (3,426) | (50,909) | (50,801) | (358) |
| Ratio of earnings to fixed charges(8) | — | — | — | 2.1 | — | — | — |

| | Year Ended December 31, | | | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2008 | 2009 |
| | (Dollars in thousands) | | | | | (Dollars in thousands) | |
| **Consolidated Balance Sheet Data:** | | | | | | | |
| Cash and cash equivalents | $ 78,581 | $ 69,592 | $ 69,847 | $ 61,784 | $ 47,414 | $ 40,834 | $ 40,733 |
| Working capital (deficiency)(9) | 155,774 | 152,456 | 121,378 | (25,379) | (320,520) | 68,950 | (339,783) |
| Total assets | 399,703 | 401,319 | 362,686 | 344,772 | 243,376 | 283,825 | 228,734 |
| Total debt(5)(6) | 492,848 | 520,743 | 552,769 | 414,882 | 381,819 | 377,967 | 384,163 |
| Redeemable preferred stock(5)(6) | 36,882 | 37,717 | 41,051 | — | — | — | — |
| Total stockholders' deficit | (192,819) | (228,121) | (303,919) | (146,829) | (186,583) | (141,287) | (214,391) |

(1)     Selling, general and administrative expense is a summary of the following captions from our consolidated statement of operations: marketing and sales, fulfillment and distribution, general and administrative, and restructuring. For the years ended December 31, 2004 and 2005, our selling, general and administrative expense includes restructuring and restructuring related charges of $0.4 million and $0.4 million, respectively, relating to IT system implementation costs at our *Recorded Books* and *Triumph Learning* businesses. For the year ended December 31, 2006 our selling, general and administrative expense includes restructuring and restructuring related charges of $0.8 million, relating to the consolidation of the Iowa-based warehousing, customer service and order fulfillment functions of our *Buckle Down Publishing* business with our then-existing shared service facility in Northborough, Massachusetts and IT system implementation costs at our *Recorded Books* business. For the year ended December 31, 2007, our selling, general and administrative expense includes restructuring charges of $1.2 million related to *Buckle Down Publishing* and *Options Publishing* businesses. For the year ended December 31, 2008 our selling, general and administrative expense includes restructuring and restructuring related charges of $2.0 million, relating to *Buckle Down Publishing* and *Options Publishing* businesses.

(2)     We capitalize and amortize the pre-publication costs associated with the development of our new products. These costs primarily include author fees under work-for-hire agreements (excluding royalties), the costs associated with artwork, photography and master tapes, other external creative costs, internal editorial staff costs and pre-press costs that are directly attributable to the product. Also included is the intangible value assigned to the backlist of acquired companies. These capitalized pre-publication and intangible costs are amortized over the anticipated life of the product, for a period not exceeding five years.

(3)     Goodwill and other intangible assets with indefinite lives are tested for impairment annually, as required by SFAS No. 142, "Goodwill and Other Intangible Assets." For the year ended December 31, 2006 financial results include a $10.4 million goodwill impairment charge related to our *Options Publishing* businesses. For the year ended December 31, 2008 financial results include a $31.6 million goodwill impairment charge related to our *Triumph Learning* businesses.

(4)     The year ended December 31, 2007 included a restructuring of our *Test-prep and Intervention* segment with the consolidating of our *Options Publishing* business into our *Triumph Learning* business. In connection with the consolidation, our building located in Merrimack, New Hampshire was abandoned and offered for sale resulting in a $0.6 million impairment charge from a fair value assessment of the building.

(5)     On August 10, 2007, we consummated the Recapitalization Agreement and, under the terms of the Recapitalization Agreement, holders of our previously outstanding Series A Preferred Stock ("Preferred A"), Series B Preferred Stock ("Preferred B") and Series C Preferred Stock ("Preferred C") converted their shares into shares of common stock. The Company recorded a gain of $115.5 million on troubled debt restructuring in the year ended December 31, 2007, based on the difference in carrying value of the Preferred B compared to the fair value, based on an independent appraisal, of the common shares exchanged. The gain includes approximately $1.9 million in transaction costs and a $2.8 million benefit from consequential balance sheet write offs, primarily the unamortized portion of the deferred gain on Preferred B. The recapitalization of the Preferred A and Preferred C also resulted in gains based on their carrying value compared to the fair value of the common shares exchanged, but because of their classification as equity instruments, the gains of $33.0 million and $1.3 million, respectively, are reflected as Gain on Recapitalization in the calculation of net income available to common stockholders.

(6)     On January 1, 2004 we adopted Statement of Financial Accounting Standards No. 150, "Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity" ("SFAS No. 150"). SFAS No. 150 establishes standards for classifying and measuring as liabilities certain financial instruments that embody obligations of the issuer and have characteristics of both liabilities and equity. This adoption required that our Preferred B be classified as debt on our consolidated balance sheet and that the dividends and accretion related to the Preferred B be classified as interest expense on a going forward basis. On August 10, 2007, we consummated the Recapitalization Agreement and under the terms of the Recapitalization Agreement, holders of our previously outstanding Preferred A, Preferred B and Preferred C converted their shares into shares of common stock..

(7)     The financial statements for the year ended December 31, 2005 include a change in accounting to reflect our outstanding Warrants as liabilities in accordance with FASB Staff Position FAS 150-5: Issuer's Accounting under FASB Statement No. 150 for Freestanding Warrants and Other Similar Instruments on Shares That Are Redeemable.

As a result of recording these Preferred Warrants as liabilities which should be marked to fair market value, the Company recorded a gain of $2.2 million, which is presented as a cumulative effect of accounting change for the year ended December 31, 2005. On August 10, 2007 we consummated the recapitalization pursuant to the Recapitalization Agreement. Upon the closing of the Recapitalization Agreement, all outstanding shares of Preferred Warrants were converted into warrants to acquire common stock at an agreed upon rate.

(8)     The "ratio of earnings to fixed charges" is an analytical tool used to assist investors in evaluating a company's ability to meet the interest requirements of debt securities or the dividend requirements of preferred stock. Earnings for the purpose of this calculation are defined as pretax income before the effects of discontinued operations, extraordinary items and the cumulative effect of accounting change. Fixed charges are defined as the sum of interest expense, amortization of deferred financing costs, and the interest portion of rental expense. Earnings for the year ended December 31, 2008 included a $31.6 million of goodwill impairment charge in *Triumph Learning* business. Earnings for the year ended December 31, 2007 included a $115.5 million gain on troubled debt restructuring. Excluding the impact of this gain, earning would have been insufficient to cover fixed charges by $37.8 million. For the years ended December 31, 2004, 2005, 2006 and 2008 earnings were inadequate to cover fixed charges by, $33.6 million, $34.8 million, $47.7 and $58.6 million, respectively.

(9)     At December 31, 2007 the working capital deficiency resulted from the reclassifications of our Term Loans due August 15, 2008 as a current liability. At December 31, 2008 the working capital resulted from the reclassifications of our Term Loans, Senior Discount Notes and Senior Notes as a current liability due to defaults under our loan agreements.

# I. VOTING PROCEDURES AND REQUIREMENTS

The following instructions for voting to accept or reject the Plan, together with the instructions contained in the Ballot and Master Ballot, constitute the Voting Instructions. To vote on the Plan, you must be a beneficial Holder of a Class 2 Secured Credit Agreement Claim, a Class 4 Senior Note Claim or a Class 5 Senior Discount Note Claim as of the Voting Record Date. Please note that we reserve the right to establish a later Voting Record Date in the event that we decide to extend the Voting Deadline. To vote, you must fill out and sign a Ballot (if you are not a Nominee) or Master Ballot (if you are a Nominee) enclosed herewith.

### A. *Ballots*

#### 1. General Provisions

After carefully reviewing this Disclosure Statement and its exhibits, including the Plan, please indicate your acceptance or rejection of the Plan by completing the enclosed Ballot. Ballots should be returned to your Nominee or the Voting Agent as directed below.

If you do not receive a Ballot for a Claim that you believe you hold and that is in a Class that is entitled to vote on the Plan, or if a Ballot is damaged or lost or if you have any questions regarding the procedures for voting on the Plan, you should contact:

Globic Advisors, Inc.
One Liberty Plaza, 23rd Floor
New York, NY 10006
Attention: Robert Stevens
Banks and Brokers call: 212-201-5346
Toll-Free: 1-800-974-5771
Facsimile: 212-271-3252

#### 2. Special Instructions for Nominees

A Nominee should transmit a Ballot with a copy of this Disclosure Statement and the Plan to each beneficial owner of Impaired Notes held in the name of such Nominee as of the Voting Record Date. Please note that we reserve the right to establish a later Voting Record Date in the event that we decide to extend the Voting Deadline. Each such beneficial owner should return its Ballot to its Nominee, and the Nominee should complete and submit the Master Ballot in accordance with the instructions in this Article I.A. and the Master Ballot. All Ballots must be retained by the Nominee for inspection for at least one year after the Voting Deadline. If a Nominee requires additional copies of this Disclosure Statement or Ballots, it should contact:

Globic Advisors, Inc.
One Liberty Plaza, 23rd Floor
New York, NY 10006
Attention: Robert Stevens
Banks and Brokers call: 212-201-5346
Toll-Free: 1-800-974-5771

B.    *Procedures for Subscribing to Rights Offering*

So long as Class 5 accepts the Plan, each Eligible Holder of an Allowed Senior Discount Note Claim shall have the opportunity, but not the obligation, to participate in the Rights Offering. The Subscription Form will be included with the Ballots and will request that any such Eligible Holder that desires to participate in the Rights Offering subscribe according to the procedures therein. For additional information regarding the subscription procedures and the terms and conditions of the Rights Offering, see Article VII "RIGHTS OFFERING" herein.

C.    *Procedures for Casting and Deadlines for Voting on the Plan*

If you are the Holder of a Senior Note Claim or a Senior Discount Note Claim and your Senior Notes or Senior Discount Notes are held by a Nominee or registered in "street name," please complete the information requested on the Ballot, and return the Ballot to your Nominee in sufficient time for your Nominee to then forward your vote to the Voting Agent so that it is actually received by the Voting Agent before the Voting Deadline. To ensure your Nominee has sufficient time to cast your vote on your behalf, it is important that your Ballot be mailed or delivered to your Nominee well in advance of the Voting Deadline. Any Master Ballot received after the Voting Deadline will not be included in any calculation to determine whether the parties entitled to vote on the Plan have voted to accept or reject the Plan. When a Ballot or Master Ballot is returned indicating acceptance or rejection of the Plan, but is unsigned, illegible or incomplete, the unsigned, illegible or incomplete Ballot or Master Ballot will not be included in any calculation to determine whether the requisite parties entitled to vote on the Plan have voted to accept the Plan.

If the Senior Notes or Senior Discount Notes are registered in your own name, please complete the information requested on the Ballot, sign, date, and indicate your vote on the Ballot, and return the Ballot in the enclosed return envelope, by first class mail, courier or hand delivery, to the Voting Agent at the following address:

Globic Advisors, Inc.
One Liberty Plaza, 23rd Floor
New York, NY 10006
Attention: Robert Stevens
Banks and Brokers call: 212-201-5346
Toll-Free: 1-800-974-5771
Facsimile: 212-271-3252

**BALLOTS AND MASTER BALLOTS WILL NOT BE COUNTED IF THEY ARE RECEIVED BY THE VOTING AGENT AFTER THE VOTING DEADLINE OR ARE ILLEGIBLE, INCOMPLETE OR UNSIGNED.**

Subject to the terms of the Plan Support Agreement, we reserve the right to terminate the Solicitation at any time prior to the Voting Deadline. Additionally, upon notice to the Holders of

Senior Note Claims and Senior Discount Note Claims, we reserve the right to amend this Solicitation at any time prior to the Voting Deadline; provided, however, that any such amendment is made after acquiring any and all consents required under the terms of the Plan and/or the Plan Support Agreement, as applicable.

We also reserve the right to extend the Voting Deadline, subject to the terms of the Plan Support Agreement. Any such extension will be followed as promptly as practicable by notice thereof by press release or other public announcement. In the event of an extension of the Voting Deadline, we reserve the right to establish a later Voting Record Date.

Except with respect to a Plan Support Party, upon the expiration or termination of the Solicitation, Ballots and Master Ballots may not be revoked or withdrawn; provided, however, that prior to the expiration or termination of the Solicitation, Ballots and Master Ballots may be revoked or withdrawn even if such votes have been delivered to the Voting Agent. A Plan Support Party's rights with respect to revocation or withdrawal of a Ballot are governed by the Plan Support Agreement.

At this time, we are not requesting the delivery of, and neither we, nor the Voting Agent, will accept certificates representing any Prepetition Notes or Equity Interests.

D.    *Parties Entitled to Vote on the Plan*

Pursuant to section 1126 of the Bankruptcy Code, each Impaired Class of Claims that is not deemed to accept or reject the Plan is entitled to vote to accept or reject the Plan. A class is "impaired" unless the legal, equitable and contractual rights of the holders of claims or interests in that class are left unaltered by a plan of reorganization or if the plan reinstates the claims or interests held by members of such class by (i) curing any defaults which exist, (ii) reinstating the maturity of such claims or interests, (iii) compensating the holders of such claims or interests for damages which result from the reasonable reliance on any contractual provision or law that allows acceleration of such claims or interests, (iv) compensating the holders (other than the debtor or an insider) of any claims arising from failure to perform a nonmonetary obligation for any actual pecuniary loss incurred by such holder as a result of such failure and (v) otherwise leaving unaltered any legal, equitable or contractual rights to which the claims or interests entitle the holders of such claims or interests.

Classes that are not impaired under a plan are conclusively presumed to accept such plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, votes are not solicited from the holders of claims or interests in classes that are not impaired.

Section 1126(g) of the Bankruptcy Code provides that a class of claims or equity interests is presumed to have rejected a plan of reorganization if such plan does not entitle the holders of claims or equity interests in such class to receive or retain any property on account of such claims or interests. Accordingly, votes are not being solicited from the holders of claims or interests in such classes.

Votes to accept the Plan are being solicited only from Impaired Classes that are not deemed to accept or reject the Plan. Holders of Claims in Class 2, Class 4 and Class 5 are Impaired under the Plan, and Holders of Claims therein are the only Holders of Claims that are

entitled to vote to accept or reject the Plan. No other Class of Claims or Equity Interests is entitled to vote on the Plan.

E.    *Counting of Ballots and Master Ballots for Determining Acceptance of the Plan*

Only those Ballots and Master Ballots (other than any Ballot or Master Ballot that is illegible, incomplete or unsigned) that are received on or prior to the Voting Deadline will be counted for purposes of determining whether each Impaired Class that is entitled to vote has voted to accept or reject the Plan.

Under the Bankruptcy Code, a voting class of claims is deemed to have accepted a plan if it is accepted by holders holding at least two-thirds in amount and more than one-half in number of the allowed claims in such class that vote on the plan.

**THE PLAN SUPPORT PARTIES HAVE AGREED TO VOTE IN FAVOR OF THE PLAN SUBJECT TO THE TERMS AND CONDITIONS CONTAINED IN THE PLAN SUPPORT AGREEMENT. THE PLAN SUPPORT PARTIES HOLD 100% OF THE DOLLAR VALUE OF AND REPRESENT 100% OF THE NUMBER OF CLAIMS IN CLASS 2, APPROXIMATELY 80% OF THE DOLLAR VALUE OF CLASS 4 AND APPROXIMATELY 13% OF THE DOLLAR VALUE OF CLASS 5 CLAIMS.**

Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is presumed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) if there is no such law, rule or regulation, such acceptance or rejection was solicited after disclosure to such holder of "adequate information," as defined in section 1125(a) of the Bankruptcy Code. Section 1125 of the Bankruptcy Code defines "adequate information" as information of a kind and in sufficient detail as is reasonably practicable in light of the nature and history of a company and the condition of such company's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or equity interests of the relevant class to make an informed judgment about the plan of reorganization. In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest that has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be presumed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

We believe that this Solicitation is proper under applicable non-bankruptcy law, rules and regulations. The Prospective Debtors cannot be certain, however, that this Solicitation will be approved by the Bankruptcy Court. If such approval is not obtained, then we may have to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited. There also is a risk that confirmation of the Plan would be denied by the Bankruptcy Court and if confirmation (and subsequent consummation) does not occur by March 18, 2010 (or such later date as may be agreed to by the Plan Support Parties), the Plan Support Agreement will

terminate unless the Requisite Plan Support Parties elect to waive such termination pursuant to the terms thereof.

We believe that, with respect to the Plan, all the requirements of Bankruptcy Rule 3018(b) will be satisfied. This Disclosure Statement and the Plan, together with the accompanying materials, are being transmitted to the Holders of Secured Credit Agreement Claims, Senior Note Claims and Senior Discount Note Claims to solicit their votes to accept or reject the Plan. We believe that this Disclosure Statement contains adequate information for all of the Holders of Secured Credit Agreement Claims, Senior Note Claims and Senior Discount Note Claims to cast informed votes to accept or reject the Plan.

## II.     RISK FACTORS

### A.     *Risks Relating to the Chapter 11 Cases*

#### 1.     *General*

The filing of bankruptcy petitions by the Prospective Debtors and the publicity attendant thereto may affect our businesses adversely.  Any such adverse effects may worsen during the pendency of a protracted bankruptcy case if the Plan is not timely confirmed and consummated as expected.

#### 2.     *Failure to Satisfy Vote Requirement*

If we obtain the requisite votes from the Holders of Allowed Secured Credit Agreement Claims, Allowed Senior Note Claims and Allowed Senior Discount Note Claims to accept the Plan in accordance with the requirements of the Bankruptcy Code, we intend to file voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code and to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received from the Holders of Allowed Secured Credit Agreement Claims, Allowed Senior Note Claims and Allowed Senior Discount Note Claims, we nevertheless may file petitions for relief under chapter 11 of the Bankruptcy Code.  In such event, we may seek to accomplish an alternative restructuring of our capital structure and obligations.  We may decide to seek consent to any such restructuring plan by means of another out-of-court solicitation for acceptance of a plan of reorganization.  We cannot assure that the terms of any such alternative restructuring would be similar to or as favorable to Holders of Claims as those proposed in the Plan.

#### 3.     *Method of Solicitation*

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code.

In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be deemed to have accepted or rejected the plan if the court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

In order to satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), we are attempting to deliver this Disclosure Statement to all Holders of Secured Credit Agreement Claims, Senior Note Claims and Senior Discount Note Claims as of the Voting Record Date.  In that regard, we believe that the solicitation of votes to accept or

reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. We cannot be certain, however, that our solicitation of acceptances or rejections will be approved by the Bankruptcy Court and if such approval is not obtained the confirmation of the Plan could be denied. If the Bankruptcy Court were to conclude that we did not satisfy the solicitation requirements then we may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited. We cannot provide any assurances that such a resolicitation would be successful.

4. *Risks Associated with Resolicitation*

In the event that we resolicit acceptances of the Plan from parties entitled to vote thereon, confirmation of the Plan could be delayed and possibly jeopardized. Nonconfirmation of the Plan could result in an extended chapter 11 proceeding, during which time we could experience significant deterioration in our relationships with our trade vendors and major customers. Furthermore, if the Effective Date is significantly delayed, there is a risk that certain material restructuring agreements, such as the Plan Support Agreement, may expire or be terminated in accordance with their terms. Article II.A.10. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Termination Rights Under Plan Support Agreement."

5. *Classification and Treatment of Claims and Equity Interests*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Equity Interests in, the Prospective Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class. We believe that all Claims and Equity Interests have been appropriately classified in the Plan. We have elected to separately classify General Unsecured Claims because such Claims are largely those of trade creditors, many of whom are key suppliers of products and services essential to our operations. Accordingly, any impairment of these Claims could be detrimental to our ability to obtain essential trade credit and could substantially impair the ability of the Prospective Debtors to do business with trade creditors whose goods and services are essential. To the extent that the Bankruptcy Court determines that such classification is incorrect, the Bankruptcy Court could deny confirmation of the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Equity Interest of a particular Class unless the Holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest. We believe that we have complied with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

6. *Nonacceptance of the Plan—Confirmation by Nonconsensual "Cram Down"*

It is possible that a Class entitled to vote on the Plan may vote against confirmation of the Plan. In the event that a Class of Claims does not vote to accept the Plan, the Bankruptcy Court nevertheless may confirm the Plan at our request pursuant to the "cram down" provisions of the Bankruptcy Code if at least one impaired Class of Claims has accepted the Plan (with such acceptance being determined without including the acceptance of any "insider" (as defined in the Bankruptcy Code) in such Class) and, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such impaired class.

Although we believe that the Plan will meet such tests, we cannot assure you that the Bankruptcy Court would reach the same conclusion. Under section 1129(b)(2)(C) of the Bankruptcy Code, the condition that a plan be "fair and equitable" with respect to a class of claims includes the requirement that the holder of any claims that are junior to the claims of such class will not receive or retain any property under the plan on account of such junior claims. If, however, the Bankruptcy Court does not confirm the Plan, we may pursue one of the following alternatives: (i) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (ii) dismissal of the Chapter 11 Cases or (iii) liquidation of the Prospective Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. See Article XV.F. "CONFIRMATION—Alternatives to Confirmation and Consummation of the Plan."

7. *Certain Risks of Nonconfirmation or Delay of Confirmation*

It is possible that the Chapter 11 Cases could evolve into lengthy and contested cases, the results of which cannot be predicted.

Regardless of whether all Classes of Claims accept or are presumed to have accepted the Plan, the Plan still may not be confirmed by the Bankruptcy Court, which sits as a court of equity and may exercise substantial discretion. A nonaccepting creditor might challenge the adequacy of the disclosure, the solicitation procedures and results, or the terms of the Plan as not being in compliance with the Bankruptcy Code. In such event, we may seek to resolicit acceptances. Nonetheless, confirmation of the Plan could be delayed and possibly jeopardized. Additionally, we cannot assure you that the Plan will not require significant modifications for confirmation, or that such modifications would not require a resolicitation of acceptances.

Even if the Bankruptcy Court were to determine that the disclosure and the balloting procedures were appropriate and the results were accurate and appropriate, the Bankruptcy Court could nevertheless decline to confirm the Plan if it were to find that any statutory conditions to confirmation had not been met, including that the terms of the Plan are fair and equitable to nonaccepting Classes. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any nonaccepting Classes, that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of distributions to nonaccepting Holders of Impaired Claims and Impaired Equity Interests will not be less than the value of distributions

such Holders would receive if the Company were liquidated under chapter 7 of the Bankruptcy Code. See Article XV.E.1. "CONFIRMATION—Plan Meets Requirements for Confirmation—Best Interests of Creditors—Liquidation Analysis." Although we believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court would reach the same conclusion. See Article XV.E. "CONFIRMATION—Plan Meets Requirements for Confirmation."

The confirmation and consummation of the Plan also are subject to certain other conditions. See Article VI.D. "THE PLAN—OTHER PROVISIONS—Conditions Precedent to Confirmation and Effective Date of the Plan." We cannot assure that these conditions will be satisfied or, if not satisfied, that we could or would waive such conditions, or that any required consent to such waiver would be obtained.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented and what Holders of Claims and Equity Interests would ultimately receive in respect of their Claims and Equity Interests. If an alternative plan of reorganization could not be agreed to, it is possible that we would have to liquidate our assets, in which case it is likely that Holders of Claims would receive less than they would have received pursuant to the Plan. See Article XV.F.3. "CONFIRMATION—Alternatives to Confirmation and Consummation of the Plan—Liquidation Under Chapter 7 or Chapter 11." Moreover, nonconfirmation of the Plan could result in an extended chapter 11 proceeding, during which time we could experience significant deterioration in our relationships with our trade vendors and major customers. Furthermore, if the Effective Date is significantly delayed, there is a risk that certain material restructuring agreements may expire or be terminated in accordance with their terms. Article II.A.10. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Termination Rights Under Plan Support Agreement."

8.      *Alternatives to Confirmation and Consummation of the Plan*

We cannot assure that the Plan will be confirmed or consummated. If we commence the Chapter 11 Cases and the Plan is not subsequently confirmed by the Bankruptcy Court and consummated, the alternatives include (i) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (ii) dismissal of the Chapter 11 Cases and (iii) liquidation of the Prospective Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. We believe the Plan is significantly more attractive than these alternatives because we believe, among other things, that it will minimize disputes concerning our reorganization, significantly shorten the time required to accomplish the reorganization, reduce the expenses of a case under chapter 11 of the Bankruptcy Code, minimize the disruption to our business that would result from a protracted and contested bankruptcy case and ultimately result in a larger distribution to creditors than would other types of reorganizations under chapter 11 of the Bankruptcy Code or a liquidation under chapter 7 of the Bankruptcy Code.

9.      *Risk of Nonoccurrence of the Effective Date*

Although we believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. The effectiveness of the Plan is subject to a number of conditions precedent, as outlined in section 8.2 of the Plan, and we cannot assure that all such

conditions will occur (or be waived in accordance with the terms of the Plan). If, for this or any other reason, the Effective Date is significantly delayed, there is a risk that certain material restructuring agreements, such as the Plan Support Agreement, may expire or be terminated in accordance with their terms. Article II.A.10. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Termination Rights Under Plan Support Agreement."

10.    *Termination Rights Under Plan Support Agreement*

Our ability to consummate the transactions contemplated by the Plan is conditioned upon, among other things, satisfaction of the terms contained in the Plan Support Agreement and Plan Documents, which contains certain closing conditions and termination rights. As discussed in Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases," there are several risks that, if realized, could have the effect of extending the chapter 11 proceeding beyond the anticipated timeline. If this happens, the termination rights may be triggered.

The Plan Support Parties are entitled to terminate the Plan Support Agreement if, among other things, (a)(i) the solicitation of votes to accept or reject the Plan is not concluded by January 12, 2010, (ii) we fail to commence the Chapter 11 Cases prior to January 15, 2010, or (iii) the Effective Date does not occur prior to March 18, 2010, as such dates may be extended by the Requisite Plan Support Parties, (b) a material adverse effect with respect to the Prospective Debtors or their businesses occurs or (c) we materially breach the terms of the Plan Support Agreement. Upon termination, the Plan Support Parties could withdraw their votes for the Plan, which would substantially impede our ability to consummate the proposed restructuring.

11.    *Inability to Assume Certain Contracts*

The Plan provides for the assumption of all our executory contracts and unexpired leases. Our intention is to preserve as much of the benefit of our existing contracts as possible. Certain limited classes of executory contracts, however, may not be assumed without the consent of the counterparty. In these cases, we would need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent would be forthcoming or that material conditions would not be attached to any such consent that would make assuming such contracts unreasonable. We would then be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

B.    *Factors Affecting the Value of the Securities to Be Issued Under the Plan of Reorganization*

1.    *Capital Requirements*

The Reorganized Debtors' business is expected to have substantial capital expenditure needs. Although the Plan reduces our debt obligations, we will remain highly leveraged, and our ability to gain access to additional capital, if needed, cannot be assured, particularly in view of competitive factors and industry conditions.

2.  *Variances From Projections*

A fundamental premise of the Plan is that it restructures our indebtedness as reflected in the Projections. The Projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors and their subsidiaries, some of which may not occur. Such assumptions include, among others, assumptions concerning the general economy, our ability to manage costs and achieve cost reductions, our ability to establish market strength, consumer purchasing trends and preferences, the ability to stabilize and grow our sales base and control future operating expenses and other risk factors described below. We believe that the assumptions underlying the Projections are reasonable. Unanticipated events and circumstances occurring subsequent to the preparation of the Projections, however, may affect our actual financial results. Additionally, upon the Effective Date, Reorganized Holdings will have new directors who may elect not to pursue the same business plan that underlies the Projections. In addition, no adjustments for Fresh Start Accounting have been included in the Projections. For example, the allocation of the valuation among asset classes performed as part of Fresh Start Accounting will effect future depreciation, amortization, cost of goods sold and tax expenses that have not been reflected in the Projections. The actual results achieved throughout the Projection Period, therefore, necessarily will vary from the projected results, and such variations may be material and adverse. Accordingly, Holders of Claims and Equity Interests and other interested parties are cautioned not to place undue reliance on the Projections.

3.  *Recovery Percentages May Differ From Estimates*

The estimated percentage recovery by Holders of Secured Credit Agreement Claims, Senior Note Claims and Senior Discount Note Claims is based upon estimated values of the New First Lien Notes, the New Second Lien Notes, the Exit Warrants and the New Common Stock. Given that the market and economic conditions upon which such values are based are beyond our control, the actual results achieved necessarily will vary from the estimate. Such variations may be material and adverse. See "SUMMARY OF THE SOLICITATION AND PLAN."

4.  *Lack of Trading Market for New Securities and Restrictions on Transfer of New Securities*

The New Securities will be new issues with no established trading market or prior trading history. There can be no assurance regarding the future development of a market for the New Securities, the ability of holders thereof to sell their New Securities or the price for which such holders may be able to sell such New Securities. If a market were to develop, the New Securities could trade at prices lower than their initial values under the Plan. The trading prices of the New Securities will depend on many factors, including factors beyond our control. Furthermore, the liquidity of, and trading market for, the New Securities may be adversely affected by price declines and volatility in the market for similar securities, as well as by any changes in our financial condition or results of operations.

The shares of New Common Stock issued in the Rights Offering will be "restricted securities" within the meaning of Rule 144 under the Securities Act and may not be resold absent a registration statement under the Securities Act or the availability of an exemption under the Securities Act.

To the extent that Persons who receive New Securities pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, including as an "affiliate" of the issuer, resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Consequently, an "underwriter" or "affiliate" may not resell New Securities except in compliance with the registration requirements of the Securities Act or an exemption therefrom, including Rule 144. In addition, any person who is an "underwriter" but not an "issuer," including an "affiliate," with respect to an offer and sale of securities is entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b) of the Bankruptcy Code.

The New Common Stock also will be subject to mandatory voting pursuant to the terms of the Voting Agreement and to substantial restrictions on transfer contained in the Reorganized Holdings Certificate of Incorporation (see the description of the proposed transfer restrictions contained in Section VIII.C.3. hereto). In addition, the Exit Warrants may only be sold to holders of New Common Stock or other holders of Exit Warrants.

Consequently, any Holder of the New Securities may have to bear the economic risk associated with such stock for an indefinite period of time. We do not intend to register the New Securities under the Securities Act until required under the Registration Rights Agreement, or to list the New Common Stock on any securities exchange. Holders of New Securities should not expect to receive reports or financial statements from us except to the extent required by the Registration Rights Agreement, the New First Lien Note Indenture or the New Second Lien Note Indenture, or to the extent voluntarily provided.

Furthermore, recipients of Senior Discount Note Rights may not sell, assign or otherwise transfer their Senior Discount Note Rights. Because the Senior Discount Note Rights are non-transferable, there will not be a market for the Senior Discount Note Rights.

### 5. *Dividends on New Securities*

We do not anticipate that we will generate sufficient net profits to pay cash dividends to holders of the New Common Stock for the foreseeable future. In addition, provisions in the New First Lien Note Indenture and the New Second Lien Note Indenture will limit our ability to pay dividends.

### 6. *Ownership of Voting Stock.*

We expect that after our Restructuring, a large percentage of our New Common Stock may be beneficially owned by a small number of stockholders. A limited number of our shareholders may therefore be able to direct our policies, select a majority of our directors and control stockholder actions such as the approval of agreements to be executed in connection with the sales process. The interests of these shareholders and their affiliates may conflict with the interest of our other investors. These conflicting interests could include, without limitation:

- interests in our outstanding New First Lien Notes, New Second Lien Notes or other obligations;

- investments in media businesses and businesses that support or enhance media properties, including publishing businesses;

- ownership of controlling or non-controlling interests in media and related businesses, including publishing businesses, some of which may compete with us; and

- the participation in the acquisition of one or more of our business units in connection with our sales process.

To the extent that conflicts of interests may arise between us and our principal stockholders or their affiliates, these conflicts may be resolved in a manner adverse to other of our investors.

7.    *Collateral Securing New First Lien Notes and New Second Lien Notes*

The value of the collateral securing the New First Lien Notes and the New Second Lien Notes may not be sufficient to satisfy our obligations under such New Notes. In addition, the indenture for the New Notes permits us to incur up to $25 million of indebtedness under a senior credit facility which may be secured equally and ratably on a first priority basis with the New First Lien Notes (hereinafter "other first lien debt"); and to the extent we incur other first lien debt the interest of the holders of the New Notes in the collateral securing the New Notes will be diluted. No appraisal of the value of the collateral was made in connection with the offerings of the New Notes, and the fair market value of the collateral is subject to fluctuations based on factors that include, among others, general economic conditions and similar factors. The amount to be received upon a sale of the collateral would be dependent on numerous factors, including, but not limited to, the actual fair market value of the collateral at such time, the timing and the manner of the sale and the availability of buyers. By its nature, portions of the collateral may be illiquid and may have no readily ascertainable market value. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, the collateral may not be sold in a timely or orderly manner and the proceeds from any sale or liquidation of this collateral may not be sufficient to pay our obligations under the New Notes (and any other first lien debt we may incur).

To the extent liens permitted under the indentures governing the New Notes and other rights encumber any of the collateral securing the New Notes, those parties have or may exercise rights and remedies with respect to the collateral that could adversely affect the value of the collateral and the ability of the collateral trustee or the holders of the New Notes to realize or foreclose on the collateral.

8.    *Subordination of the Second Lien Notes*

The New Second Lien Notes will be expressly subordinated and junior in right of payment to the New First Lien Notes (and up to $25 million of other first lien debt we may incur under a senior credit facility) pursuant to the terms of the New Second Lien Note Indenture; and the lien on the collateral securing the New Second Lien Notes will be junior to the lien on the

collateral securing the New First Lien Notes (and any other first lien debt we may incur) pursuant to the Intercreditor Agreement. As a result, upon any distribution to creditors of the Reorganized Debtors in a bankruptcy, liquidation or reorganization or similar proceeding relating to the Reorganized Debtors or their assets, the holders of New First Lien Notes (and any other first lien debt we may incur) will be entitled to be paid in full and in cash from the proceeds of the collateral or otherwise before any payment may be made from such proceeds with respect to the New Second Lien Notes. In any of these cases, the Reorganized Debtors may not have sufficient funds to pay all of its creditors and the holders of the New Second Lien Notes may not receive any payments on account of such debt unless and until the holders of the New First Lien Notes (and any other first lien debt we may incur) have been repaid in full.

In addition, enforcement rights of the holders of New Second Lien Notes with respect to the collateral will be subject to an Intercreditor Agreement containing customary "standstill" periods and other restrictions on enforcement. Essentially, these restrictions provide that until the New First Lien Notes (and any other first lien debt) are paid in full (i) any decisions to be made in connection with any foreclosure or other enforcement action with respect to all or any part of the collateral will be made by holders of the New First Lien Notes (and any other first lien debt) without any input from the holders of the New Second Lien Notes and (ii) the holders of Second Lien Notes are prohibited from exercising any of their rights or remedies as a secured creditor with respect to the collateral until 120 days after the later of the date of (a) the date of the declaration of an event of default under the new Second Lien Note Indenture and acceleration of the New Second Lien Notes or (b) the date the collateral trustee for the New First Lien Notes is notified of the event of default under the New Second Lien Note Indenture; provided, however, that notwithstanding the foregoing, the holders of the New Second Lien Notes may not exercise any of their rights or remedies as a secured creditor with respect to the collateral so long as the holders of the New First Lien Notes (and any other first lien debt) are diligently pursuing their rights and remedies with respect to the collateral.

Furthermore, the subordination provisions of the New Second Lien Note Indenture limit the rights of the holders of the New Second Lien Notes as unsecured creditors vis-à-vis the holders of the New First Lien Notes (and any other first lien debt) as follows:

- upon any payment default under the New First Lien Note Indenture (or any other first lien debt), no payments may be made on the Second Lien Notes unless and until such default is cured or waived or the New First Lien Notes (or such other first lien debt) cease to exist;

- upon any other default under the New First Lien Note Indenture (or any other first lien debt) which (with or without notice, the passage of time or both) would permit the holders thereof to accelerate such indebtedness, the trustee under the New First Lien Note Indenture (or the representative under any other first lien debt) may issue a "payment blockage notice" and, unless such notice is waived or such indebtedness is accelerated, prohibits us from making any payments on the New Second Lien Notes until the earliest to occur of (i) the date on which such default is cured or waived or such indebtedness is discharged or paid in full, (ii) 179 days pass after the date on

which the payment blockage notice is received, and (iii) such payment blockage period shall have been voluntarily terminated;

- upon an event of default under the New Second Lien Note Indenture (other than events of default related to bankruptcy or insolvency), the holders of the New Second Lien Notes cannot accelerate the New Second Lien Notes until 5 business days after the date written notice of such acceleration is delivered to the trustee under the New First Lien Note Indenture;

- an event that is solely an event of default under the New First Lien Note Indenture (or other first lien debt) does not become an event of default under the New Second Lien Note Indenture (due to the cross default provisions under the New Second Lien Note Indenture) until after a 45 day grace period under the New Second Lien Note Indenture which is in addition to any grace period under the New First Lien Note Indenture (or other first lien debt); and

- upon any mandatory redemption of the New Notes, the New First Lien Notes must be redeemed in full before any New Second Lien Notes are redeemed.

9. *Covenants under the indentures governing the New Notes and under any future debt agreements restrict our future operations.*

The indentures governing the New Notes will impose operating and financial restrictions that limit our discretion on some business matters, which could make it more difficult for us to expand our business, finance our operations and engage in other business activities that may be in our interest. These restrictions include compliance with, or maintenance of, certain financial tests and ratios, including a maximum leverage ratio, an interest coverage ratio and limits on the amount of capital expenditures we may make. These restrictions also limit our ability and that of our subsidiaries to, among other things:

- incur additional indebtedness or place additional liens on our assets;

- pay dividends or make other distributions on, redeem or repurchase our capital stock;

- make investments or repay subordinated indebtedness;

- engage in sale-leaseback transactions;

- enter into transactions with affiliates;

- sell assets;

- create restrictions on dividends and other payments to us from our subsidiaries;

- issue or sell stock of our subsidiaries;

- engage in a merger, consolidation or other business combination; or

- change the nature of our businesses.

Any additional indebtedness we may incur in the future may subject us to similar or even more restrictive conditions.

     10.    *The imposition of certain permitted liens could adversely affect the value of the collateral.*

The collateral securing the New Notes will be subject to liens permitted under the terms of the indentures governing the New Notes and the related security documents, whether arising on or after the date the New Notes are issued. The existence of any permitted liens could adversely affect the value of the collateral securing the New Notes and the other first lien debt as well as the ability of the collateral trustee to realize or foreclose on such collateral. The liens of such third parties could also have priority over the liens securing the New Notes and the other first lien debt. For example, in the future if we were to acquire another company that already had outstanding indebtedness secured by all of its assets, that indebtedness would have a priority claim on the acquired company's assets. Even if that Company's assets are pledged to secure the New Notes and the related guarantees, the lien securing the New Notes and guarantees will be junior to the lien on such assets that existed at the time we acquired the Company. See the definition of ''Permitted Liens'' in the indentures governing the New Notes in <u>Exhibits F</u> and <u>G</u> to this Disclosure Statement.

     11.    *The collateral is subject to casualty risks.*

We intend to maintain insurance or otherwise insure against hazards in a manner appropriate and customary for our business. There are, however, certain losses that may be either uninsurable or not economically insurable, in whole or in part. Insurance proceeds may not compensate us fully for our losses. If there is a complete or partial loss of any of the pledged collateral, the insurance proceeds may not be sufficient to satisfy all of the secured obligations, including the New Notes and any other first lien debt.

     12.    *Rights of holders of New Notes in the collateral may be adversely affected by bankruptcy proceedings.*

The right of the collateral trustee to repossess and dispose of the collateral securing the New Notes or any related guarantee thereof upon acceleration is likely to be significantly impaired by federal bankruptcy law if bankruptcy proceedings are commenced by or against us or any guarantor of the New Notes prior to or possibly even after the collateral trustee has repossessed and disposed of the collateral. Under federal bankruptcy law, a secured creditor, such as the collateral trustee, is prohibited from repossessing its security from a debtor in a bankruptcy case or from disposing of security repossessed from a debtor, without bankruptcy court approval. Moreover, bankruptcy law permits the debtor to continue to retain and to use collateral, and the proceeds, products, rents or profits of the collateral, even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" may vary according to circumstances, but it is intended in general to protect the value of the secured creditor's interest

in the collateral and may include cash payments or the granting of additional security, if and at such time as the court in its discretion determines, for any diminution in the value of the collateral as a result of the stay of repossession or disposition or any use of the collateral by the debtor during the pendency of the bankruptcy case. In view of the broad discretionary powers of a bankruptcy court, it is impossible to predict how long payments under the New Notes or any related guarantee could be delayed following commencement of a bankruptcy case, whether or when the collateral trustee would repossess or dispose of the collateral, or whether or to what extent holders of the New Notes would be compensated for any delay in payment of loss of value of the collateral through the requirements of "adequate protection." Furthermore, in the event the bankruptcy court determines that the value of the collateral is not sufficient to repay all amounts due on the New Notes, the holders of the New Notes would have "undersecured claims" as to the difference. Federal bankruptcy laws do not permit the payment or accrual of interest, costs and attorneys' fees for "undersecured claims" during the debtor's bankruptcy case.

13.     *Any future pledge of collateral might be avoidable in bankruptcy.*

Any future pledge of collateral in favor of the collateral trustee, including pursuant to security documents delivered after the date of the indentures governing the New Notes, might be avoidable by the pledgor (as debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the New Notes to receive a greater recovery than if the pledge had not been given and a bankruptcy proceeding in respect of the pledgor were to be commenced within 90 days following the pledge or, in certain circumstances, a longer period.

14.     *Rights of holders of New Notes in the collateral may be adversely affected by the failure to perfect security interests in certain collateral acquired in the future.*

The security interest in the collateral securing the New Notes includes assets, both tangible and intangible, whether now owned or acquired or arising in the future. Applicable law requires that certain property and rights acquired after the grant of a general security interest can only be perfected at the time such property and rights are acquired and identified. There can be no assurance that the collateral trustee will monitor, or that we will inform the collateral trustee of, the future acquisition of property and rights that constitute collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired collateral. Such failure may result in the loss of the security interest therein or the priority of the security interest in favor of the New Notes against third parties.

15.     *We will in most cases have control over the collateral, and the sale of particular assets by us could reduce the pool of assets securing the New Notes and the related guarantees thereof.*

The indentures governing the New Notes and the related security documents allow us to remain in possession of, retain exclusive control over, freely operate, and collect, invest and dispose of any income from, the collateral securing the New Notes, the related guarantees and other first lien debt. So long as no default or event of default under the indentures

or the security documents would result therefrom, we may, among other things, without any release or consent by the collateral trustee, conduct ordinary course activities with respect to most of the collateral, such as selling, factoring, abandoning or otherwise disposing of collateral and using the proceeds from any such sale or disposition to reinvest in the business or repay debt. Our decisions with respect to the collateral may not always be in the best interests of the holders of the New Notes.

> 16. *There are certain categories of property that are excluded from the collateral.*

Certain categories of assets are excluded from the collateral securing the New Notes and the related guarantees thereof. Excluded assets may include, without limitation, all of the assets of our foreign subsidiaries (unless such subsidiaries become guarantors), 35% of the capital stock of our foreign subsidiaries held by the Reorganized Debtors, certain items of property, including without limitation, items as to which a security interest cannot be granted without violating contract rights, applicable licenses or law, as more fully set forth in the security documents. If an event of default occurs and the New Notes are accelerated, the New Notes and the guarantees thereof will rank equally with the holders of other unsubordinated and unsecured indebtedness of the relevant entity with respect to such excluded property. In addition, the collateral trustee may not perfect its security interest in certain items of collateral to the extent the cost of perfecting such liens on such collateral would outweigh the benefit of perfecting the liens on such collateral or to the extent the value of such collateral is de minimis. In the event a third party takes steps to perfect its lien on the collateral over which the collateral trustee has not perfected its security interest, the lien of such third party may have priority over the lien of the collateral trustee in such item of collateral.

> 17. *Ranking of New Common Stock*

New Common Stock will rank junior to all of our existing and future liabilities, and will be subject to the risks described above. In addition, in the event of a subsequent bankruptcy, liquidation or winding-up, our assets will be available to make payments with respect to our obligations pursuant to the terms of the New Common Stock only after all of our indebtedness and other liabilities have been paid.

C. *Risks Relating to the Company's Financial Condition and Business*

> 1. *Leverage and Debt Service*

We are highly leveraged and will remain so even if the Plan is confirmed and the transactions contemplated thereunder are consummated. Our high levels of indebtedness could have important consequences, including:

> (a) requiring us to dedicate a substantial portion of our cash flow from operations to payments on indebtedness thereby reducing the availability of cash flow to fund working capital, capital expenditures, research and development efforts and other general corporate purposes;

(b)     increasing our vulnerability to adverse general economic or industry conditions;

(c)     limiting our flexibility in planning for, or reacting to, changes in our business or the industry in which we operate;

(d)     impairing our ability to obtain additional financing in the future for working capital, capital expenditures, debt service requirements, acquisitions, general corporate purposes or other purposes;

(e)     placing us at a competitive disadvantage to our competitors who are not as highly leveraged; or

(f)     triggering an event of default under the New First Lien Notes Indenture or the New Second Lien Notes Indenture if we fail to comply with the financial and other restrictive covenants contained therein.

The indentures governing our New First Lien Notes and New Second Lien Notes also require us to satisfy certain financial covenants. Our ability to comply with any covenants may be adversely affected by general economic conditions, political decisions, industry conditions and other events beyond our control. As a result, we cannot assure you that we will be able to comply with these covenants, when and if they become applicable to us. Our failure to comply with these covenants should they become applicable to us, could result in an event of default, which could materially and adversely affect our operating results, our financial condition and liquidity.

In order to adequately service our indebtedness, we will require a significant amount of cash. Our future cash flow may not be sufficient to meet our obligations and commitments. If we are unable to generate sufficient cash flow from operations in the future to service our indebtedness and to meet our other commitments, we will be required to adopt one or more alternatives, such as a further refinancing or restructuring of our indebtedness, selling material assets or operations or seeking to raise additional debt or equity capital. These actions may not be implemented on a timely basis or on satisfactory terms or at all, and may not enable us to continue to satisfy our capital requirements. Restrictive covenants in our indebtedness may prohibit us from adopting any of these alternatives (with the failure to comply with these covenants resulting in an event of default which, if not cured or waived, could result in the acceleration of all of our indebtedness). We cannot assure you that our assets or cash flow would be sufficient to fully repay borrowings under our outstanding debt instruments, if accelerated upon an event of default, or that we would be able to repay, refinance or restructure the payments of those debt instruments. To the extent that interest on the New Second Lien Notes is paid-in-kind rather than in cash, our leverage will continue to increase, which could further exacerbate the risks described above.

2.     *Floating Rate Indebtedness*

Our New First Lien Notes and New Second Lien Notes will bear interest at floating rates, which may adversely affect our cash flow and liquidity. If there is a rise in interest rates, our

debt service obligations on the amounts owed in connection with the New First Lien Notes and New Second Lien Notes would increase even though the principal amount of our indebtedness remained the same. We cannot assure you that we will be able to limit our exposure to such rate fluctuations by entering into an interest rate hedging agreement on favorable terms, or at all, in the future.

3.    *Enforcement of Defaults by Entities Not Party to the Plan Support Agreement*

The Plan Support Agreement can be terminated prior to the commencement of the Chapter 11 Cases if, among other things, the trustee or Holders of the Senior Notes or Senior Discount Notes (i) seeks a judgment lien, a prejudgment lien or attachment of any form of equitable relief and we have not filed for protection under Chapter 11 of the Bankruptcy Code prior to receipt of termination from the Plan Support Parties or (ii) commence any other action or proceeding to collect or recover amounts due and payable with respect to such notes and an order granting the relief requested has been entered by the applicable court. Although Holders of a substantial proportion of the outstanding principal amount of Impaired Notes are party to the Plan Support Agreement, it is possible that these termination events could be triggered by actions of Holders who have not agreed to the Plan Support Agreement, in particular, the Holders of the Senior Discount Notes.

4.    *Treatment of Trade Vendors and Other Unsecured Claims in the Chapter 11 Cases and Risk of Failure to Obtain Authority to Pay Their Claims in the Ordinary Course of Business*

We believe that our ability to continue to receive significant levels of trade support following the Petition Date will require that we obtain a "first day order" from the Bankruptcy Court authorizing us to continue to pay trade vendors and other unsecured creditors in the ordinary course of business, including obligations which arise prior to the filing of the Chapter 11 Cases. Although we believe that ample precedent exists for obtaining such an order in chapter 11 cases such as ours, there can be no assurance that the Bankruptcy Court will grant the order or that trade support will not further erode.

Irrespective of whether we are able to obtain such an order, the Plan provides that Holders of General Unsecured Claims will be Unimpaired. Thus even if such an order is not obtained, General Unsecured Claims will be paid on the latest of (x) the Effective Date, (y) the date on which the claim becomes Allowed, and (z) such later date as may be mutually agreed by the Holder of the claim and us. As a result, no General Unsecured Claims are anticipated to be restructured or otherwise reduced in connection with the Plan.

There will be no Claims bar date established in connection with the Plan, however, and in the absence of a bar date, there will be uncertainty with respect to the overall liabilities of the Reorganized Debtors because there will be no requirement for Holders of General Unsecured Claims to identify the nature and amount of their Claims by timely Filing a proof of claim. If we had elected to pursue an alternative plan of reorganization in which General Unsecured Claims were Impaired, the amount of indebtedness with respect to such Claims could have been reduced, and the total liabilities of the Reorganized Debtors would be clearer. We believe, however, that

the Plan is a superior alternative to any alternative plan of reorganization which would Impair the Holders of General Unsecured Claims because: (i) a large number of the Holders of General Unsecured Claims are key suppliers of products and services used by the Company and any Impairment of these Claims could be detrimental to our ability to obtain essential trade credit and could substantially impair our ability to do business with trade creditors whose goods and services are essential and (ii) we believe the Plan can be consummated on a more expeditious and significantly less contentious and costly basis if General Unsecured Claims are Unimpaired than if such Claims were to be Impaired.

5.   *Disruption of Operations and Retention of Key Customers and Key Employees*

The commencement and pendency of the Chapter 11 Cases could adversely affect our relationships with our customers and suppliers, as well as our ability to retain or attract high-quality employees. In such event, weakened operating results may occur that could give rise to variances from the stated Projections.

Certain customers and suppliers have expressed concerns with respect to our ability to ensure continuity of supply and payments of invoices. Although we believe we have addressed these concerns, there can be no assurance that certain customers and suppliers will continue to do business with us.

Our ability to operate our businesses and implement our strategies effectively depends, in part, on the efforts of our executive officers and other key employees. In this way, our future success will depend on, among other factors, our ability to attract and retain other qualified personnel in key areas, including engineering, sales and marketing, operations, information technology, and finance and the continued service of our key operations, marketing, editing and sales personnel. Because of the traditional stigma associated with any bankruptcy, regardless of whether it may improve our financial condition, the commencement of the Chapter 11 Cases may adversely affect our ability to attract and retain the requisite highly-skilled personnel and key employees. Although we intend to seek authority from the Bankruptcy Court to pay, among other things, all prepetition wages, salaries, commissions and employee benefits, we cannot assure you that the Bankruptcy Court will grant such an order, or that, even with such an order, our highly skilled personnel and key employees will commence or continue their employment with us, and their failure to do so could have a material adverse effect on our business.

6.   *The recent U.S. financial turmoil and associated economic downturn has and may continue to harm our Test-prep and Intervention and Library businesses and prospects.*

The worldwide financial turmoil and associated economic downturn has resulted in the curtailment, delay or reduction in federal, state and local government funding available to schools and libraries and the general retail markets. During 2008, we derived more than 82.8% of our revenue from schools, school districts and school and public libraries. These institutions depend on funding from federal, state and local governments to purchase our products. Many state and local governments have faced, and may continue to face, budget deficits. In addition, the government appropriations process is often slow, unpredictable and subject to factors outside

of our control. Curtailments, delays or reductions in the funding of schools or libraries has reduced and could continue to reduce our revenue.

Lack of adequate funding results in decreased revenue on the sale of our products. For example, in the fourth quarter of 2008 our revenue decreased to $36.0 million compared to $42.0 million in the fourth quarter of 2007. In order to mitigate any resulting decrease in revenue, we have designed and implemented a cost-savings plan. We cannot assure that these cost savings initiatives will offset any decrease in revenue effected by the downturn in funding. If our revenue grows more slowly than we anticipate, or if our cost savings initiatives are not successful, our business and prospects will be harmed. Any continuing or further reduction or delay in governmental funding earmarked for education or library materials could have a material adverse effect on our operations.

7.     *We may be unable to compete successfully in our highly competitive industry.*

We operate in highly competitive markets. Many of our competitors are larger and have greater financial resources than us. As a result, these competitors may be able to devote greater resources to the promotion and sale of their products than we can. Conversely, other competitors are smaller than us and focused on narrow, niche market opportunities. These smaller companies may be able to adapt more quickly to new or emerging technologies and changes in customer preferences. In each of our business segments, we expect to meet significant competition in regard to our existing products and new products we might introduce. Further, competitors might expand their product offerings, either through internal product development or acquisitions of our businesses' direct competitors.

To maintain a competitive advantage, we will need to continue to invest in product development and sales and marketing. We may not have sufficient resources to make the necessary investments to compete successfully against our competitors. We cannot assure you that we will be able to compete effectively with these companies in the future, and if we are unable to compete effectively, our financial condition and results of operations will be materially adversely affected.

8.     *We have a history of losses, which we expect to continue, and we might not ever achieve or maintain profitability.*

We have experienced losses every year since our inception through 2008. In 2008, we had net loss of $38.5 million and had a stockholders deficit of $186.4 million and a working capital deficiency of $320.3 million (including long term debt in default classified as current of $381.8 million) as of December 31, 2008. The 2008 net loss was due, in part, to a goodwill impairment charge of $31.6 million. The loss for the nine months ending September 30, 2009 was $28,298,000. We expect to continue to incur losses for the foreseeable future. Even if we do achieve profitability, we may not be able to sustain or increase profitability on a quarterly or annual basis. If our revenue grows more slowly than we anticipate, or if our operating expenses exceed our expectations, our business will be harmed.

9. *We may be required to reduce the value of our inventory, long-lived assets and/or goodwill, which could materially adversely affect our financial condition and results of operations.*

We may be required to reduce inventory carrying values using the lower of cost or market approach in the future due to a decline in market conditions in our businesses, which could have a material adverse effect on our financial condition and results of operations. Future events could cause us to conclude that impairment indicators exist and that goodwill associated with our acquired businesses is impaired. Any resulting impairment loss related to reductions in the value of our long-lived assets or our goodwill could materially adversely affect our financial condition and results of operations.

Each fiscal year, the Company performs an annual goodwill impairment test. An impairment charge of $31.6 million was incurred in the fourth quarter of 2008. Assumptions used in our impairment test regarding future operating results of our reporting units could prove to be inaccurate. This could cause an adverse change in our valuation and thus any of our goodwill impairment tests may have been flawed. Any future impairment tests are subject to the same risks.

10. *Misuse, misappropriation or other loss of our proprietary rights could have a material adverse effect on our results of operations.*

Our success depends in part on our intellectual property rights in the products that we develop. We rely on a combination of registered and common law copyright, trademark and trade secret laws of the United States and other countries, as well as customer licensing agreements, employee and third-party nondisclosure agreements and other methods to protect our proprietary rights. We cannot be certain that the steps we have taken to protect our intellectual property rights will be adequate or that third parties will not infringe or misappropriate our proprietary rights or develop technology or products that are similar to ours. Any such infringement or misappropriation could materially adversely affect our future financial results, reduce or eliminate any competitive advantage we have developed and otherwise harm our business. Enforcing our intellectual property rights could result in substantial costs and a diversion of management's attention and resources, which could materially affect our business, financial condition, cash flows or results of operations, and we may not prevail.

We do not include any mechanisms in our materials or products to prevent or inhibit unauthorized copying. If such copying or misuse were to occur to any substantial degree, our results of operations could be materially adversely affected. In addition, our U.S. registrations may not be enforceable or effective in protecting our trademarks and copyrights, especially outside of the United States.

11. *We may have to defend against intellectual property infringement claims and other claims that may cause us to incur significant costs and may divert management attention.*

Although we believe that our products do not infringe on the intellectual property rights of others, other parties may assert claims that we have violated or infringed on a copyright, trademark or other proprietary right belonging to them. We license third-party content to create

some of our products. In these license agreements, the licensors have generally agreed to defend, indemnify and hold us harmless with respect to any claims by a third party that the licensed content infringes other proprietary rights. We cannot assure you that these provisions will be adequate to protect us from infringement claims regarding the use of such third-party intellectual property. In addition, in some instances we buy products created by third parties from distributors and re-package and redistribute such products without a license or other permission from the third party creators. Although we believe that the manner in which we license third party content to create our products, as well as the manner in which we purchase third party products and re-package and redistribute them, complies with applicable trademark and copyright laws, any infringement claims could result in the expenditure of significant financial and managerial resources on our part and, if such claims are finally determined to be meritorious, could materially adversely affect our business, results of operations and financial condition.

In addition, we may be vulnerable to claims of defamation, negligence, personal injury or other legal theories relating to the information we publish, including content licensed from third parties. Our insurance, which covers commercial general liability, may not adequately protect us against these types of claims. Furthermore, if such claims are successful, we may be required to cease selling or alter our product, pay financial damages or obtain licenses from others (if available on favorable terms or at all). Any of the foregoing could cause us to incur significant costs and prevent us from distributing or selling our products.

12. *Growth of multimedia products may compete with and reduce our publishing activities.*

The traditional media platform is being increasingly challenged by the growing body of multimedia products. Multimedia products serve as ancillary tools to traditional publishing mediums such as print but can also serve as stand-alone interactive tools replacing traditional publishing mediums. The continued growth of multimedia products may detract from the viability of our traditional publishing activities.

13. *Technological changes may reduce our sale of products*

Both the traditional publishing industry and the online services industry continue to experience technological change. The publishing industry continues to evolve from traditional mechanical format printing to full digital printing. An inability to keep pace with the new technologies and standards in the print industry could negatively impact the competitiveness of our products. Our future success will depend on our ability to address the increasingly sophisticated needs of our customers by producing and marketing enhancements to our products that respond to technological changes or customer requirements. We may be required to invest significant capital in additional technology in order to remain competitive. In addition, the provision of online services is characterized by continuing improvements in technology that results in the frequent introduction of new products, short product life cycles and continual improvement in product price/performance characteristics. A failure on our part to effectively manage a product transition will directly affect the demand for our products and the profitability of our operations.

14.    *Our business may be adversely affected by an increase in paper or postage costs.*

The price of paper constitutes a significant portion of our costs relating to our print book products and direct mail solicitations. Significant increases in the price of paper may have an adverse effect on our future results. Postage for product distribution and direct mail solicitations is also one of our significant expenses. To manage the potential effect of inflation on paper costs, we negotiate arrangements of up to one year with brokers to ensure a supply of needed paper at fixed pricing, and when advantageous, we purchase and inventory raw material paper in advance of our production need. Although we distribute many of our products under a contract with the United Parcel Service, shipping and postage costs increase periodically and can be expected to increase in the future. If the costs of paper or postage increase and we are unable to pass on these increased costs to our customers, our operating results could be adversely affected.

15.    *Our success depends in large part on our ability to update and expand the content of existing products and develop new products in a cost-effective manner and on a timely basis.*

We believe that the development of high quality products each year contributes not only to near-term revenue growth, but also to revenue in subsequent periods by increasing the longevity and sustaining the competitiveness of our back list. The update and expansion of our existing products and the development of new products may not be accepted by the markets we serve. If we cannot respond to changes in industry requirements, our business may be adversely affected. Even if we are able to develop acceptable new products, we may not be able to introduce these new products as quickly as the markets require or as quickly as our competitors introduce competing new products.

16.    *If the federal NCLB Act is materially changed, repealed, or found unconstitutional, our revenue and profitability could be adversely affected*

The NCLB Act, and its implementation have been criticized by certain representatives of states and schools, including complaints that federal funding is not sufficient to carry out all aspects of NCLB. If the legislation is repealed, found to be unconstitutional or is amended in a manner that results in reduced state participation in assessment and remediation programs, our revenue and profitability could be adversely affected.

17.    *If there is a substantial reduction in the emphasis placed by federal and state governments on assessment and remediation in K-12 education, our business may be adversely affected.*

The success of our test-prep and intervention and K-12 supplemental education businesses depends on the continued use of standardized tests. If the use of standardized tests declines or falls out of favor with educational institutions or state and local governments, the markets for many of our products will deteriorate and our business may be materially adversely affected.

18. *We are dependent on a limited number of suppliers and service providers, and any interruption of supply or services from these vendors could have a material adverse effect on our operations.*

We are dependent on a limited number of suppliers for certain of our product lines, and a limited number of service providers, such as delivery service from United Parcel Service. Any interruption of supply from current vendors or any material increased costs could cause significant delays in the shipment of such products and could have a material adverse effect on our business, financial condition, and results of operations. Increases in freight costs charged to us or inability to ship products, whether real or perceived, could have a material adverse effect on our business, financial condition, and results of operations.

19. *Disruption in our distribution centers could significantly lower our revenues and profitability.*

We currently maintain national distribution centers located in Littleton, Massachusetts and Prince Frederick, Maryland, which are essential to the efficient operation of our national distribution network. Any serious disruption to these distribution centers due to fire, earthquake, act of terrorism or any other cause could damage a significant portion of our inventory and could materially impair our ability to distribute our products to customers. In addition, we could incur significantly higher costs and longer lead times associated with distributing our products to our customers during the time that it takes for us to reopen or replace the centers. As a result, any such disruption could significantly lower our revenues and profitability.

20. *We are dependent upon a central computer system and if we experience damage, service interruptions or failures in this system, or if our security measures are breached, our customer relationships and our ability to attract new customers may be adversely affected.*

Our business could be interrupted by damage to or disruption of our central computer system from natural disasters, a fire, power loss, hardware or software malfunctions, penetration by computer hackers, terrorist acts, vandalism, sabotage, computer viruses, vendor performance failures or insolvency, and other causes. As a result of any of the foregoing, we may lose data, our relationships with our customers may be impaired, we may lose customers, our ability to attract new customers may be adversely affected and we could be exposed to contractual liability. The precautions that we have taken to protect ourselves from, or minimize the impact of, such events, such as our disaster recovery plans, may not be adequate and we may be unable to recover data used in our operations.

## III. BACKGROUND AND EVENTS LEADING UP TO THE SOLICITATION

### A. *Background*

The worldwide financial turmoil and associated economic downturn beginning in 2008 resulted in the curtailment, delay or reduction in federal, state and local government funding available to schools and libraries, the Company's core markets and the general retail markets. Lack of adequate funding resulted in decreased revenue on the sale of such products. In order to mitigate any resulting decrease in revenue, the Company initiated an extensive restructuring of its operations, and, in March 2009, our Board adopted a revised business plan that included significant proposed costs savings initiatives. The revised business plan was implemented to enable us to meet our financial covenants under the Secured Credit Agreement through fiscal year 2009.

Despite our implementation of this revised business plan, which included significant cost savings, our independent registered public accounting firm determined that these actions may not be sufficient for us to meet our financial covenants under our Secured Credit Agreement through fiscal year 2009, which could result in a going concern qualification in its audit opinion. Such going concern qualification would be a covenant default under the Secured Credit Agreement. As a result, as of April 15, 2009, we had not completed our audited financial statements as required under our Secured Credit Agreement or filed our 2008 Annual Report with the SEC as required under our Prepetition Indentures. As of May 29, 2009, we further had not completed our first quarter financial statements required under the Secured Credit Agreement or filed our First Quarter 2009 Quarterly Report with the SEC as required under the Prepetition Indentures, resulting in further defaults under the Secured Credit Agreement and the Prepetition Indentures. These defaults under the Prepetition Indentures also resulted in a cross-default under the Secured Credit Agreement. Ultimately, in connection with the audit of our December 31, 2008 financial statements, our independent registered public accounting firm included an explanatory paragraph that indicates that these uncertainties raised substantial doubt about our ability to continue as a going concern.

Discussions with our auditors prior to the issuance of the Company's financial statements had led us to retain Houlihan Lokey in January 2009 as our financial advisor to assist us with the development of a comprehensive financial restructuring plan. With Houlihan Lokey's assistance, in January 2009 we engaged the Lenders to begin discussing the possibility of implementing a financial restructuring.

To address the defaults in the Secured Credit Agreement caused by our failure to file our 2008 Form 10-K within the required time period and without a "going concern" opinion, we sought an agreement from the Lenders to forbear from exercising their rights under the Secured Credit Agreement. Following negotiations, on April 15, 2009, we entered into a short-term forbearance agreement with the Lenders relating to our financial reporting defaults. We subsequently entered into further forbearance agreements or extensions thereof on April 23, 2009, May 1, 2009 and May 6, 2009.

On May 7, 2009, we entered into a Fourth Forbearance Agreement and Amendment No. 1 to our Secured Credit Agreement (the "Forbearance Agreement"). The Forbearance Agreement also provided for a forbearance relating to defaults, if any, resulting from our failure to satisfy our financial covenants under the Secured Credit Agreement for the periods ended December 31, 2008 and March 31, 2009.

Also on May 7, 2009, we received a notice from the Prepetition Indenture Trustees that our failure to timely file our SEC Reports constituted a default under the Prepetition Indentures. The Prepetition Indentures provide that the Company had 60 days from receipt of this notice of default to cure such default before an event of default occurred under the Prepetition Indentures. If an event of default occurred under the Prepetition Indentures, then the Prepetition Indenture Trustees or the Holders of 25% of the Senior Note Principal Amount or the Senior Discount Note Principal Amount, respectively, may thereafter declare the applicable notes to be due and payable immediately.

On May 29, 2009, we filed our 2008 Annual Report with the SEC, thus curing the event of default noticed to the Company on May 7, 2009 by the Prepetition Indenture Trustees.

On June 8, 2009, we announced the execution of a lock-up agreement with a holder of our Senior Discount Notes and certain of its affiliates (the "Lock-Up Agreement"). Pursuant to the Lock-Up Agreement, we launched an exchange offer for our Senior Discount Notes, pursuant to which we offered to exchange such notes for our common stock (the "Exchange Offer").

On June 17, 2009, we executed a commitment letter with certain of the Lenders, pursuant to which such Lenders agreed to provide financing to replace the amounts outstanding under our Secured Credit Agreement (the "Commitment Letter").

We extended the expiration of our Forbearance Agreement, Exchange Offer and Commitment Letter several times during July. However, we were not able to obtain the requisite level of participation in the Exchange Offer needed to consummate the exchange.

On July 23, 2009, we announced our intention that, unless the Exchange Offer was consummated, we would forego making our interest payment on our Senior Discount Notes due August 3, 2009 and enter the 30 day cure period.

On July 30, 2009, we again extended the Forbearance Agreement and Commitment Letter. We also announced our intention to begin discussing alternative restructuring plans with the Senior Noteholders.

On August 3, 2009, we failed to make the scheduled interest payment of approximately $8.4 million on our Senior Discount Notes.

On August 17, 2009, we failed to make the scheduled interest payment of approximately $8.1 million on our Senior Notes. On this day, our Commitment Letter expired.

These non-payments of interest resulted in us being in default under the Prepetition Indentures. After the expiration of the applicable cure periods in the Prepetition Indentures, the non-payments of interest gave rise to events of default under the Prepetition Indentures and the

Secured Credit Agreement. Such events of default under the applicable Prepetition Indenture permits acceleration of such notes by the Holders of 25% of the principal amount thereof or the applicable Prepetition Indenture Trustee.

On August 20, 2009, we reached an agreement in principle with Lenders holding 100% of the Secured Credit Agreement Principal Amount and Holders of more than 80% of the Senior Note Principal Amount to seek a restructuring through Chapter 11 on agreed-to-terms. The parties agreed to negotiate in good faith to memorialize the agreement in principle as a plan support agreement. In connection therewith, on August 20, 2009, we terminated the Exchange Offer for our Senior Discount Notes.

Also on August 20, 2009, in connection with an extension of the Forbearance Agreement, the Lenders earned a forbearance fee equal to six percent (6%) of the outstanding amount of the senior secured term loan, plus accrued and unpaid interest on such loan (the "6% Fee"), plus one percent (1%) of the amount of the senior secured term loan acquired by certain holders with whom the Company was in discussions (all together, the "Forbearance Fee"). Two-thirds of the 6% Fee was payable upon execution of the extension of the Forbearance Agreement, and the remainder of the Forbearance Fee was added to the principal amount of the senior secured term loan subject to the Secured Credit Agreement.

Following negotiations with the Plan Support Parties, we entered into the Plan Support Agreement on September 3, 2009, with Lenders holding 100% of the Secured Credit Agreement Principal Amount, Holders of more than 80% of the Senior Note Principal Amount and Holders of more than 13% of the Senior Discount Note Principal Amount. Subject to the terms and conditions thereof, the Plan Support Agreement requires the Plan Support Parties to vote in favor of the Plan. On October 14, 2009, the Requisite Plan Support Parties agreed to extend the date by which the Solicitation must be commenced to November 1, 2009. On October 29, 2009, the Requisite Plan Support Parties agreed to extend the date by which the Solicitation must be commenced to November 9, 2009 and also extended the Outside Date to November 23, 2009. On November 4, 2009, the Requisite Plan Support Parties agreed to extend the date by which the Solicitation must be commenced to November 16, 2009. On November 13, 2009, the Requisite Plan Support Parties agreed to extend the date by which the Solicitation must be commenced to November 25, 2009 and also extended the Outside Date to November 30, 2009. On November 25, 2009, the Requisite Plan Support Parties agreed to extend the date by which the Solicitation must be commenced to December 4, 2009 and also extended the Outside Date to December 4, 2009. As previously disclosed, the Company had entered into a number of forbearance agreements pursuant to which the Lenders agreed to forbear exercising any rights and remedies under the Secured Credit Agreement primarily relating to certain financial covenant and reporting defaults. Under the Plan Support Agreement, the Plan Support Parties have agreed to forbear exercising any rights and remedies relating to certain specified forbearance items with respect to the Secured Credit Agreement and the Senior Note Indenture until the occurrence of the Termination Date under and as defined in the Plan Support Agreement, subject to the right of earlier termination in certain other limited circumstances.

On September 10, 2009, we filed with the SEC a Form 15 certification and notice of our suspension of our duty to file reports under sections 13 and 15(d) of the Exchange Act, and

issued a press release announcing that, as a result, we would no longer make periodic reporting filings with the SEC.

On October 5, 2009, our management team met with the Plan Support Parties at the offices of Houlihan Lokey and presented an overview of the business and our revised financial forecast for 2010 – 2014.

On December 3, 2009, the board of directors (or the equivalent authorized body) of each of the Prospective Debtors determined that consummation of the transactions contemplated by the Plan was in the best interests of the Prospective Debtors and their stakeholders and authorized the commencement of this Solicitation.

B.     *Equity Ownership and Debt Structure*

1.     *Equity Ownership Structure*

Each Prospective Debtor (other than Holdings) is either a direct or indirect wholly-owned subsidiary of Holdings. The authorized capital stock of Holdings consists of 30,000,000 shares of common stock, $0.0003 par value per share. As of December 4, 2009, there were 9,958,112 shares of Holdings common stock and warrants to purchase 70,301 shares of Holdings common stock outstanding.

2.     *Debt Structure*

(a)     *Prepetition Secured Credit Agreement*

Holdings and certain of its subsidiaries are parties to the Secured Credit Agreement. The Secured Credit Agreement is comprised of the Prepetition Term Loan. The Prepetition Term Loan bears interest at a rate equal, at the Haights' option, to either: (a) the three month LIBOR rate (with a floor of 3.00%) plus 12.25% per annum, payable monthly; or (b) the prime rate (with a floor of 5.25%) plus 11% per annum, payable monthly. In the event of specified defaults under the Secured Credit Agreement these interest rates may increase by an additional 2%. Prepayment of the Prepetition Term Loan is subject to a prepayment penalty of 1% with respect to prepayments occurring between August 15, 2009 to August 15, 2010 and 0% with respect to any period thereafter.

As of November 30, 2009, the outstanding principal amount due under the Prepetition Term Loan is $109,882,158.23, plus accrued and unpaid interest thereon. The obligations under the Secured Credit Agreement are secured by a first priority lien on substantially all assets of the Prospective Debtors. We intend to repay all Secured Credit Agreement Claims on or after the Effective Date pursuant to the terms of the Plan, as described below in Article V "THE PLAN—CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION."

(b)     *Senior Notes*

As of the date hereof, the outstanding principal amount due in respect of the Senior Notes is $138.8 million, plus accrued and unpaid interest thereon. The Senior Notes bear interest at a fixed rate of 11 ¾% per annum. Haights is the issuer of the Senior Notes. The Senior Notes are

guaranteed on a joint and several basis by all of the other Prospective Debtors. The Senior Notes are unsecured.

(c)     *Senior Discount Notes*

As of the date hereof, the outstanding principal amount due in respect of the Senior Discount Notes is $135.0 million, plus accrued and unpaid interest thereon. The Senior Discount Notes bear interest at a fixed rate of 12 ½% per annum. Holdings is the issuer of the Senior Discount Notes. The Senior Discount Notes are unsecured and are not guaranteed by any of the other Prospective Debtors.

## IV. THE BUSINESS

### A. *General*

We were formed in Delaware in 1997 and are a leading developer and publisher of products for the K-12 Education and library markets. Our products include state-specific test preparation materials, skills assessment and intervention books and unabridged audiobooks. Between November 2007 and January 2008, we initiated a sale process for all of our operating businesses. On June 30, 2008 we sold the subsidiary that contained our *Oakstone Publishing* business, which operated our Medical Education segment. On August 27, 2008 we sold the subsidiary that contained our *Sundance Newbridge* business, which operated our K-12 Supplemental Education segment.

### B. *Products*

Our products are sold primarily to schools and libraries and we believe we have leading positions in the two markets we serve:

#### 1. *Test-prep and Intervention*

*Triumph Learning.* Our Test-prep and Intervention segment publishes test preparation materials, skills based instructional and assessment products, and standards-based supplemental materials for students in grades K-12 in language arts, math, science and social studies, and intervention programs based on educational principles and research. Our products are published under the well-known imprints of *Coach, Buckle Down* and *Options Publishing*. The *Coach* and *Buckle Down* brands have been used in classrooms for over 21 years, and the *Options* brand for 17 years.

On September 28, 2007, the Board of Directors authorized a restructuring of *Options Publishing* and *Triumph Learning*, whereby the management of *Options Publishing* was merged into *Triumph Learning* and the warehouse functions of *Options Publishing* were consolidated into the shared services division; the accounting functions were taken over by the *Triumph Learning* general accounting group located in New York City; customer services, warehousing and fulfillment were incorporated in to the shared service facility in Northborough, MA; and the manufacturing and product purchasing functions were consolidated into a new shared manufacturing group that was being formed in our Iowa City location. The purpose of this restructuring was to save operational costs and to improve the product development process. Furthermore, certain functions of *Triumph Learning* were moved to other locations to improve processes, leverage shared resources and take advantage of lower cost facilities. The accounts receivable and cash applications functions were relocated to Northborough, MA; and the manufacturing functions located in NY were moved into the previously discussed shared manufacturing function in Iowa City. Additionally, as of January 1, 2008, the *Triumph Learning* accounting group took over certain accounting functions from *Sundance/Newbridge* related to the shared service facility in Northborough, MA. This restructuring process was completed during the first quarter of 2008.

On November 19, 2008 the board approved the consolidation of the management of the *Buckle Down/Options* operations in Iowa under the *Triumph Learning* management in New York City. This resulted in the elimination of the President of *Buckle Down*; the moving of the marketing function to the companies New York City facility, the consolidation of sales management and product development to be managed in the New York office. In addition to reducing costs, this action better allowed the company to leverage its resources and coordinate activities in product development, sales and marketing.

On March 11, 2009 the board approved the closing of our sales, marketing and product development facility in Iowa City. These actions allowed us to complete the consolidation of the *Buckle Down* and *Options* operations that began in November 2008. The remaining product development and sales and marketing functions have been moved to the Company's New York City facility location.

Our test-preparation and intervention products are sold primarily to schools and school districts and cover reading, writing, math, science and social studies., *Triumph Learning* also publishes skills assessment products and complementary skills books focused on building reading, math, social studies, writing and other basic skills, which can be used either alone or in conjunction with our test-prep books.

*Triumph Learning* and *Buckle Down* product lines include:

| Product Line | Grades | Description |
|---|---|---|
| *Coach* | 1-12th | Approximately 975 state-specific test-prep workbooks covering 22 states; and 450 complementary skills books and collections of state-specific practice tests. |
| *Buckle Down* | 3rd-12th | Approximately 595 state-specific test-prep workbooks covering 23 states; and collections of state-specific practice tests. |

We believe *Triumph Learning's* competitive advantages include the customer loyalty they have built over 21 years of providing state-specific test preparation materials, the breadth and depth of their product lines and the degree to which they customize each product to each state test. Unlike other test-preparation publishers, who may offer one series of products for all states or who partially customize books, our titles are highly customized and precisely focused on each state's specific standards. Our products provide high quality instruction on each of the subjects assessed on the state test. Our practice tests, included in both *Coach* and *Buckle Down* books, have the benefit of helping students become more familiar with the actual test they will be taking because they match the features — including format, typeface, lettering or numbering system, style of answer foils and question type — of each state's particular exam.

*Options Publishing.* Under our *Options Publishing* imprint, we publish skills assessment products and standards-based supplemental materials for grades K-8 in reading, writing, science, and literature, and intervention programs based on educational principles and research. The core focus of *Options Publishing's* product strategy is to create and offer products with effective learning techniques and extensive practice to assist students struggling with the current grade

level curriculum. These products are often used in after-school, tutorial, and summer school environments, otherwise known as intervention settings, by students who have not initially achieved required skill levels through the classroom. *Options Publishing* offers more than 560 workbook titles, 2 intervention kit products and 65 intervention kit titles, and over 45 different product lines, including:

| **Product Line** | **Grades** | **Description** |
|---|---|---|
| *Comprehensive Reading Assessment*<br>*Comprehensive Math Assessment*<br>*Comprehensive Science Assessment*<br>*Comprehensive Social Studies Assessment* | K-8th | Comprehensive assessment of students' skills in the specific subject, extensive exercises and lessons to improve performance in one book. |
| *GPS* | 2nd-6th | State specific leveled skills based reading kit. Provides essential reading skill required to achieve proficiency on standardized tests. |
| *CSK* | 2nd-5th | Paired fiction and non-fiction reading program designed to help increase reading comprehension; Includes interactive practice. |
| *Best Practices in Reading* | 1st-8th | Each book uses research-based strategies, modeling in early lessons, and skills development to help students learn to become independent readers and thinkers. |
| *Intervention Packages – Math or Reading* | K-8th | Programs for after school, summer school and special programs, ability to diagnose students' current functioning levels, instruction for critical skills and strategies, and extensive additional practice. |

We believe *Options Publishing's* competitive strengths include its concentrated focus on developing products for the struggling student market and its knowledge of classroom trends and teacher demands through its extensive field sales network, which allows *Options Publishing* to rapidly create responsive product solutions. *Options Publishing's* product development team has a track record of success in creating new products for the struggling student market in a timely

and cost effective manner. *Options Publishing's* sales and marketing effort is also a meaningful competitive strength. Its experienced field sales force is able to reach the significant struggling student school districts, and the extensive use of product sampling helps ensure students and teachers in the classroom environment remember and value *Options* products.

2. *Library*

Our *Library* segment publishes unabridged audiobooks and other products, under our *Recorded Books* imprint, for adults and children and markets these titles to public libraries, schools and consumers.

*Recorded Books.* *Recorded Books* publishes and markets unabridged audiobooks in the U.S. and U.K. markets across multiple genres of literature, including mystery, history, classics, inspirational, western, romance, and sports, primarily in CD and audiocassette format. *Recorded Books* released over 700 new titles in 2008, and has over 7,500 titles on its backlist. *Recorded Books* licenses the right to produce an unabridged audiobook for the library market, usually on an exclusive basis, from the author or trade book publisher. *Recorded Books'* unabridged audiobooks, which generally run 10 to 20 hours in length, are known for their high quality, from the engaging narration of the book performed by professional voiceover artists to the quality of recording and packaging materials used in the end product. *Recorded Books'* dedication to quality production has won it numerous industry awards. In addition, to meet the increasing demand of its customers, *Recorded Books* supplements its proprietary audiobooks by distributing non-proprietary titles.

Approximately 36% of *Recorded Books'* sales to public libraries are through its Continuous-Order-Plans (COP). In a COP, a public library agrees to purchase a specific number of new titles each quarter, with the size of such quarterly purchases ranging from 6 titles to over 400 titles. The COP arrangement automatically renews each year and benefits from high customer renewal rates. The new titles at each COP level are selected by *Recorded Books*, and while the library has the right to return COP titles, such returns have occurred at a rate of less than 4% of library sales historically. Our Continuous-Order-Plans represent a meaningful, recurring revenue stream for our *Recorded Books* imprint. As of December 31, 2008, over 3,000 libraries participate in our COP program.

In addition to its extensive production of unabridged audiobooks, *Recorded Books* has leveraged its expertise in audio-based products, and its reputation with the library market, by creating new product lines such as *The Modern Scholar* series, and licensing on an exclusive basis for sale to the library market such well known product lines as the *Pimsleur Language* series and a growing collection of independent films from *The Film Movement*. Beginning in late 2004, *Recorded Books* began to offer a downloadable audiobook service to the public library market, in which libraries pay an annual subscription fee based on usage, which allows their patrons to download audiobooks to their computers or portable music players. *Recorded Books* also offers proprietary and non-proprietary audiobooks to libraries and consumers under its *Audio Adventures* and *Landmark* brands.

We believe *Recorded Books* is the largest publisher of unabridged audiobooks in the United States. This position gives us a competitive advantage in negotiating audiobook rights for

the majority of the best titles in the market. Another competitive advantage is *Recorded Books'* reputation for high quality, which along with offering some of the best titles in the industry, has resulted in a very high level of customer satisfaction and brand loyalty. We also believe our dedicated employee field sales force for the public library market is a significant competitive advantage, allowing us to capture a larger share of the public library audiobook market.

C.    *Seasonality*

Our business is subject to moderate seasonal fluctuations. Our revenue and income from operations have historically been higher during the second and third calendar quarters.

D.    *Customers*

Our customer base is highly diversified across a broad range of end customers in the Test-prep and Intervention and Library markets. In 2008, no one customer accounted for more than 4% of our consolidated revenue, and our ten largest customers accounted for 7.2% of our consolidated revenue.

1.    *Test-prep and Intervention*

*Triumph Learning* sold its products to approximately 41,000 customers, consisting mostly of schools and school districts, in 2008, with such customers accounting for substantially all of 2008 revenue for this segment.

2.    *Library*

*Recorded Books* sold its products to approximately 9,000 U.S. and U.K. public libraries, 14,000 schools and school libraries, and 24,000 consumers and consumer related distributors in 2008. In addition, *Recorded Books* sells and rents its products to consumers at retail locations and through direct mail and other channels.

E.    *Product and Content Development*

We make significant investments in product development, which is an important focus at each of our businesses and, we believe, a key factor in the continued success of our backlist. Though the product development process varies across our imprints and brands, all of our product development efforts feature a disciplined approach designed to reduce the risk of introducing products that will not receive market acceptance or achieve profitable sales levels. Our editors, managers and sales force generate new product ideas that are outsourced to freelance authors for writing and development, providing us with significant operating leverage. We limit expenditures during the product development process until we see evidence of feasibility and likely success in the market.

There are two important aspects of product development across our various imprints: the identification of new product lines and the development of new titles within existing and new products lines.

*Identification of New Product Lines.* The identification of new product lines is the core of the new product development culture across our company and is primarily the responsibility of the senior management of our various publishing imprints. New product ideas originate from many sources, including the product development teams for each imprint, our sales forces, internal market and customer research studies and reviews of competitive product offerings. Once we identify a new product line that we consider promising, we prepare a business and financial plan. Assuming the expected return on investment exceeds our minimum requirements, we then subject the product concept to a customer review and feedback process. For smaller new product lines, this process might simply include an informal review by established market contacts. For larger new product lines, we conduct organized customer focus groups to gather comprehensive feedback. Upon a successful customer review, the product development team takes over to begin creating the new titles under the new product line.

*Development of New Titles.* Across our various imprints, we have published more than 1,000 new proprietary titles each year since 2003. In the development of these new titles, we invested $17.1 million, $18.0 million and $19.0 million in 2006, 2007, and 2008, respectively. Our product development teams for each imprint lead the creation of our new proprietary titles, working with independent authors, illustrators, designers, artists and narrators. We believe that our use of independent experts enables us to produce a significant number of new titles each year with a relatively small in-house product development team. This approach also gives the resources to continue producing and expanding our product lines and to create new product lines more quickly. We engage the majority of these independent product development partners on a work-for-hire basis, while some well-known authors create products for us under a royalty arrangement. Our imprint-specific product development teams are responsible for the final product design and layout prior to transferring the new product master to production for printing or duplication. Our products require varying periods of development time depending upon the complexity of the graphics and design, and the writing and editing process. We develop most of our new Test-prep and Intervention titles in a six- to twelve-month period. We generally produce new Recorded Books titles in a three- to six-month timeframe.

While the important aspects of product development are similar across our imprints, the actual processes vary by imprint based on the market, specific customer needs and product requirements.

1. *Test-prep and Intervention*

For the *Coach* and *Buckle Down* product lines, including the online assessment products, *Triumph Learning's* product development team's efforts involve a three-pronged approach that focuses on updating existing state-specific materials in response to changes in state tests, developing non-state-specific skills materials and entering new state markets with customized titles. Thus, to be successful, test-preparation publishers must anticipate these changes and deliver product soon after the new tests are issued. *Triumph Learning's* authors, editors and sales representatives have long-term relationships with personnel in state education departments that allow it to monitor changes in state tests as well as to receive up-to-date information on standards changes and test formats as soon as they become available. *Triumph Learning's* editorial leadership screens new editorial hires for an understanding of the curriculum, a commitment to quality and a sensitivity to the needs of students and educators. These editors then seek to

cultivate a broad pool of authors that can produce high quality test preparation material. The combination of these factors, together with its 41 years of experience developing content, usually enables all of *Triumph Learning's* brands to be first to market with high quality test-preparation products that it develops for and targets toward specific states.

When evaluating whether to develop product for a new state, *Triumph Learning* analyzes the size of the state, the consequences of performance on the state's test, the state's average expenditures on instructional materials and the competitive landscape. Once *Triumph Learning* decides to enter a state, it works closely with the educators in that state and carefully analyzes the state's tests in order to develop products that address specific testing needs in the context of the state's curriculum. In order to maintain the state-specific focus and credibility of its product line, *Triumph Learning* strives to match and customize the type, difficulty, structure and presentation of questions to the state test in the markets in which it publishes. *Triumph Learning's* writing, editorial and graphic design teams create and adapt content for each test to achieve a custom product that matches the state test as closely as possible.

*Triumph Learning's Options Publishing* imprint is known for its focused quality product for the struggling student market. The development team is composed of experienced editors — all former educators — who have in-depth expertise in the various curriculum areas that *Options Publishing* targets. Paying close attention to information from schools, teachers, administrators and field salespeople, *Options Publishing* has been able to develop product quickly and take advantage of new market opportunities, often before its competitors, and to constantly explore new niches as the market and funding sources change.

## 2. *Library*

*Recorded Books* begins its product development efforts by acquiring the rights to produce books in the recorded audiobook format. *Recorded Books* utilizes its deep, long-standing relationships with publishers, agents and authors to review or preview books for rights acquisition. These relationships improve its ability to identify high quality product early and obtain the rights at reasonable costs. In some instances, *Recorded Books'* ongoing relationships allow it to purchase the exclusive unabridged audio rights to a title directly from the author prior to completion or publication, thereby reducing its acquisition cost. *Recorded Books* has also successfully purchased rights in competitive auctions. Through its Continuous-Order (COP) plans, *Recorded Books* has the ability to sell automatically up to 3,000 copies of a title to libraries across the country on the first day of a new title release, giving *Recorded Books* a significant advantage over its competitors in the library market when purchasing rights.

*Recorded Books'* direct, daily interaction with librarians often enables it to be first to market with new products that satisfy specific market demands. For example, in response to direct requests and feedback from its library customers, from 2002 through 2006, *Recorded Books* introduced an audio lecture series, *The Modern Scholar*; a remastered *Classics* imprint; The Bible on audiocassette and compact disk; and a downloadable audiobook service provided in conjunction with *NetLibrary* and in 2008, added a *Science Fiction* imprint as well as a *Canadian* imprint.

In 2005, *Recorded Books* partnered with Dr. Janet Allen, a prominent educator/lecturer on reading instruction and literacy, to develop *Dr. Janet Allen's Plugged Into Reading*, a curriculum level product that teams audiobooks with young adult fiction and non-fiction titles coupled with teacher guides written to those materials. The product was launched in spring 2006 and now accounts for over 60% of *Recorded Books'* school channel revenue.

*Recorded Books* operates an audiobook recording studio in New York City, employing as independent contractors voice talent from the stage and screen industries. The studio director casts each work individually, choosing the narrators whose talents best fit the type of book being recorded. The studio operates seven recording booths and creates between 700 and 1,000 recordings each year varying in length from less than one hour to more than 45 hours each. Each recording is edited and proofread against the written work to ensure faithfulness to the word-for-word reproduction of the unabridged text. We employ a full-time linguist who researches pronunciations in each text, supplying narrators with pronunciation guides for each recording session. Final recordings undergo quality control review at our facilities in Prince Frederick, Maryland as a part of the duplication and assembly process.

F.      Sales and Marketing

We place a great deal of emphasis on utilizing a multi-tiered sales and marketing strategy. We recognize the importance of having a flexible, integrated and fully-coordinated sales and marketing effort to reach all potential customer levels. We conduct our sales and marketing activities through employees and independent field sales representatives, inside and outsourced telesales and telemarketing, direct mail with catalogs, product promotional pieces, conventions, and teacher workshops and through our involvement in professional associations.

As of December 31, 2008, our employee field sales force consisted of 81 sales professionals and 11 sales representatives focused on telemarketing. In addition, as of that date, we utilized the services of 29 outside representatives to sell our products. In 2008, we distributed approximately eight million catalogs to potential customers across our various imprints.

While the principles are the same across our imprints, the execution of the marketing plans varies by business in accordance with their particular markets and customers.

1.      *Test-prep and Intervention*

*Triumph Learning* sells its products through a multi-channel approach, in which almost all members of its sales force, including both employees and independent sales representatives, sell *Triumph Learning* products exclusively. *Triumph Learning* has implemented various strategies to improve sales penetration and reduce cost of sales, including the introduction of a telesales program. *Triumph Learning* complements its sales representatives, both inside and field, with targeted direct mail campaigns, especially during critical buying periods. *Triumph Learning* also regularly mails catalogs to its customers, samples new and existing products, attends key local, regional and national conferences is increasing the focus of the use of electronic direct response and fax campaigns, as well as targeted print, in order to reach specific customers and maximize contact with customers during optimal purchase cycles.

In November 2008, *Triumph Learning* consolidated the sales and marketing function of *Coach*, *Buckle Down* and *Options* under a single management team. This allowed the company to eliminate duplicate functions, and reduce costs while better leveraging the company's sales and marketing resources It also enable the company to more efficiently leverage and coordinate sales efforts across brands. While the company has consolidated management, it continues to maintain separate sales forces and marketing campaigns for each brand.

2.    *Library*

*Recorded Books* has internal sales representatives and sales managers that sell exclusively to public libraries throughout the United States, as well as sales representatives and sales managers that target public libraries in the United Kingdom. We believe *Recorded Books* has one of the largest field sales organization dedicated to selling audiobooks in the U.S. public library market in the U.S., which provides it with a significant competitive advantage in selling product into this customer channel. In support of this sales force, in 2008, *Recorded Books* mailed fourteen separate catalogs to over 16,000 public library locations in the United States and an additional four catalogs, on a quarterly basis, to approximately 3,000 public libraries in the United Kingdom.

In the school market, *Recorded Books* has a combination of internal and independent sales representatives. Field representatives are supplemented by internal telesales representatives. *Recorded Books* also mailed approximately 2,200,000 catalogs to schools in the United States in 2008. These catalogs were sent in three seasonal mailings so as to coincide with most schools' regular buying cycles.

In the consumer market, *Recorded Books* markets its audiobooks and other products for rental and sale directly through the use of catalog mailings and its website. On average, *Recorded Books* mails approximately 30,000 to 40,000 catalogs per month directly to consumers. *Recorded Books* also distributes titles through booksellers, such as Barnes & Noble, Borders and Waldenbooks.

G.    *Competition*

Our imprints face competition from numerous publishers and more recently software companies offering print and electronic products to the same market niches we serve. We believe we compete successfully in these markets based on our well-established product lines and brand names, our reputation for quality products and new product development, our broad range of product offerings, our competitive pricing, the strength of our sales and marketing efforts and our commitment to continued product innovation.

1.    *Test-prep and Intervention*

*Triumph Learning* and *Buckle Down* generally face competition from small companies that publish products that are state or subject area focused, such as math or reading, or from large educational publishers that publish products focused on national standards. Additionally, large educational publishers provide state-specific test-preparation products as part of an overall Basal program. We believe the quality of the competive product provided by the basal publisher is of a lower quality and less comprehensive as it is a premium provided in the text book adoption