process. *Triumph Learning* and *Buckle Down's* primary competitors include People's Publishing, Continental Press, Contemporary Publishing, Amsco and Curriculum Associates. *Options Publishing* faces competition in its skills assessment and intervention product categories from Harcourt Achieve, Curriculum Associates, Great Source and Scholastic.

Competition for the electronic products comes primarily from smaller start-up software companies. As most of our competitors are not publishers, we believe the quality and breadth of our content is superior than that offered by other companies. Triumph Learning's primary competitors include Study Island and People's Publishing.

### 2. Library

*Recorded Books* faces competition in the public library market from other publishers of unabridged audiobooks, including Books on Tape, a division of Random House, BBC Audio (Chivers), Blackstone, Brilliance Audio and Audio Editions, none of which, we believe, is more than one-half the size of *Recorded Books* in the public library market. In the retail channel, which is not a major emphasis for *Recorded Books*, we compete with the large trade publishers, including Random House, Simon & Schuster, Harper Collins and Time Warner.

### H. Production and Fulfillment

The principal raw materials used in our products are paper, cassette tapes and audio compact discs. We purchase paper and audio media from suppliers directly based on price, quality and, to a lesser extent, availability. Paper is a commodity product which is affected by demand, capacity and economic conditions. We believe that adequate sources of supply will continue to be available to fulfill our requirements.

Nearly all of our print products are printed and bound by third parties with whom we have contracts. We believe that outside printing and binding services at competitive prices are readily available. We conduct much of our pre-press production, typesetting, layout and design functions internally, which we believe provides us with greater quality control and flexibility over the creative process. We produce the product master files for our non-print products, including our audiocassettes and compact discs, internally and then replicate both in-house and through third party vendors as volume, scheduling and packaging demands dictate.

In general, we maintain an inventory of our products in owned or leased warehouse facilities and fulfill customer orders from these locations.

### I. Intellectual Property

We regard our trademarks, copyrights, trade secrets and similar intellectual property as valuable assets and rely upon trademark and copyright laws to protect our rights. For some of our products that involve the use of content created by third parties, we enter into license agreements that generally give us the exclusive right to use this content for specified purposes in specified geographic areas and mediums. In addition, in some cases we buy products created by third parties from distributors and re-package and redistribute such products.

Our efforts to protect our intellectual property rights could be inadequate to deter misappropriation of proprietary information. For example, we may not detect unauthorized use of our intellectual property. In addition, the legal status of intellectual property on the Internet is currently subject to various uncertainties. However, we do not believe any single copyrighted product to be significant in the event of inappropriate use, and as the majority of our customers are schools and public libraries we further believe that likelihood of these customers purchasing unauthorized copies of our copyrighted products is very small. To our knowledge, there are no threatened or pending legal proceedings or claims related to our intellectual property that are likely to have, individually or in the aggregate, a material adverse effect on our business, financial condition or results of operations.

J.    *Executive Officers*

The Company's executive officers are as follows:

| Name | Age | Title(s) |
| --- | --- | --- |
| Paul J. Crecca | 51 | President, Chief Executive Officer and Director |
| Mark Kurtz | 44 | Senior Vice President and Chief Financial Officer |
| Melissa Linsky | 50 | Senior Vice President – Finance and Planning |
| John A. Lawler | 49 | President and Chief Executive Officer, Triumph Learning |
| Scott Williams | 48 | President, Recorded Books |

Set forth below is a brief description of the business experience of the executive officers listed above.

*Paul J. Crecca* has served as a member of our Board of Directors since October 2004 and as our Chief Executive Officer and President since November 2007. Mr. Crecca also has served as President of Haights Cross Operating Company since March 2008. Mr. Crecca served as our Interim Chief Executive Officer and Interim President from August 2007 to November 2007. Mr. Crecca also served as our Executive Vice President and Chief Financial Officer from January 1998 to August 2007. Additionally, Mr. Crecca served as our Chief Operating Officer from January 1998 to June 2000 and as Treasurer from 2001 to 2004. From 1995 to 1998, Mr. Crecca served as Executive Vice President — Finance of the Marvel Comics Group, an operating division of Marvel Entertainment Group, Inc. From 1985 to 1995, Mr. Crecca served as Chief Financial Officer of Dun & Bradstreet International, a division of the Dun & Bradstreet Corporation. Prior to 1985, Mr. Crecca was employed as an audit manager for Ernst & Young LLP. Mr. Crecca, a C.P.A. since 1981, received a B.A. from the Rutgers College of Arts and Sciences and an M.B.A. from the Rutgers Graduate School of Business Management.

*Mark Kurtz* has served as our Senior Vice President, and Chief Financial Officer since December 2007. Mr. Kurtz served as our Vice President, Finance and Accounting, and Chief Accounting Officer from December 1999 to December 2007. From June 1996 to December

1999, Mr. Kurtz served as Chief Accounting Officer of Oakstone Publishing. Prior to joining Oakstone Publishing, Mr. Kurtz served as a senior manager at Hardman Guess Frost and Cummings, a public accounting firm. Mr. Kurtz, a C.P.A. since 1989, received a B.B.A. from the University of Montevallo.

*Melissa L. Linsky* has served as our Senior Vice President — Finance & Planning since December 2007. Ms. Linsky served as our Vice President, Finance and Planning from June 1999 to December 2007 and as our Treasurer since October 2004. From 1998 to 1999, Ms. Linsky served as Vice President of Finance and Planning at the MacManus Group, an advertising and communications company, and from 1995 to 1997 served as Vice President of Marvel Comics Group, an operating division of Marvel Entertainment Group, Inc. From 1988 to 1995, Ms. Linsky served as Assistant Vice President of Dun & Bradstreet International, a division of the Dun & Bradstreet Corporation, and from 1984 to 1988 as Assistant Treasurer at Chase Manhattan Bank. Ms. Linsky received a B.B.A. *magna cum laude* from Temple University and an M.B.A. from New York University's Stern School of Business.

*John A. Lawler* has served as President and Chief Executive Officer of *Triumph Learning* since January 2009. Prior to joining the Company, Mr. Lawler led his own consulting firm, Arrow Advisory, LLC, which specialized in assisting media companies to raise capital and develop and execute innovative growth strategies. From 2001 to 2006, Mr. Lawler was the President and Chief Executive Officer of Martindale-Hubbell and chief executive of the Emerging Markets division at LexisNexis. Prior to 2001, Mr. Lawler held executive positions in business and product development, sales and marketing, and general management with Dun & Bradstreet. Mr. Lawler received a B.A. from Williams College and an M.B.A. from University of Virginia.

*Scott Williams* has served as President of *Recorded Books* since October 2007. From January 2003 to October 2007, Mr. Williams served as Chief Operating Officer of *Recorded Books*. Mr. Williams joined *Recorded Books* in 1992 as a Public Library Sales Representative. Mr. Williams received his B.A. from Hobart College.

The following table sets forth, for the year ending December 31, 2008, the information regarding the cash compensation paid by us, as well as other compensation paid or accrued for that period, to each of our current executive and principal officers named below, in all capacities in which they served.

| Name and Principal Position | Year | Compensation[3] | Other[4] | Total Compensation |
|---|---|---|---|---|
| Paul J. Crecca, *President and Chief Executive Officer* | 2008 | $806,894 | $45,730 | $852,624 |
| Mark Kurtz, *Senior Vice President and Chief Financial Officer* | 2008 | $250,000 | $134,040 | $384,040 |
| Melissa Linsky, *Senior Vice President – Finance and Planning* | 2008 | $250,000 | $131,086 | $381,086 |

| Name and Principal Position | Year | Compensation[3] | Other[4] | Total Compensation |
|---|---|---|---|---|
| John A. Lawler, *President and Chief Executive Officer, Triumph Learning*[5] | 2008 | N/A | N/A | N/A |
| Scott Williams, *President, Recorded Books* | 2008 | $251,385 | $96,055 | $347,440 |

[3] Includes base compensation, annual bonus and stock awards.

[4] For each executive officer, the amounts in this column also consist of: (i) non-equity incentive payments earned pursuant to our Annual Management/Employee Bonus Plan, (ii) contributions by the Company under its 401(k) plan and (iii) car allowances.

[5] John A. Lawler joined Triumph Learning, LLC in January 2009.

K.  *Employees*

As of August 31, 2009, the Prospective Debtors had 439 full and part-time employees. None of the Prospective Debtors' employees are represented by any union or other labor organization, and the Prospective Debtors have had no strikes or work stoppages.

L.  *Properties*

The Company owns a 52,000 square foot office, warehouse and production facility for its business located at 270 Skipjack Road, Prince Frederick, Maryland.

The Company also leases additional office, warehouse and mixed use facilities for their businesses, as summarized in the table below:

| Leased Location | Use | Sq. Ft. | Expiration Date |
|---|---|---|---|
| 136 Madison Avenue New York, NY | Office | 16,500 | March 30, 2010 |
| 10 New King Street White Plains, NY | Office | 5,450 | March 30, 2010 |
| 301 Bugeye Square Prince Frederick, MD | Warehouse | 9,000 | March 31, 2010 |
| 826-828 Broadway New York, NY | Recording Studios | 11,500 | August 31, 2010 |
| 200 Skipjack Road Prince Frederick, MD | Warehouse | 23,000 | November 30, 2012 |
| 1-3 Distribution Center Circle Littleton, MA | Warehouse/Office | 80,000 | Approximately October 31, 2014 |
| Units 4 Rearsby Business Park, Rearsby, UK | Warehouse/Office | 20,000 | December 31, 2015 |
| 5540-B Ketch Road Building "C" Prince Frederick, MD | Warehouse | 12,000 | December 31, 2015 |

We believe that our properties, taken as a whole, are in good operating condition and are suitable and adequate for our current business operations, and that suitable additional or alternative space will be available at commercially reasonable terms for future expansion, if necessary.

M.    *Environmental Regulation*

We are subject to environmental laws and regulations, including those that regulate the generation and disposal of hazardous materials and worker health and safety. We believe that we currently conduct our operations in material compliance with applicable environmental laws and regulations. Based on our experience to date and the nature of our operations, we believe that the future cost of compliance with existing environmental laws and regulations and liability for known environmental claims will not have a material adverse effect on our financial condition, results of operations or liquidity.

N.    *Legal Proceedings*

In September 2009, Mid-West Tape, LLC, filed a complaint against our subsidiary, Recorded Books, LLC, in the U.S. District Court for the Northern District of Ohio. Generally, the complaint challenges Recorded Books' practice of labeling the retail versions of audiobooks "Not for Sale to Libraries", which Midwest Tape claims unlawfully interferes with its resale business, claiming that such practice constitutes copyright misuse and unfair competition, and violates Section 43(b) of the Lanham Act (false advertising) and the Ohio Deceptive Trade Practices Act. The complaint seeks to permanently enjoin us from so labeling our audiobooks or otherwise stating or implying that versions of our audiobooks may not be purchased by libraries or others, to require us to issue a corrective public statement and to engage in appropriate corrective advertising, to destroy or otherwise dispose of all offending materials, to pay unspecified damages to Mid-West Tape, together its costs and attorney's fees, and to obtain such further relief as the Court deems equitable. We have denied any liability and filed a motion to dismiss those claims for failure to state a claim upon which relief can be granted.

We are a party to various other legal proceedings and claims arising out of the ordinary course of our business.

## V. THE PLAN – CLASSIFICATIONS, DISTRIBUTIONS AND IMPLEMENTATION

### A. *Overview of Chapter 11*

Chapter 11 is the business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its financial affairs for the benefit of itself and its creditors and equity holders. The principal goals of chapter 11 are to permit the rehabilitation of the debtor and provide for equality of treatment of similarly situated creditors.

The Plan provides, among other things, for a restructuring of our financial indebtedness. The goal of the Plan is to delever our balance sheet in order to provide us with a capital structure that will best enable us to compete effectively in our markets.

The following summary is a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan and the more detailed information and financial statements contained elsewhere in this Disclosure Statement.

### B. *Administrative Expense Claims, Priority Tax Claims and Other Unclassified Claims*

#### 1. *Administrative Expense Claims*

Each Holder of an Allowed Administrative Expense Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the amount of such Allowed Administrative Expense Claim (except to the extent that such Holder agrees to less favorable treatment thereof) on, or as soon as practicable after, the latest of (a) the Effective Date, (b) thirty days after the date on which such Administrative Expense Claim becomes Allowed, (c) the date on which such Administrative Claim becomes due and payable and (d) such other date as mutually may be agreed to by such Holder, the Requisite Plan Support Parties and the Prospective Debtors.

#### 2. *Ordinary Course Liabilities*

Notwithstanding Section 2.1 of the Plan, Allowed Administrative Expense Claims based on liabilities incurred by a Prospective Debtor in the ordinary course of its business, including (i) Administrative Expense Claims arising from or with respect to the sale of goods or provision of services on or after the Petition Date in the ordinary course of the applicable Prospective Debtor's business, (ii) Administrative Expense Claims of governmental units for Taxes (including Tax audit Claims related to Tax years or portions thereof ending after the Petition Date), (iii) Administrative Expense Claims arising from executory contracts and unexpired leases and (iv) Intercompany Expense Claims that are Administrative Claims, will be paid by the applicable Reorganized Debtor, pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claims, without further action by the Holders of such Administrative Claims or further approval by the Bankruptcy Court.

3. *Priority Tax Claims*

Each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the amount of such Allowed Priority Tax Claim (except to the extent that such Holder agrees to less favorable treatment thereof) on, or as soon as practicable after, the latest of (a) the Effective Date, (b) thirty days after the date on which such Priority Tax Claim becomes Allowed, (c) the date on which such Priority Tax Claim becomes due and payable and (d) such other date as mutually may be agreed to by such Holder, the Requisite Plan Support Parties and the Prospective Debtors; provided, however, that the Prospective Debtors shall be authorized, at their option, and in lieu of payment in full of an Allowed Priority Tax Claim, to make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.

4. *Professional Fees*

Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Cases prior to the Confirmation Date must File an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases on or before the sixtieth day following the Effective Date. Without limiting the foregoing, any Prospective Debtor or Reorganized Debtor, as the case may be, may pay the charges incurred by the Prospective Debtors on and after the Confirmation Date for any Professional's fees disbursements, expenses or related support services, without application to or approval by the Bankruptcy Court.

Notwithstanding the paragraph above, all reasonable fees and expenses of the Professional Advisors to the Informal Committee of Senior Notes that are incurred in connection with the Chapter 11 Cases (whether incurred before or after the Petition Date, but no later than the Effective Date, and in each case, subject to the terms and provisions of any applicable fee letter or other similar reimbursement agreement between Haights and such Professional Advisors) shall be deemed to be Allowed Administrative Expense Claims for purposes hereof.

5. *Prepetition Indenture Trustee Fees and Expenses*

The Prepetition Indenture Trustees have provided and will continue to provide necessary services under the Prepetition Indentures prior to and after the Petition Date. On, or as soon as practicable after, the Effective Date, the Debtors shall pay all reasonable fees, costs and expenses incurred by the Prepetition Indenture Trustees in the performance of their duties (including, but not limited to, the reasonable fees, costs and expenses incurred by the Prepetition Indenture Trustees' professionals (to the extent payable under the terms of the Prepetition Indentures)) prior to the Effective Date, provided (a) such fees, costs and expenses are reimbursable under the terms of the applicable Prepetition Indentures and (b) any dispute in connection with such fees, costs and expenses has been resolved by Final Order. The Reorganized Debtors shall promptly pay to the Prepetition Indenture Trustees any fees, costs and expenses reimbursable under the terms of the applicable Prepetition Indentures that are not disputed and shall attempt to resolve the disputed portion, if any, consensually. To the extent the Reorganized Debtors and the Prepetition Indenture Trustees are unable to consensually resolve any disputes regarding fees, costs or expenses and the Prepetition Indenture Trustees continue to seek payment of such

disputed amount pursuant to this section, such payment shall occur following the entry of a Final Order of the Bankruptcy Court resolving such dispute. Notwithstanding Section 4.5 hereof, the Reorganized Debtors shall pay all reasonable fees, costs and expenses incurred by any Prepetition Indenture Trustee (to the extent payable under the terms of the Prepetition Indentures) after the Effective Date in connection with the distributions required pursuant to Section 6.3 of the Plan or the implementation of any provisions of the Plan (including, but not limited to, the reasonable fees, costs and expenses incurred by the Prepetition Indenture Trustees' professionals). Distributions received by the Holders of Allowed Senior Note Claims and Allowed Senior Discount Note Claims, pursuant to the Plan, shall not be reduced on account of the payment of the Prepetition Indenture Trustees' fees, costs and expenses pursuant to the terms of the Plan. Nothing in this section shall affect the rights of the Prepetition Indenture Trustees preserved under Section 4.5 of the Plan.

## C.  *Classification of Claims and Equity Interests*

Section 1123(a)(1) of the Bankruptcy Code requires a plan of reorganization to designate classes of claims and classes of interests. The Plan segregates the various Claims against the Prospective Debtors into various classes.

The Bankruptcy Code also provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class. We believe that all Claims and Equity Interests have been appropriately classified in the Plan.

In the event that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, we would seek (with the consent of any required parties) to (i) modify the Plan to provide for whatever reasonable classification might be required for confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this Solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which the Holder of such Claim was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and required a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan adversely affects the treatment of a Holder of Claims in a manner that requires resolicitation, we likely will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this Solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class to which such Holder is ultimately deemed to be a member. See Article II.A. "RISK FACTORS—Risks Relating to the Chapter 11 Cases."

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Equity Interest of a particular Class unless the Holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest. We believe we have

complied with the requirement of equal treatment for each Claim or Equity Interest of a particular Class.

Only Classes that are "impaired" (pursuant to section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan, unless the Class is deemed to have rejected the Plan. As a general matter, a class of claims or equity interests is considered to be "unimpaired" under a plan of reorganization if the plan does not alter the legal, equitable and contractual rights of the holders of such claims or equity interests. Under the Bankruptcy Code, holders of unimpaired claims are conclusively presumed to have accepted a proposed plan of reorganization. Holders of Equity Interests which do not receive or retain anything under a proposed plan of reorganization are deemed to have rejected such plan.

The categories of Claims and Equity Interests outlined in the Plan and listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. Pursuant to section 3.1 of the Plan, a Claim or Equity Interest will be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest will fall within a particular Class only to the extent that such Claim or Equity Interest has not been paid or otherwise settled prior to the Effective Date.

**The Plan classifies General Unsecured Claims as a separate Class because this Class is largely composed of trade creditors. We intend to seek authority from the Bankruptcy Court to make payments on account of obligations to general unsecured creditors in the ordinary course of business, including any such obligations arising prior to the commencement of the Chapter 11 Cases. The Plan also provides for nonimpairment by ensuring that Allowed General Unsecured Claims either will be paid in full in Cash or be reinstated pursuant to section 1124 of the Bankruptcy Code.**

The classification of Claims and Equity Interests pursuant to the Plan is as follows:

Claims Against and Equity Interests in the Prospective Debtors

Class 1—Other Priority Claims

Class 2—Secured Credit Agreement Claims

Class 3—Other Secured Claims

Class 4—Senior Note Claims

Class 5—Senior Discount Note Claims

Class 6—General Unsecured Claims

Class 7—Intercompany Claims

Class 8—Surviving Equity Interests

Class 9—Prepetition Holdings Equity Interests

D.     *Treatment of Claims and Equity Interests*

The treatment of Claims and Equity Interests pursuant to Article III of the Plan is as follows:

1.     *Treatment of Claims and Equity Interests*

(a) *Class 1—Other Priority Claims.*

(i)     *Impairment and Voting*: Class 1 is Unimpaired by the Plan. Each Holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, is not entitled to vote to accept or reject the Plan.

(ii)    *Treatment:* On, or as soon as practicable after, the Effective Date, each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to the principal, interest and any other amounts that may be owed in respect of such Claim, so as to leave unaltered the legal, equitable and contractual rights to which such Claim entitles such Holder.

(b) *Class 2—Secured Credit Agreement Claims.*

(i)     *Impairment and Voting*: Class 2 is Impaired by the Plan. Each Holder of an Allowed Secured Credit Agreement Claim is entitled to vote to accept or reject the Plan.

(ii)    *Allowance*: The Secured Credit Agreement Claims shall be deemed Allowed, in the aggregate, in the sum of (A) the Secured Credit Agreement Principal Amount *plus* (B) the accrued and unpaid interest thereon (including paid in kind interest and default interest as applicable) through the Effective Date *plus* (C) all fees and expenses owed and unpaid in connection with the Secured Credit Agreement, in each case as determined without accounting for Adequate Protection Payments.

(iii)   *Treatment*: If the Prospective Debtors consummate an Alternative Financing, then on, or as soon as practicable after, the Effective Date, each Holder of Allowed Secured Credit Agreement Claims shall receive, in full satisfaction and discharge thereof, Cash in an amount equal to its

Allowed Secured Credit Agreement Claims. If the Prospective Debtors are unable to consummate an Alternative Financing, then on, or as soon as practicable after, the Effective Date, each Holder of Allowed Secured Credit Agreement Claims shall receive, in full satisfaction and discharge thereof, (A) its Pro-Rata Share of the New First Lien Notes; and (B) Cash equal to the difference between (x) the amount of its Allowed Secured Credit Agreement Claims and (y) the principal amount of its Pro-Rata Share of the New First Lien Notes. All Adequate Protection Payments shall be applied against the Cash distributions contemplated under Section 3.2(b)(iii) of the Plan, and provided the Confirmation Order becomes a Final Order, no Holder of Secured Credit Agreement Claims will be required to disgorge or otherwise turn over any portion of such payments.

(c) *Class 3—Other Secured Claims.*

    (i)    *Impairment and Voting*: Class 3 is Unimpaired by the Plan. Each Holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, is not entitled to vote to accept or reject the Plan.

    (ii)    *Treatment:* On, or as soon as practicable after, the Effective Date, unless otherwise agreed by the Holder of an Allowed Other Secured Claim, the Requisite Plan Support Parties and the applicable Prospective Debtor or Reorganized Debtor, such Holder will receive treatment on account of its Allowed Other Secured Claim in the manner set forth in Option A, B or C below, at the election of the applicable Prospective Debtor. The applicable Prospective Debtor will be deemed to have elected Option B except with respect to (a) any Allowed Other Secured Claim as to which the applicable Prospective Debtor elects either Option A or Option C in one or more certifications Filed prior to the conclusion of the Confirmation Hearing and (b) any Allowed Secured Tax Claim, with respect to which the applicable Prospective Debtor will be deemed to have elected Option A.

        *Option A*: On, or as soon as practicable after, the Effective Date, Allowed Claims in Class 3 with respect to which the applicable Prospective Debtor elects Option A will receive Cash equal to the amount of such Allowed Claim.

*Option B*: On, or as soon as practicable after, the Effective Date, Allowed Claims in Class 3 with respect to which the applicable Prospective Debtor elects or is deemed to have elected Option B will be reinstated pursuant to section 1124(2) of the Bankruptcy Code such that such Claims are rendered Unimpaired.

*Option C*: On, or as soon as practicable after, the Effective Date, a Holder of an Allowed Claim in Class 3 with respect to which the applicable Prospective Debtor elects Option C will be entitled to receive (and the applicable Prospective Debtor or Reorganized Debtor shall release and transfer to such Holder) the collateral securing such Allowed Claim.

(d) *Class 4—Senior Note Claims.*

    (i)    *Impairment and Voting*: Class 4 is Impaired by the Plan. Each Holder of an Allowed Senior Note Claim is entitled to vote to accept or reject the Plan.

    (ii)    *Allowance*: The Senior Note Claims shall be deemed Allowed, in the aggregate, in the sum of (A) the Senior Note Principal Amount *plus* (B) the accrued and unpaid interest thereon through the Petition Date *plus* (C) all fees and expense owed and unpaid in connection with the Senior Notes, to the extent earned or accrued through the Petition Date.

    (iii)    *Treatment if Class 5 Accepts the Plan*: On, or as soon as practicable after, the Effective Date, each Holder of an Allowed Senior Note Claim shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of (A) the New Second Lien Notes *plus* (B) the Senior Note Stock Consideration (subject to adjustment for rounding of fractional shares) (C) any Senior Note Cash Consideration *plus* (D) any Rights Offering Proceeds.

    (iv)    *Treatment if Class 5 Rejects the Plan*: On, or as soon as practicable after, the Effective Date, each Holder of an Allowed Senior Note Claim shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of (A) the New Second Lien Notes *plus* (B) 9,000,000 shares of New Common Stock (subject to adjustment for rounding of fractional shares), which amount shall be equal to 100% of

the total number of shares of New Common Stock issued under the Plan subject to dilution for the Exit Warrants and any future issuances, *plus* (C) any Senior Note Cash Consideration.

(e) *Class 5—Senior Discount Note Claims.*

    (i)    *Impairment and Voting*: Class 5 is Impaired by the Plan. Each Holder of an Allowed Senior Discount Note Claim is entitled to vote to accept or reject the Plan.

    (ii)    *Allowance*: If Class 5 accepts the Plan, the Senior Discount Note Claims shall be deemed Allowed, in the aggregate, in the sum of (A) the Senior Discount Note Principal Amount *plus* (B) the accrued and unpaid interest thereon through the Petition Date *plus* (C) all fees and expenses owed and unpaid in connection with the Senior Discount Notes, to the extent earned or accrued through the Petition date.

    (iii)    *Treatment if Class 5 Accepts the Plan*: On, or as soon as practicable after, the Effective Date, each Holder of an Allowed Senior Discount Note Claim shall receive, in full satisfaction and discharge thereof, its Pro-Rata Share of (A) 720,000 shares of New Common Stock (subject to adjustment for rounding of fractional shares), which amount shall be equal to approximately 8% of the total number of shares of New Common Stock issued under the Plan subject to dilution for the New Warrants and any future issuances, *plus* (B) the Exit Warrants.

    (iv)    *Treatment if Class 5 Rejects the Plan*: No Holder of a Senior Discount Note Claim shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Senior Discount Note Claim; provided, however, that nothing in the Plan shall affect the rights of the Senior Discount Note Indenture Trustee under Sections 2.5 and 4.5 of the Plan.

(f) *Class 6—General Unsecured Claims.*

    (i)    *Impairment and Voting*: Class 6 is Unimpaired by the Plan. Each Holder of a General Unsecured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, is not entitled to vote to accept or reject the Plan.

    (ii)    *Treatment*: Each Holder of an Allowed General Unsecured Claim, at the election of the applicable Prospective Debtor

or Reorganized Debtor, shall (A) receive Cash equal to the principal amount of its Allowed General Unsecured Claim or (B) have the principal amount of its Allowed General Unsecured Claim reinstated pursuant to section 1124(2) of the Bankruptcy Code. The failure of the Prospective Debtors or any other party in interest to File an objection, prior to the Effective Date, with respect to any General Unsecured Claim that is reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtors or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article IX of the Plan) when and if such Claim is sought to be enforced. Any cure amount that the Prospective Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated General Unsecured Claim shall be paid on, or as soon as practicable after, the latest of (x) the Effective Date, (y) within two (2) Business Days of the date on which such General Unsecured Claim becomes Allowed, or (z) such other date as may be agreed to by and among the Holder thereof, the Requisite Plan Support Parties and the Prospective Debtors.

(g) *Class 7—Intercompany Claims.*

    (i)   *Impairment and Voting*: Class 7 is Unimpaired by the Plan. Each Holder of an Allowed Intercompany Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, is not entitled to vote to accept or reject the Plan.

    (ii)   *Treatment*: Each Allowed Intercompany Claim shall be reinstated pursuant to section 1124(2) of the Bankruptcy Code such that such Claim is rendered Unimpaired, except to the extent that such Holder agrees to less favorable treatment thereof.

(h) *Class 8—Surviving Equity Interests.*

    (i)   *Impairment and Voting*: Class 8 is Unimpaired by the Plan. Each Holder of a Surviving Equity Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, is not entitled to vote to accept or reject the Plan.

        (ii)    *Treatment*: On the Effective Date, all Surviving Equity Interests shall be reinstated pursuant to section 1124(2) of the Bankruptcy Code such that such Claim is rendered Unimpaired.

    (i)   *Class 9—Prepetition Holdings Equity Interests.*

        (i)    *Impairment and Voting*: Class 9 is Impaired by the Plan. Each Holder of a Prepetition Holdings Equity Interest is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, is not entitled to vote to accept or reject the Plan.

        (ii)    *Treatment*: No Holder of a Prepetition Holdings Equity Interest shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Prepetition Holdings Equity Interest.

### 2.    *Confirmation Pursuant to 1129(b) of the Bankruptcy Code*

Section 3.3 of the Plan provides that if any Impaired Class of Claims or Equity Interests entitled to vote shall not accept the Plan by the requisite majorities provided in section 1126(c) of the Bankruptcy Code, the Prospective Debtors reserve the right to amend or modify the Plan in accordance with Section 10.4 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both, in each case, with the consent of the Requisite Plan Support Parties. With respect to any Class of Claims or Equity Interests that is deemed to reject the Plan, the Prospective Debtors will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

### 3.    *Special Provision Regarding Unimpaired Claims*

Section 3.4 of the Plan provides that, except as otherwise provided in the Plan, nothing in the Plan will affect the Prospective Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to Setoff Claims or recoupments against Unimpaired Claims.

### 4.    *Issuances Subject to Future Dilution*

Section 3.5 of the Plan provides that all of the capital stock rights described in the Plan will be subject to dilution upon future issuances, including management awards.

### E.    *Means of Implementation of Plan*

### 1.    *Compromise of Controversies*

The Plan is the product of extensive negotiations with the Plan Support Parties, as representatives of certain of the Classes of Claims that are Impaired by the Plan. Section 4.1 of

the Plan provides that in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

## 2. *Guarantees*

The Secured Credit Agreement and the Senior Notes all have been guaranteed by certain of the Prospective Debtors. Section 4.2 of the Plan contemplates that, on the Effective Date, all guarantees by any Prospective Debtor of the payment, performance, or collection of another Prospective Debtor with respect to the Claims specified in Class 2, Class 4 and Class 5 shall be forever discharged, eliminated, cancelled and of no further force and effect. Upon the occurrence of the Effective Date, no Foreign Subsidiary that is a "Guarantor" under the Senior Note Indenture will guarantee or otherwise directly or indirectly provide credit support for any Indebtedness (as defined in the Senior Note Indenture) of the Company (as defined in the Senior Note Indenture) or any of its Domestic Subsidiaries (as defined in the Senior Note Indenture). Therefore, pursuant to Section 10.05(d) of the Senior Note Indenture, upon the occurrence of the Effective Date, each such Foreign Subsidiary shall be released and relieved of any and all obligations under its Note Guarantee. As promptly as practicable after the Effective Date, the Senior Note Indenture Trustee shall execute any and all documents required in order to evidence such release.

## 3. *Vesting of Assets*

Pursuant to section 4.3 of the Plan, except as otherwise provided in the Plan or in any Plan Document, on the Effective Date, title to all Assets of any Prospective Debtor will vest in such Reorganized Debtor, free and clear of all Claims, liens, encumbrances and other interests. Surviving Equity Interests shall be reinstated pursuant to section 1124(2) of the Bankruptcy Code, and the legal, equitable and contractual rights to which the Holders of such Allowed Surviving Equity Interests are entitled shall remain unaltered. From and after the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire and dispose of property and settle and compromise Claims or Interests without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the generality of the foregoing, the Prospective Debtors may, without application to or approval by the Bankruptcy Court, pay the fees and expenses of Professionals and other Professional Advisors that they incur after the Effective Date.

## 4. *Continued Corporate Existence and New Constituent Documents*

On and after the occurrence of the Effective Date, the Reorganized Debtors will be authorized to operate their respective businesses, and to use, acquire or dispose of Assets without supervision or approval by the Bankruptcy Court, and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Each of the Prospective Debtors, as Reorganized Debtors, will continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under applicable law and pursuant to the applicable

New Constituent Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.

Pursuant to section 1123(a)(6) of the Bankruptcy Code, with respect to each Prospective Debtor that is a corporation, a limited liability corporation or a limited liability partnership, the charter (or other similar constituent document) is required, after the Effective Date, to provide for, among other things, a prohibition on the issuance of non-voting equity securities. The Plan provides that the New Constituent Documents for each of the Prospective Debtors will be amended consistent with section 1123(a)(6) of the Bankruptcy Code. Section 10.2 of the Plan provides that it is a condition precedent to the effectiveness of the Plan that the Reorganized Holdings Certificate of Incorporation must be duly filed with the Delaware Secretary of State, unless such condition is waived pursuant to the terms of the Plan. In addition, on the Effective Date, the Reorganized Debtors will, in consultation with the Requisite Plan Support Parties, (a) make any and all filings as may be required in connection with the New Constituent Documents with the appropriate governmental offices and/or agencies and (b) take any and all other actions as may be required to render the New Constituent Documents effective.

5. *Cancellation of Notes, Instruments, Debentures, Equity Interests and Liens*

Section 4.5 of the Plan provides that so long as the treatments provided for in, and the distributions contemplated by, Article III of the Plan are made as contemplated therein, each of (a) the Senior Notes, (b) the Senior Discount Notes, (c) the Prepetition Indentures, (d) the Prepetition Holdings Equity Interests, (e) the Secured Credit Agreement, (f) the Loan Documents and (g) any other notes, bonds, indentures, certificates or other instruments or documents evidencing or creating any Claims or Equity Interests that are Impaired under the Plan, will be cancelled and deemed terminated, and shall represent only the right to receive the distributions, if any, to which the Holders thereof are entitled under the Plan; provided, however, that the provisions of the Prepetition Indentures granting the Prepetition Indenture Trustees (1) charging liens or other rights against distributions payable to holders of the Prepetition Notes, to the extent that the Prepetition Indenture Trustees do not receive payments of their fees, costs and expenses payable pursuant to Section 2.5 of the Plan and (2) ability to make distributions to holders of Prepetition Notes as set forth in the Prepetition Indentures and the Plan shall survive the cancellation of the Prepetition Indentures and remain in full force and effect. Except with respect to their obligations concerning the distributions to be made by the Disbursing Agent under the Plan (as described in section 6.3 of the Plan), as of the Effective Date, the Prepetition Indenture Trustees shall have no further obligations under their respective Prepetition Indentures.

Under section 4.6 of the Plan, upon the Effective Date, any Lien (other than a Lien with respect to a Class 3 Claim that is reinstated pursuant to the treatment provided by section 3.2(c) of the Plan) securing any Secured Claim will be deemed released, and the Holder of such Secured Claim will be authorized and directed to release any collateral or other property of any Prospective Debtor (including any cash collateral) held by such Holder and to take such actions as may be requested by the Prospective Debtors (or the Reorganized Debtors, as the case may be) to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Prospective Debtors (or the Reorganized Debtors, as the case may be).

### 6. *Directors and Officers of the Reorganized Debtors*

Pursuant to section 1129(a)(5) of the Bankruptcy Code, which requires, among other things, that the plan proponent disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director or officer of the debtor, the identity and affiliations of each proposed member of the initial Reorganized Holdings Board of Directors (and, to the extent such Person is an insider, the nature of any compensation for such Person) will be disclosed in the Plan Supplement. The initial Reorganized Holdings Board of Directors will consist of seven directors. As long as the Class composed of Senior Discount Note Claims has voted to accept the Plan, one director shall be appointed by Holders of a majority in principal amount of Senior Discount Note Claims and the remaining directors shall be appointed by the Requisite Plan Support Parties. Notwithstanding the foregoing, in the event that any Holder of an Allowed Senior Discount Note Claim acquires more than 14% of the issued and outstanding shares of New Common Stock pursuant to the terms of the Plan and the Rights Offering, appointment rights shall be modified as described in Article VIII.C.3 hereof. Each member of the initial Reorganized Holdings Board of Directors (other than the initial chief executive officer of Reorganized Holdings) will assume such position on the Effective Date and shall serve from and after the Effective Date until the first annual meeting of the Holders of New Common Stock. Any subsequent Reorganized Holdings Board of Directors will be elected, classified, and composed in a manner consistent with the Reorganized Holdings Constituent Documents, and applicable non-bankruptcy law. The identity and affiliations of each of the New Officers (and, to the extent such Person is an insider, the nature of any compensation for such Person) and proposed members of each other Reorganized Subsidiary Debtors' Board of Directors also will be disclosed in the Plan Supplement.

### 7. *Corporate Action*

Section 4.10 of the Plan provides that all actions contemplated by the Plan will be deemed authorized and approved in all respects, including (a) the adoption of the New Constituent Documents, (b) the selection of the directors and officers for the Reorganized Debtors, (c) the issuance of the New First Lien Notes (or the consummation of the Alternative Financing), (d) the issuance of the New Second Lien Notes (e) the issuance of the New Common Stock, (f) the issuance of the Exit Warrants, (g) the execution of and entry into the Registration Rights Agreement and (h) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Prospective Debtors or the Reorganized Debtors, and any corporate action required by us or the Reorganized Debtors in connection with the Plan, will be deemed to have occurred and will be in effect, without any requirement of further action by the security holders, directors or officers of the Prospective Debtors or the Reorganized Debtors. Upon the Effective Date, the appropriate officers of the Reorganized Debtors and members of the boards of directors of the Reorganized Debtors will be authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary and desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including (i) the New First Lien Note Indenture (or the Alternative Financing Documents), (ii) the New Second Lien Note Indenture, (iii) the Registration Rights Agreement, and (iv) any and all other agreements, documents, securities and instruments relating

to the foregoing. The authorizations and approvals contemplated in section 4.10 of the Plan will be effective notwithstanding any requirements under any applicable non-bankruptcy law.

### 8. *Sources of Cash for Plan Distribution*

Except as otherwise provided in the Plan or Confirmation Order, all Cash required for the payments to be made under the Plan will be obtained from the Prospective Debtors' and the Reorganized Debtors' operations and Cash balances, the proceeds of any Alternative Financing and any Rights Offering Proceeds.

### 9. *Restructuring Transactions*

Pursuant to section 4.12 of the Plan, from the Confirmation Date through the Effective Date, and subject to the reasonable consent of the Requisite Plan Support Parties, we will be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate restructuring of our businesses, to otherwise simplify our overall corporate structure or to reincorporate certain of the Prospective Debtors under the laws of jurisdictions other than the laws of which they currently are incorporated. In effecting the Restructuring Transactions, the Prospective Debtors will be permitted to (a) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such other terms to which the applicable entities may agree, (b) execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree, (c) file appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable state law and (d) take all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions. The Restructuring Transactions may include one or more mergers, consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by us and the Requisite Plan Support Parties to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Prospective Debtors vesting in one or more surviving, resulting or acquiring corporations. In each case in which the surviving, resulting or acquiring corporation in any such transaction is a successor to a Prospective Debtor, such surviving, resulting or acquiring corporation will perform the obligations of such Prospective Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against such Prospective Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring corporation, which may provide that another Prospective Debtor will perform such obligations.

### 10. *Voting Agreement*

Pursuant to Section 4.13 of the Plan, all Persons that are entitled to receive shares of New Common Stock under the terms of the Plan (including, but not limited to, the Rights Offering) or upon exercise of the Exit Warrants shall be required to become parties to the Voting Agreement, and such Persons shall not be deemed to own such shares or receive certificates therefor unless

and until they have executed and returned their respective signature pages to the Voting Agreement. To the extent that any such Person fails to execute and return its signature page(s) to the Voting Agreement within one year following the Effective Date, the shares of New Common Stock that such Person otherwise would be entitled to receive shall be deemed undeliverable (pursuant to Section 6.5(b) of the Plan or otherwise) and shall be forfeited to the Reorganized Debtors.

## VI. THE PLAN – OTHER PROVISIONS

### A. *Treatment of Executory Contracts and Unexpired Leases*

#### 1. *Assumption and Cure of Executory Contracts and Unexpired Leases*

Section 365 of the Bankruptcy Code permits debtors to assume or reject executory contracts and unexpired leases with the authorization of the Bankruptcy Court. Section 365 of the Bankruptcy Code further provides that an executory contract or unexpired lease can be assumed only if (i) certain defaults with respect to such contract or lease are cured (or adequate assurance of a prompt cure is provided), (ii) compensation for any pecuniary losses arising from such default are provided and (iii) "adequate assurance" of future performance is provided. Section 1123(b)(2) of the Bankruptcy Code allows for the assumption of unrejected contracts and leases pursuant to the terms of a plan of reorganization. Pursuant to Section 5.1 of the Plan, except as otherwise provided in the Plan, or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Prospective Debtors shall be deemed to have assumed each executory contract and unexpired lease to which they are parties (including, but not limited to, non-exclusive or exclusive patent, trademark, copyright or other intellectual property licenses), unless such contract or lease (i) was assumed or rejected by the Prospective Debtors prior to such date, (ii) expired or terminated pursuant to its own terms prior to such date, (iii) is the subject of a motion to reject filed on or before the Confirmation Date or (iv) is set forth in a schedule, Filed as part of the Plan as an executory contract or unexpired lease to be rejected, filed as part of the Plan. The Confirmation Order shall constitute an order of the Bankruptcy Court under sections 365 and 1123 of the Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease assumed pursuant to Article V of the Plan will revest in, and be fully enforceable by, the Reorganized Debtors in accordance with the terms thereof, except as otherwise modified by the provisions of the Plan, or by any order of the Bankruptcy Court.

Each executory contract and unexpired lease assumed pursuant to Article V of the Plan and related to the use, ability to acquire, or occupancy of real property will include (i) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, and (ii) all executory contracts or unexpired leases and other rights appurtenant to the property, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises, and any other equity interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court or is the subject of a motion to reject Filed on or before the Confirmation Date.

Any monetary amount by which any executory contract or unexpired lease to be assumed pursuant to the Plan is in default will be satisfied by the Prospective Debtors. If there is a dispute regarding (i) the nature or amount of any cure, (ii) the ability of the Prospective Debtors or any

assignee thereof to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving such dispute and approving the assumption or assumption and assignment, as the case may be.

2.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Section 5.2 of the Plan provides that all proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases, if any, must be Filed within 30 days after the later of (a) the date of the order of the Bankruptcy Court approving such rejection and (b) the date of the Confirmation Order. Any Claim arising from the rejection of an executory contract or unexpired lease for which proof of such Claim is not Filed within such time period will be barred forever from assertion against the Prospective Debtors or the Reorganized Debtors, the Estates and their property, unless otherwise ordered by the Bankruptcy Court. The Allowed amount of a Claim shall be subject to the limitations of Section 502(b). Section 502(b) of the Bankruptcy Code provides, among other things, for certain statutory limitations or "caps" on the size of allowed claims of certain types of creditors. Among the types of claims that may be capped under section 502(b) of the Bankruptcy Code are (i) certain claims of lessors of real property and (ii) certain claims arising from the termination of employment contracts.

3.    *Indemnification of Directors, Officers and Employees*

Pursuant to section 5.3 of the Plan, any obligations or rights of the Prospective Debtors or Reorganized Debtors to defend, indemnify, reimburse, or limit the liability of Covered Persons pursuant to any applicable certificates of incorporation, by-laws, policy of providing employee indemnification, state law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Covered Persons based upon any act or omission related to such Covered Persons' service with, for, or on behalf of the Prospective Debtors prior to the Effective Date, will be treated as if they were executory contracts that are assumed under the Plan and will survive the Effective Date and remain unaffected thereby, and will not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability is owed in connection with an occurrence before or after the Petition Date and shall be fully enforceable by the Reorganized Debtors and the Covered Persons. Without limiting the generality of the foregoing: (i) the Debtors shall assume all of the directors' and officers' liability insurance policies existing as of the Petition Date and (ii) on or before the Effective Date, the Debtors shall purchase tail coverage for a period of six (6) years under a directors' and officers' insurance policy for current and former directors and officers covering claims for, among other things, breach of fiduciary duties. The Debtors are authorized to purchase such tail coverage and, subject to the Order(s) entered in these Chapter 11 Cases authorizing the Debtors' use of cash collateral, to pay all amounts with respect thereto, including premiums, payments to insurance brokers and payments of deductible and reserve funding, if applicable.

4. *Compensation and Benefit Programs*

Section 5.5 of the Plan provides that except and to the extent previously assumed by an Order of the Bankruptcy Court, on or before the Confirmation Date, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Prospective Debtors applicable to their employees, retirees and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, and life, accidental death and dismemberment insurance plans, including benefit plans and programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Plan. The Prospective Debtors' obligations under such plans and programs shall survive confirmation of the Plan, except for (i) executory contracts or benefit plans specifically rejected pursuant to this Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code) and (ii) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract. In addition, the Prospective Debtors may, prior to the Confirmation Date, enter into employment agreements with key employees that may become effective on or prior to the Effective Date and survive consummation of the Plan. Any such agreements will be included with the Plan Supplement or otherwise Filed with the Bankruptcy Court.

5. *Termination of Prepetition Equity Agreements*

Section 5.7 of the Plan also provides that upon the Effective Date, each Prepetition Equity Agreement will be deemed terminated and of no further force and effect, and any Claim in respect thereof will be treated as a Prepetition Holdings Equity Interest under the Plan.

B. *Provisions Governing Distributions*

1. *Date of Distributions*

Pursuant to section 6.1 of the Plan, and except as otherwise provided therein, any distribution to be made or done under the Plan (or in connection with the Rights Offering) will be made on the Effective Date, or as soon as practicable thereafter. Any payment or act required to be made under the Plan on a day that is not a Business Day will be made on the next succeeding Business Day.

2. *Interest On Claims*

Section 6.2 of the Plan provides that, except for interest, fees and expenses owed and owing to the Lenders pursuant to the Loan Documents, unless otherwise specifically provided by the Plan or in the Confirmation Order, or by applicable bankruptcy law, post-petition interest shall not accrue and not be paid on Allowed Claims when due under the contract, agreement or other instrument governing the terms and conditions of the obligation comprising such Allowed Claim. Post-petition interest shall not accrue and not be paid upon any Disputed Claim in respect of the period from the Effective Date to the date a final distribution is made thereon, if and after such Disputed Claim becomes an Allowed Claim.

### 3. *Disbursing Agent*

Section 6.3 of the Plan provides that, except as otherwise provided in the Plan, all distributions under the Plan will be made by the Reorganized Debtors, acting as Disbursing Agent thereunder. The Disbursing Agent will be authorized to make any Cash payment required to be made under the Plan by check or wire transfer, at its discretion. No distributions of fractional shares or fractions of dollars (whether in the form of Cash or notes) will be made under the Plan on account of Claims in Classes 2, 3, 4 and 5, and for purposes of distribution under the Plan on account of such Claims, fractional shares and fractions of dollars (whether in the form of Cash or notes) shall be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down). The Reorganized Debtors will be permitted, without further order of the Bankruptcy Court, to employ or contract with any Entities to assist in or make the distributions required under the Plan. The Plan also provides that the Prepetition Agent and the Prepetition Indenture Trustees (or such other recipients as these entities shall instruct) are to receive, in the first instance, all distributions on account of Allowed Secured Credit Agreement Claims, Allowed Senior Note Claims and Allowed Senior Discount Note Claims. The Prepetition Agent and the Prepetition Indenture Trustees (or such other recipients as these entities have instructed) will be authorized and required to deliver such distributions to the applicable Holders as of the Mandatory Exchange Date pursuant to section 6.3 of the Plan. Holders of Allowed Claims will receive such distributions only after they have surrendered their Prepetition Notes and/or any other instrument or documentation relating to such Claims to the Reorganized Debtors pursuant to any notice received in connection with section 6.7 of the Plan (or at such time as a waiver of such requirement has been received). **The Holder of any Allowed Claim that fails to surrender such securities in the manner required within two years of the Effective Date, will have such Claim discharged, and will forever be barred from asserting such Claim against any of the Reorganized Debtors or their respective property.**

### 4. *Mandatory Exchange Date*

Pursuant to section 6.4 of the Plan, as of the Mandatory Exchange Date relating to any Prepetition Indenture, the transfer register for such Prepetition Indenture will be closed and the transfer of the Prepetition Notes issued thereunder, or any interest therein, will be prohibited. Neither the Disbursing Agent nor the Prepetition Indenture Trustee under such Prepetition Indenture will have any obligation to recognize the transfer or sale of, or any participation in, any Allowed Claims relating to such Prepetition Indenture that occurs after such Mandatory Exchange Date, and will be entitled for all purposes related to the Plan to recognize and make distributions only to Holders of such Claims as of the Mandatory Exchange Date.

### 5. *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

Pursuant to section 6.5 of the Plan, any distribution to be made under the Plan to a Holder of an Allowed Claim will be made to the address of such Holder as set forth in the books and records of the Prospective Debtors or their agents, or in a letter of transmittal, unless the Prospective Debtors have been notified in writing of a change of address, including by the Filing of a proof of claim by such Holder that contains an address for such Holder that is different from the address reflected on such books and records or letter of transmittal. In the event that any

distribution or notice provided in connection with the Chapter 11 Cases to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or otherwise is unclaimed, the Disbursing Agent will make no further distribution to such Holder unless and until such Disbursing Agent is notified in writing of such Holder's then current address. On, or as soon as practicable after, the date on which a previously undeliverable or unclaimed distribution becomes deliverable and claimed, the Disbursing Agent will make such distribution without interest thereon. Any Holder of an Allowed Claim that fails to assert a Claim under the Plan for an undeliverable or unclaimed distribution within one year after the Effective Date will be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and will forever be barred and enjoined from asserting such Claim against any of the Prospective Debtors, the Estates, or the Reorganized Debtors or their property. Any Cash amounts in respect of undeliverable or unclaimed distributions for which a Claim is not made within the one-year period will be forfeited to the Reorganized Debtors. Any securities issued by the Prospective Debtors in respect of undeliverable or unclaimed distributions for which a Claim is not made within the one-year period will be cancelled and extinguished. Nothing contained in the Plan will require, or be construed to require, the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

6. *Setoff and Recoupment*

Pursuant to section 6.6 of the Plan, the Reorganized Debtors will be permitted, but not required, to set off against any Claim (other than the Secured Credit Agreement Claims, the Senior Note Claims and the Senior Discount Note Claims, which Claims shall not be subject to setoff, recoupment or reduction of any kind), or the distributions to be made under the Plan on account of such Claim, any claims of any nature whatsoever the Prospective Debtors have against the Holder of such Claim. The Plan also provides that neither the failure to exercise any such setoff nor the allowance of any Claim under the Plan will constitute a waiver or release by the Reorganized Debtors of any such claim the Reorganized Debtors may have against such Holder.

7. *Surrender of Cancelled Instruments or Securities*

Under section 6.7 of the Plan, any Holder of a Claim evidenced by the instruments, securities or other documentation cancelled under section 4.5 of the Plan (including the Prepetition Agent and the Prepetition Indenture Trustees) is required to surrender such applicable instruments, securities or other documentation to the Reorganized Debtors, in accordance with written instructions to be provided to such Holder by the Reorganized Debtors, unless such requirement is waived in writing by the Prospective Debtors or the Reorganized Debtors. With respect to any global note relating to any Prepetition Indenture that is held in the name of DTC, DTC will surrender the applicable instrument to the applicable Prepetition Indenture Trustee, and such Prepetition Indenture Trustee shall surrender such global note to the Reorganized Debtors. Any distribution required to be made under the Plan on account of any such Claim will be treated as an undeliverable distribution under section 6.5(b) of the Plan pending the satisfaction of the terms of section 6.7(a) of the Plan.

Subject to section 6.8 of the Plan, any Holder of any Claim evidenced by the instruments, securities or other documentation cancelled under section 4.5 of the Plan that fails to surrender

such applicable instruments, securities or other documentation in accordance with section 6.7(a) of the Plan within two years after the Effective Date will have such Claim, and the distribution on account of such Claim, discharged, and will forever be barred from asserting such Claim against any of the Reorganized Debtors or their respective property.

8.    *Lost, Stolen, Mutilated or Destroyed Debt or Equity Securities*

In the event that any instruments, securities or other documentation cancelled under section 4.5 of the Plan have been lost, stolen, mutilated or destroyed, the Holder of a Claim or Interest based upon such instruments, securities or documentation, in addition to any requirements under any applicable agreement, are required as a condition to receiving distributions under the Plan, and in lieu of surrendering such instruments, securities or other documentation, to deliver to the Reorganized Debtors (a) evidence reasonably satisfactory to the Reorganized Debtors and the Requisite Plan Support Parties of such loss, theft, mutilation or destruction and (b) such security or indemnity as may be required by the Reorganized Debtors to hold the Reorganized Debtors harmless from any damages, liabilities or costs incurred in treating such Entity as the Holder of such Allowed Claim. Such Holder will, upon compliance with Article VI of the Plan, be deemed to have surrendered such instruments, securities or other documentation for all purposes under the Plan.

C.    *Procedures for Resolving Disputed Claims*

1.    *Prosecution of Objections to Claims; Distributions*

Pursuant to section 7.1 of the Plan, Holders of Claims and Equity Interests need not File proofs of claim and shall be subject to the Bankruptcy Court process only to the extent provided in the Plan. On and after the Effective Date, except as otherwise provided herein, all valid Claims shall be paid in the ordinary course of business of the Reorganized Debtors. If the Prospective Debtors dispute any Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, as if the Chapter 11 Cases had not been commenced, provided, however, that the Prospective Debtors may elect, at their sole discretion, to object under section 502 of the Bankruptcy Code with respect to any proof of claim filed by or on behalf of a Holder of a Claim, provided further however, that before the Effective Date, the Prospective Debtors shall not take any action pursuant to section 7.1 of the Plan without the reasonable consent of the Requisite Plan Support Parties.

Pursuant to section 7.3 of the Plan, notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

Pursuant to section 7.4 of the Plan, to the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to

which such holder is entitled under this Plan as of the Effective Date, without any interest to be paid on account of such Claim.

2. *Estimation of Claims*

Pursuant to section 7.2 of the Plan, the Prospective Debtors (or the Reorganized Debtors, as the case may be) and any parties in interest, including the Requisite Plan Support Parties, will be permitted, at any time, to request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Prospective Debtors (or the Reorganized Debtors, as the case may be) or any parties in interest, including the Requisite Plan Support Parties, previously had objected to such Claim or whether the Bankruptcy Court had ruled on such objection, and the Plan provides that the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during any litigation concerning any objection to such Claim, including during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on the amount of such Claim, the Prospective Debtors (or the Reorganized Debtors, as the case may be) or, prior to the Effective Date, any parties in interest, including the Requisite Plan Support Parties, may elect to pursue any supplemental proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

D. *Conditions Precedent to Confirmation and Effective Date of the Plan*

1. *Conditions Precedent to Confirmation*

Section 8.1 of the Plan provides that the Confirmation Order shall not be entered unless and until such Confirmation Order is in form and substance reasonably satisfactory to the Prospective Debtors and the Requisite Plan Support Parties.

2. *Conditions Precedent to the Effective Date and Waiver of Conditions*

Section 8.2 of the Plan provides that the Effective Date will not occur unless and until each of the following conditions has occurred or has been waived:

(a) the Confirmation Order shall (i) have been entered in form and substance reasonably satisfactory to the Prospective Debtors and the Requisite Plan Support Parties, (ii) not have been amended or otherwise modified after its entry in any manner that is not reasonably satisfactory to the Prospective Debtors and the Requisite Support Parties and (iii) have become a Final Order;

(b) the execution and delivery of (i) the New First Lien Note Indenture (or Alternative Financing Documents), (ii) the New Second Lien Note Indenture, (iii) the New Constituent Documents, (iv) the Intercreditor Agreement, (v) all other documents and agreements necessary to implement the terms of the Plan; and (vi) all other Plan Documents to be executed as of the Effective Date;

(c) the Reorganized Holdings Certificate of Incorporation shall have been duly filed with the Delaware Secretary of State;

(d) all authorizations, consents and approvals determined by the Prospective Debtors or the Requisite Plan Support Parties to be necessary to implement the terms of the Plan shall have been obtained;

(e) there shall be no order, opinion, ruling or other decision issued or entered by any governmental entity or any court of competent jurisdiction staying, restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by the Plan;

(f) there shall be no circumstance that would give rise to a default or an event of default (or reasonably could be expected with the passage of time to give rise to a default or event of default) under any of the Plan Documents;

(g) all Plan Documents and the transactions contemplated thereby shall be consistent in all material respects with the Disclosure Statement, and all other documents material to the consummation of the transactions contemplated under the Plan shall be in form and substance reasonably acceptable to the Prospective Debtors and Requisite Plan Support Parties; and

(h) all other actions necessary to implement the terms of the Plan shall have been taken.

The conditions set forth above may be waived, pursuant to section 8.3 of the Plan, in whole or in part, at any time by the Prospective Debtors, with the reasonable consent of the Requisite Plan Support Parties (not to be conditioned or delayed), without notice or leave or order of the Bankruptcy Court.

3. *Modification of Plan*

Section 1127 of the Bankruptcy Code provides for the modification of a plan of reorganization, subject to certain statutory requirements. A modification of the Plan prior to confirmation of the Plan would require compliance with the Bankruptcy Code provisions governing the filing and content, solicitation and disclosure, and confirmation of a plan of reorganization. Section 1127 of the Bankruptcy Code also provides for modification of a plan of reorganization after confirmation (but prior to substantial consummation) of such plan if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified under section 1129 of the Bankruptcy Code. Section 8.4 of the Plan provides that the Prospective Debtors, with the reasonable consent of the Requisite Plan Support Parties, may alter, amend, or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date and prior to substantial consummation of the Plan, as defined in section 1101(2) of the Bankruptcy Code, the Prospective Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not materially adversely affect the treatment of Holders of Claims or Equity Interests under the Plan; provided,

however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.

### 4. *Effect of Withdrawal or Revocation and Reservation of Rights*

The Prospective Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date, subject to the Plan Support Agreement. Section 8.5 of the Plan provides that if the Plan is so revoked or withdrawn, or if the Effective Date fails to occur, then the Plan will be deemed null and void in its entirety, and of no force or effect. In such event, nothing contained in the Plan will be deemed to constitute a waiver or release of (i) any Claims or rights of the Informal Committee of Senior Notes or any Plan Support Party or (ii) any Claim against or Equity Interest in any Prospective Debtor or any other Entity, or to prejudice in any manner, in any further proceedings involving any Prospective Debtor, the rights of (a) any Prospective Debtor or any other Entity or (b) the Informal Committee of Senior Notes or any Plan Support Party.

The Plan will have no force or effect unless and until the Confirmation Order is entered. Section 8.6 of the Plan clarifies that prior to the Effective Date, none of the Filing of the Plan, any statement or provision contained in the Plan, or action taken by the Prospective Debtors with respect to the Plan will be, or will be deemed to be, an admission or waiver of any rights of any Prospective Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

### 5. *Substantial Consummation of Plan*

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) will be deemed to occur on the Effective Date.

### E. *Effect of Plan Confirmation*

### 1. *Binding Effect*

Section 9.1 of the Plan provides that, on and after the Confirmation Date, the provisions of the Plan will bind any Holder of a Claim against, or Equity Interest in, the Prospective Debtors and such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan and whether or not such holder has accepted the Plan. The Plan will also be binding upon the Prospective Debtors and their respective successors and assigns, including, without limitation, the Reorganized Debtors.

### 2. *Discharge of Claims*

Section 1141(d)(1)(A) of the Bankruptcy Code provides debtors with a discharge of debts that arose before the date of the confirmation of a plan of reorganization. Except as otherwise provided in Article III of the Plan, Section 9.2 of the Plan provides that upon the Effective Date, all existing Claims and Equity Interests will be, and will be deemed to be, discharged and terminated.

3.    *Releases*

The Plan provides for certain releases, including releases against certain non-debtor third-parties. Although we believe that these provisions in the Plan are permissible under the Bankruptcy Code, arguments exist that certain case law would permit a contrary conclusion which, if accepted by the Bankruptcy Court, may result in the Plan not being confirmed. See Article II.A.7. "RISK FACTORS—Risks Relating to the Chapter 11 Cases—Certain Risks of Nonconfirmation or Delay of Confirmation."

(a)    *Releases By the Prospective Debtors*

Section 9.3(a) of the Plan provides that upon the Effective Date, the Prospective Debtors, the Reorganized Debtors and any successors, in their individual capacities and as debtors in possession, will be deemed, to the fullest extent permitted by applicable law, forever to release, waive and discharge the Releasees from all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action and liabilities (other than the rights of the Prospective Debtors or Reorganized Debtors to enforce the terms of the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or before the Effective Date in any way relating to the Prospective Debtors, the Reorganized Debtors or any successors or their property, the Chapter 11 Cases, the Plan or this Disclosure Statement, and that could have been asserted by or on behalf of the Prospective Debtors, the Estates or the Reorganized Debtors; provided however, that the foregoing shall not release, waive or discharge any claim or obligation relating to or arising out of (i) the willful misconduct, gross negligence, intentional fraud or criminal conduct of any Releasee or (ii) any continuing contractual obligation owed by any Releasee to or for the benefit of the Prospective Debtors.

(b)    *Releases By Holders of Claims*

Section 9.3(b) of the Plan provides that, for good and valuable consideration, the adequacy of which is thereby confirmed in the Plan, upon the Effective Date, each Releasor, in consideration for the obligations of the Prospective Debtors and the Reorganized Debtors under the Plan and the Cash and other contracts, instruments, releases, agreements or documents to be delivered in connection with the Plan, will be deemed forever to release, waive and discharge the Releasees from all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights to enforce the obligations of the Prospective Debtors and the Reorganized Debtors under the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or before the Effective Date in any way relating to the Prospective Debtors, the Reorganized Debtors or any sucessors or their property, the Chapter 11 Cases, the Plan or this Disclosure Statement; provided, however, that the foregoing will not release, waive or discharge

any claim or obligation relating to or arising out of (x) the willful misconduct, gross negligence, intentional fraud or criminal conduct of any Releasee or (y) any continuing contractual obligation owes by any Releasee to or for the benefit of such Releasor.

Section 9.3(c) further provides that the releases in Section 9.3(a) and 9.3(b) of the Plan will not limit, abridge or otherwise affect the rights of Covered Persons pursuant to Section 5.3 of the Plan.

4.    *Exculpation and Limitation of Liability*

Section 9.4 of the Plan provides that none of the Prospective Debtors, the Reorganized Debtors, the Releasees or any official committee appointed in the Chapter 11 Cases, or any of their respective present or former members, partners, officers, directors, managers, employees, advisors, attorneys or agents, will have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or Equity Interest, or any other party in interest in the Chapter 11 Cases, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, formulation, negotiation or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the confirmation of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for their gross negligence, willful misconduct, fraud or criminal conduct as determined by a final order entered by a court of competent jurisdiction; provided, however, that the foregoing shall apply to the members of any official committee solely to the extent that any such act or omission constituted an exercise of any such Person's fiduciary duties acting as an official committee member. Without limiting the foregoing, the Plan provides that the Prospective Debtors, the Reorganized Debtors, the Releasees or any official committee appointed in the Chapter 11 Cases will, in all respects, be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and related thereto.

5.    *Injunction*

(a)    *General*

Section 9.5 of the Plan provides that all Entities that hold or have held Claims or Equity Interests (other than the Claims that are reinstated under section 3.2 of the Plan) and all other parties in interest in the Chapter 11 Cases, along with their respective current and former employees, agents, officers, directors, principals and affiliates, permanently are enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind against the Prospective Debtors or the Reorganized Debtors, (ii) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Prospective Debtors or Reorganized Debtors, (iii) creating, perfecting, or enforcing any encumbrance of any kind against the Prospective Debtors or Reorganized Debtors, or (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Prospective Debtors or Reorganized Debtors or against the property or interests in property of the Prospective Debtors or Reorganized Debtors, on account of such Claims or Equity Interests. This injunction will not, however, preclude such Entities

from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures and other agreements and documents delivered under and in connection with the Plan.

(b)     *Injunction Against Interference With Plan*

Section 9.5 of the Plan further provides that upon entry of the Confirmation Order, all Holders of Claims and Equity Interests and their respective current and former employees, agents, officers, directors, principals and affiliates will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim will be deemed to have consented to the injunction set forth in section 9.5 of the Plan.

6.     *Term of Bankruptcy Injunction or Stays*

Section 362 of the Bankruptcy Code provides for an "automatic stay" that enjoins a large number of creditor enforcement actions against a debtor's estate. A debtor also may seek additional injunctive relief from the Bankruptcy Court pursuant to the court's equitable powers under section 105 of the Bankruptcy Code. Section 9.6 of the Plan provides that any such injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence as of the Confirmation Date, will remain in full force and effect until the Effective Date.

7.     *Termination of Subordination Rights and Settlement of Related Claims*

The classification and manner of satisfying all Claims and Equity Interests under the Plan takes into consideration all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510(b) or 510(c) of the Bankruptcy Code, or otherwise. Section 9.7 of the Plan, therefore, provides that all subordination rights that a Holder of a Claim or Equity Interest may have with respect to any distribution to be made under the Plan will be discharged and terminated, and all actions related to the enforcement of such subordination rights will be enjoined permanently. Accordingly, distributions under the Plan to Holders of Allowed Claims will not be subject to payment of a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by a beneficiary of such terminated subordination rights.

8.     *Preservation of Rights of Action*

Under section 1123(b) of the Bankruptcy Code a plan may provide for the retention by the debtors of any claims, including rights and causes of action against other entities. Pursuant to Section 9.8 of the Plan and subject to Sections 9.3 and 9.4 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and have the exclusive right to enforce, after the Effective Date, any claims, rights and Causes of Action that the Prospective Debtors or the Estates may hold against any Entity, including, but not limited to, Causes of Action against former employees, officers and directors (unless otherwise provided in the Plan), all claims relating to transactions under section 549 of the Bankruptcy Code, all transfers recoverable under section 550 of the Bankruptcy Code, all Causes of Action against any Entity on account of indebtedness and any other Causes of Action in favor of the Reorganized

Debtors or their Estates. The Reorganized Debtors will be permitted to pursue such retained claims, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

F.     *Retention of Jurisdiction*

Article X of the Plan provides that pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, and related to, the Plan, the Confirmation Order and the Chapter 11 Cases to the fullest extent permitted by law, including jurisdiction to:

(a)     Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

(b)     Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Confirmation Date; *provided, however,* that from and after the Confirmation Date, the payment of fees and expenses of the Reorganized Debtors, including fees and expenses of counsel, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(c)     Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Prospective Debtors are party or with respect to which any Prospective Debtor or Reorganized Debtor may be liable, and hear, determine and, if necessary, liquidate, any Claims arising therefrom;

(d)     Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Prospective Debtors that may be pending on the Effective Date;

(f)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Rights Offering or the Confirmation Order;

(g)     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release or other agreement or document

that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such other documents;

(h)    Modify the Plan before or after the Effective Date under section 1127 of the Bankruptcy Code or modify the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Rights Offering or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan, the Rights Offering or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, in each case subject to the reasonable consent and approval of the Requisite Plan Support Parties;

(i)    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j)    Hear and determine any rights, claims or Causes of Action held by, or reserved by, or accruing to, the Prospective Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code, the Confirmation Order or, in the case of the Prospective Debtors any other applicable law;

(k)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(l)    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(m)    Determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Rights Offering, or the Confirmation Order;

(n)    Enter an order of final decree closing the Chapter 11 Cases;

(o)    Hear and resolve all matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(p)    Hear and resolve all matters involving the nature, existence or scope of the Prospective Debtors' discharge;

(q)     Hear and resolve all matters related to the property of the Estates from and after the Confirmation Date; and

(r)     Hear and resolve such other matters as may be provided in the Confirmation Order or as may be authorized by the Bankruptcy Code.

G.     *Miscellaneous Provisions*

1.     *Payment of Statutory Fees*

Section 1930 of title 28 of the United States Code requires the payment of certain filing and quarterly fees by debtors, and any such fees, as determined by the Bankruptcy Court at the confirmation hearing to be held pursuant to section 1128 of the Bankruptcy Code, will be paid on or before the Effective Date pursuant to section 11.1 of the Plan.

2.     *Section 1145 Exemption*

Section 11.2 of the Plan provides that pursuant to section 1145(a) of the Bankruptcy Code, the Exit Warrants, shares of New Common Stock (except those issued in the Rights Offering), shares of New Common Stock issuable upon exercise and payment under the Exit Warrant, the New First Lien Notes and the New Second Lien Notes issued under the Plan will be exempt from registration under section 5 of the Securities Act and may be resold by holders thereof without registration, unless the holder is an "underwriter" (as defined in section 1145(b)(1) of the Bankruptcy Code) with respect to such securities, in each case, subject to the terms thereof, applicable securities laws, the Reorganized Holdings Constituent Documents and the Registration Rights Agreement, as applicable. See Article XII.B. "CERTAIN OTHER LEGAL CONSIDERATIONS—Offers and sales under section 1145 of the Bankruptcy Code" for a discussion of section 1145.

3.     *Governing Law*

Section 11.3 of the Plan provides that except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law, rule or regulation is applicable, or to the extent that an exhibit or supplement to the Plan provides otherwise, the Plan will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof that would require application of the law of another jurisdiction.

4.     *Severability of Plan Provisions*

Section 11.4 of the Plan provides that if, prior to entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Prospective Debtors (with the reasonable consent of the Requisite Plan Support Parties), will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan will remain in full force and effect and will in no way be affected,

impaired, or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 5. *Inconsistency*

In the event of any inconsistency among the Plan, this Disclosure Statement, the Plan Documents, any exhibit or schedule to the Plan, or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan will govern pursuant to section 11.5 of the Plan.

### 6. *Section 1125(e) of the Bankruptcy Code*

Section 11.8 of the Plan provides that as of the Confirmation Date, (i) the Prospective Debtors will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (ii) the Prospective Debtors, the Plan Support Parties, the Informal Committee of Senior Notes and each of their respective affiliates, agents, directors, officers, employees, advisors and attorneys will be deemed to have participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code, in the offer and issuance of any securities under the Plan, and therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 7. *Exemption from Certain Transfer Taxes*

Section 1146(a) of the Bankruptcy Code prohibits the imposition of a stamp or similar tax on the issuance, transfer or exchange of a security or the making or delivery of an instrument of transfer under a chapter 11 plan. Section 11.9 of the Plan provides that pursuant to section 1146(a) of the Bankruptcy Code, no stamp tax, recording tax, personal property tax, real estate transfer tax, sales or use tax or other similar tax will result from, or be levied on account of, (i) the issuance, transfer or exchange of notes or equity securities, (ii) the creation of any mortgage, deed of trust, lien, pledge or other security interest, (iii) the making or assignment of any lease or sublease, or (iv) the making or delivery of any deed or other instrument of transfer, under, in furtherance of or in connection with, the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property. Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date will be deemed to have been in furtherance of, or in connection with, the Plan.

### 8. *Tax Reporting, Withholding and Compliance*

Section 502(b)(2) of the Bankruptcy Code empowers debtors to obtain expedited determinations of tax liability with respect to postpetition tax periods and proscribes certain time

limits within which governmental units must respond to tax returns for such periods. Pursuant to section 11.10 of the Plan, the Reorganized Debtors will be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Prospective Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date. In connection with the Plan and all distributions thereunder, the Disbursing Agent will, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local or foreign tax authority, and all distributions under the Plan will be subject to any such withholding and reporting requirements. The Disbursing Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

9.    *Schedules and Exhibits*

Other than for purposes of section 11.5 of the Plan, all exhibits and schedules to the Plan, including the Plan Supplement, will be deemed incorporated into and a part of the Plan as if fully set forth in the Plan.

10.    *No Prejudice*

Section 11.12 of the Plan provides that if the Confirmation Order is vacated or the Effective Date has not occurred within one year of the last day of the Confirmation Hearing, then (a) the Confirmation Order will be vacated, (b) the Plan will be null and void in all respects, (c) no distributions under the Plan will be made, (d) the Prospective Debtors and all Holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date and (e) nothing contained in the Plan or this Disclosure Statement will: (i) be deemed to constitute a waiver or release of (x) any Claims by the Informal Committee of Senior Notes or the Plan Support Parties or (y) any Claims against, or Equity Interests in, the Prospective Debtors; (ii) prejudice in any manner the rights of the Prospective Debtors, the Informal Committee of Senior Notes or the Plan Support Parties; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Prospective Debtors, the Informal Committee of Senior Notes or the Plan Support Parties, in any respect.

11.    *Allocation of Payments*

To the extent that any Allowed Claim entitled to distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, for all income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest, pursuant to section 11.13 of the Plan.

12.    *Terms of Injunctions Or Stay*

Pursuant to section 11.15 of the Plan, unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), will remain in full force and effect until the Effective Date.

## VII. RIGHTS OFFERING

The Rights Offering is only being made to Holders of Senior Discount Note Claims that Holdings reasonably believes is an "accredited investor" under Section 4(2) of the Securities Act and Regulation D promulgated thereunder that is not an individual (an "Institutional Accredited Investor").

The shares of New Common Stock being offered in the Rights Offering have not been registered under the Securities Act. The shares of New Common Stock being offered in the Rights Offering herein will be "restricted securities" within the meaning of Rule 144 under the Securities Act and subject to restrictions on transferability. You may not sell or otherwise transfer such shares except pursuant to an effective registration statement under, or exemptions from the registration requirements of, the Securities Act and applicable state securities laws.

### A. *Issuance of Senior Discount Note Rights*

The Rights Offering will commence on the Subscription Commencement Date, and the Subscription Form included with the Ballots will request that any Eligible Holder that desires to participate in the Rights Offering subscribe therein. The ability of an Eligible Holder to elect to participate in the Rights Offering will conclude on the Subscription Expiration Date.

So long as Class 5 votes to accept the Plan, each Eligible Holder of an Allowed Senior Discount Note Claim as of the Subscription Record Date will have the opportunity, but not the obligation, to participate in the Rights Offering. Each such Eligible Holder may subscribe for all or a portion of its pro-rata share (determined as of the Subscription Record Date) of shares of New Common Stock offered through the Rights Offering. In addition, Eligible Holders of Senior Discount Note Claims may oversubscribe (on a pro-rata basis) to exercise the Senior Discount Note Rights, if any, which are not subscribed for by other Eligible Holders of Allowed Senior Discount Note Claims. To the extent that any Senior Discount Note Rights remain unexercised after the Subscription Expiration Date, such Senior Discount Note Rights will be null and void and have no further value. No payment in lieu of the Senior Discount Note Rights will be made to any Eligible Holder of a Senior Discount Note Claim.

Participation in the Rights Offering may permit the Eligible Holder to designate one or more members of the board of directors of Reorganized Holdings. See Article VIII.F. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS RELATED TO THE PLAN—Description of Voting Agreement."

### B. *Solicitation of Institutional Accredited Investors Only*

Reorganized Holdings will issue New Common Stock pursuant to the Rights Offering in a private placement that is exempt from registration under the Securities Act by virtue of Section 4(2) thereof and Regulation D promulgated thereunder. Each Holder of a Senior Discount Note Claim as of the Subscription Record Date that Holdings reasonably believes is an Institutional Accredited Investor" will have the opportunity, but not the obligation, to participate in the Rights Offering, provided, each such Holder that desires to subscribe, among other things, confirms to Holdings that it is an Institutional Accredited Investor".

C.  *Rights Offering Amount*

As soon as reasonably practical after the Confirmation Date and in no event later than the Rights Offering Payment Date, the number of shares of New Common Stock attributable to the Senior Discount Note Rights that have been exercised shall be determined. Each Eligible Holder of a Senior Discount Note Claim exercising its Senior Discount Note Rights will receive a number of shares of New Common Stock equal to such Eligible Holder's Subscription Purchase Price divided by the Exercise Price. Any unexercised Senior Discount Note Rights shall then expire and become null and void.

All of the capital stock rights described above will be subject to dilution upon future issuances, including the Exit Warrants and any management awards. In addition, each share of New Common Stock purchased pursuant to the exercise of the Senior Discount Note Rights, if any, will reduce the Senior Note Stock Consideration for Holders of the Class 4 Allowed Senior Note Claims. The Rights Offering Proceeds, if any, will be distributed to the Class 4 Allowed Senior Note Claims.

D.  *Exercise Price*

Each Eligible Holder of Senior Discount Note Rights shall be required to pay such Eligible Holder's Subscription Purchase Price for the New Common Stock purchased pursuant to the exercise of the Senior Discount Note Rights.

The Exercise Price will not be known until the Confirmation Date. For illustrative purposes only, the following presents an example of the computation of the Exercise Price in the Rights Offering:

Exercise Price = the amount equal to the quotient of: (1)(A) the sum of (i) $100,000,000 and (ii) the Senior Note Principal Amount, plus accrued and unpaid interest thereon through the Petition Date,[4] less (B) the sum of (x) the consolidated Cash balance of the Reorganized Debtors on the Effective Date in excess of $15 million (as estimated on the Confirmation Date and verified to the reasonable satisfaction of the Requisite Plan Support Parties), (y) the aggregate principal amount of the New First Lien Notes or Alternative Financing, as applicable, and (z) the aggregate principal amount of the New Second Lien Notes; divided by (2) 9,000,000

Exercise Price = ($100,000,000 *plus* $138,800,000 *plus* $15,238,552 accrued and unpaid interest on the Senior Notes through the Petition Date) *less* (estimated excess cash of $6,341,318[5] *plus* $100,000,000 *plus* $80,000,000) divided by 9,000,000

Exercise Price = ($254,038,552 *less* $186,341,318) divided by 9,000,000

---

[4]  Projected using an assumed Petition Date of January 11, 2010.

[5]  Cash balance is estimated as of the Confirmation Date assuming an Effective Date of February 28, 2010 and is net of minimum $15 million working capital requirement, paydown of Secured Credit Agreement and financing expenses.

Exercise Price = $67,697,234 / 9,000,000

In this example, the 9,000,000 shares of New Common Stock to be issued on the Effective Date would have an Exercise Price of $7.52. This amount would be the Exercise Price in the Rights Offering.

An Exercise Price of $7.52 would result in a Rights Offering Amount of 4,320,708 shares of New Common Stock. Taking into effect the reduction in shares of New Common Stock that would be issued to Holders of Senior Note Claims, the Rights Offering, if fully subscribed, would constitute approximately 48.0% of the issued shares of our issued and outstanding New Common Stock on the Effective Date, subject to dilution for the Exit Warrants and other future issuances, including management awards.

The final Exercise Price and the Rights Offering Amount may differ from the illustration above.

Promptly after the Confirmation Date, we will distribute a notice to inform all subscribing Eligible Holders of the final Exercise Price, the acceptance of their Subscription Form, if applicable, and the total share amount that is applicable to their Subscription Purchase Price, as further described below.

E.  *Exercise of Senior Discount Note Rights*

Each Eligible Holder may exercise all or any portion of such Eligible Holder's Senior Discount Note Rights pursuant to the procedures outlined below. We may adopt such additional detailed procedures consistent with the provisions of the Plan to more efficiently administer the exercise of the Senior Discount Note Rights.

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Senior Discount Note Rights will be determined by us, and our good faith determination in that regard shall be final and binding. We may, in our discretion reasonably exercised in good faith, waive any defect or irregularity, or permit a defect or irregularity to be corrected within such times as we may determine, or reject any purported exercise of any Senior Discount Note Rights. We will use commercially reasonable efforts to give notice to any Eligible Holder regarding any defect or irregularity in connection with any purported exercise of Senior Discount Note Rights by such Eligible Holder and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that none of the Prospective Debtors, the Reorganized Debtors nor the Subscription Agent will incur any liability for failure to give such notification.

Shortly after the Subscription Record Date, we will cause the Subscription Form to be mailed to each Eligible Holder, together with appropriate instructions for the proper completion, due execution and timely delivery of the Subscription Form, as well as instructions for the payment (to the extent required) of the applicable Subscription Purchase Price for such portion of the Senior Discount Note Rights sought to be exercised by such Eligible Holder. Brokerage firms or banks holding Senior Discount Notes on behalf of beneficial owners will be provided

with sufficient quantities of Subscription Forms and subscription materials to forward to beneficial owners of those securities.

**In order to exercise the Senior Discount Note Rights, each Eligible Holder (or nominee thereof) must: (i) vote to accept the Plan; and (ii) return a duly completed Subscription Form to the Subscription Agent so that such form is actually received by the Subscription Agent on or before the Subscription Expiration Date.**

If the Subscription Agent for any reason does not receive from an Eligible Holder (or its nominee) a duly completed Subscription Form on or prior to the Subscription Expiration Date, such Eligible Holder shall be deemed to have relinquished and waived its right to participate in the Rights Offering.

We will not issue fractional Senior Discount Note Rights or Cash in lieu of fractional Senior Discount Note Rights. Fractional Senior Discount Note Rights will be rounded down to the nearest whole number. Furthermore, we will not issue fractional shares of New Common Stock in the Rights Offering. The number of shares to be issued to an Eligible Holder who subscribes to the Rights Offering shall be rounded down to the nearest whole share and any remaining unused Subscription Purchase Price shall be returned to the Eligible Holder.

Promptly after the Confirmation Date, we will distribute a notice to inform all subscribing Eligible Holders of the final Exercise Price, the acceptance of their Subscription Form, if applicable, and the total share amount that is applicable to their Subscription Purchase Price. This notice will include a request for the Subscription Purchase Price to be delivered to the Subscription Agent (by wire, a certified bank or cashier's check) prior to the Rights Offering Payment Date, which date shall be included in the notice and is expected to be approximately three (3) Business Days prior to the Effective Date. The payments made in connection with the Rights Offering shall be deposited and held by the Subscription Agent in a trust account, or similarly segregated account or accounts which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any Lien or any cash collateral arrangements and which segregated account or accounts will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date, or such other later date, at our option (and with the consent of the Requisite Committed Purchasers), but not later than 20 days after the Effective Date. The Subscription Agent shall not use such funds for any other purpose prior to such date and shall not encumber or permit such funds to be encumbered with any Lien.

We will not issue fractional shares of New Common Stock in the Rights Offering. The number of shares to be issued to an Eligible Holder who subscribes to the Rights Offering shall be rounded down to the nearest whole share and any remaining unused Subscription Purchase Price shall be returned to the Eligible Holder.

To the extent an Eligible Holder subscribes to the Rights Offering, such subscription shall be irrevocable until the earliest of (i) April 30, 2010, (ii) the decision by the Prospective Debtors to abandon the Plan or (iii) the rejection of the Plan by the Bankruptcy Court. If an Eligible Holder subscribes to the Rights Offering but fails to pay the applicable Subscription Purchase Price to the Subscription Agent on or before the Rights Offering Payment Date, such

holder shall (i) not receive the subscribed shares of New Common Stock and (ii) be subject to a breach of contract claim by the Prospective Debtors.

The New Common Stock also will be subject to mandatory voting pursuant to the terms of the Voting Agreement and to substantial restrictions on transfer contained in the Reorganized Holdings Certificate of Incorporation (see the description of the proposed transfer restrictions contained in Section VIII.C.3. hereof.

An Eligible Holder who acquires at least 10% of the shares of New Common Stock under the Plan and the Rights Offering will be permitted to become a party to the Registration Rights Agreement. See Article VIII.D. "DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS EXECUTED PURSUANT TO THE PLAN— Description of Registration Rights Agreement."

Pursuant to Section 4.13 of the Plan, all Persons that are entitled to receive shares of New Common Stock under the terms of the Plan (including, but not limited to, the Rights Offering) or upon exercise of the Exit Warrants shall be required to become parties to the Voting Agreement, and such Persons shall not be deemed to own such shares or receive certificates therefor unless and until they have executed and returned their respective signature pages to the Voting Agreement. To the extent that any such Person fails to execute and return its signature page(s) to the Voting Agreement within one year following the Effective Date, the shares of New Common Stock that such Person otherwise would be entitled to receive shall be deemed undeliverable (pursuant to Section 6.5(b) of the Plan or otherwise) and shall be forfeited to the Reorganized Debtors.

F.      *Transfer and Revocation of Senior Discount Note Rights*

The Senior Discount Note Rights are not Transferable. Any Transfer or attempted Transfer of any Senior Discount Note Rights will be null and void, and we will not treat any purported transferee as the holder of any Senior Discount Note Rights. Once an Eligible Holder has properly exercised any Senior Discount Note Rights, such exercise cannot be revoked.

G.      *Use of Proceeds of the Rights Offering*

The proceeds of the Rights Offering will be used to fund Cash payments to Holders of Allowed Senior Note Claims under the Plan.

## VIII. DESCRIPTION OF MATERIAL AGREEMENTS, INSTRUMENTS AND OTHER DOCUMENTS RELATED TO THE PLAN

A.      *Description of the New First Lien Notes*

The New First Lien Notes will be issued by Reorganized Haights in an aggregate principal amount of $100 million. The terms and conditions of the New First Lien Notes and the New First Lien Note Indenture shall be substantially similar to the terms and conditions contained in the form of New First Lien Note Indenture attached hereto as Exhibit F. A summary of certain of the principal terms of the New First Lien Notes and the New First Lien

Note Indenture is set forth below. This summary does not purport to be a complete description of the terms and conditions thereof, certain terms and conditions of which have not yet been determined. Capitalized terms used in this Article VIII.A. "Description of New First Lien Notes" but not otherwise defined in Annex II shall have the meanings assigned such terms in Exhibit F.

| | |
|---|---|
| **Title:** | Floating Rate Senior Secured Notes Due 2013 |
| **Issuer:** | Reorganized Haights |
| **Principal Amount:** | $100 million |
| **Maturity:** | The New First Lien Notes will mature approximately three years after the date the New First Lien Notes are originally issued. No scheduled principal payments will be required prior to maturity. |
| **Interest:** | LIBOR plus 1000 basis points (10%) per annum (LIBOR floor of 3.0%). |
| | Interest shall be payable in arrears on the last day of the interest period selected by the Issuer (which may be one, two, three or six months) and at the end of every three months, in the case of interest periods of longer than three months, and upon any prepayment of the New First Lien Notes. Interest shall be calculated on the basis of a 360-day year. |
| **Additional Amounts:** | The Issuer may be required to make additional payments on the New First Lien Notes in certain instances, including for breakage costs and gross-ups for tax withholding. For a full description of these payments and the terms and conditions of when they are due, see Section 4A.14 of the New First Lien Note Indenture. |
| **Guarantors:** | The New First Lien Notes will be jointly and severally guaranteed on a senior secured basis by Reorganized Holdings and each of the Issuer's domestic subsidiaries (SNEP, LLC, Triumph Learning, LLC and Recorded Books, LLC). |
| | In addition, within 90 days after the issue date, holders representing a majority of the aggregate principal amount of New First Lien Notes may request the Issuer to cause its U.K. subsidiary, W.K. Howes Limited, to also become a Guarantor of the New First Lien Notes. |
| **Collateral:** | The New First Lien Notes and the related Note Guarantees will be secured by a first-priority security interest (subject to certain permitted liens) in substantially all of the assets of the Issuer and the Guarantors, subject to certain important exceptions specified in the documents governing the security interest. The collateral securing the New First Lien Notes and the related Note Guarantees will also secure the New Second Lien Notes and related guarantees thereof, but the lien securing the New Second Lien Notes and related guarantees will be junior to the lien |

securing the New First Lien Notes and related Note Guarantees. Pursuant to the Intercreditor Agreement, any proceeds from any foreclosure or other remedial action taken with respect to the collateral will first be applied to repay the New First Lien Notes in full before any such proceeds are applied to repay the New Second Lien Notes. Pursuant to the terms of the Intercreditor Agreement and the New First Lien Note Indenture, the first priority lien securing the New First Lien Notes may also secure, on an equal and ratable basis, up to $25 million of other senior indebtedness that the Issuer and the Guarantors may incur in the future under a revolving credit facility, as permitted under the New First Lien Note Indenture.

**Ranking:** The New First Lien Notes and the related Note Guarantees will be secured, unsubordinated obligations of the Issuer and the Guarantors and will rank:

- senior in right of payment to the New Second Lien Notes and the related guarantees thereof as described in Article Twelve of the New Second Lien Note Indenture;

- effectively senior in right of payment to the Issuer's and the Guarantors' unsecured and unsubordinated obligations to the extent of the value of the collateral securing the New First Lien Notes and the related Note Guarantees, and, to the extent of any unsecured remainder after payment of the value of the collateral, the New First Lien Notes and the related Note Guarantees will rank equally in right of payment with such unsecured and unsubordinated obligations of the Issuer and the Guarantors;

- equal in right of payment with any unsubordinated indebtedness up to $25 million that the Issuer and the Guarantors may incur in the future under a revolving credit facility to the extent secured equally and ratably with the first-priority lien on the collateral securing the New First Lien Notes and the related Note Guarantees, as permitted by the New First Lien Note Indenture and the Intercreditor Agreement;

- senior in right of payment to subordinated indebtedness, if any, of the Issuer and the Guarantors; and

- structurally junior in right of payment to all indebtedness and other liabilities (including trade payables) of any subsidiaries of the Issuer or Restructured Holdings that do not guarantee the New First Lien Notes.

**Optional Redemption:** The New First Lien Notes may be redeemed in whole or in part at any time or from time to time, at the Issuer's option, upon not less than 10 Business Days' nor more than 30 Business Days' prior notice, at the redemption prices set forth below (expressed as percentages of principal amount), plus accrued and unpaid interest and Additional Amounts, if any, on the New First Lien Notes to be redeemed to the date of redemption, if redeemed during the twelve month period beginning on [date to be specified in the New First Lien Note Indenture] of the years indicated below:

| Year | Percentage |
|------|-----------|
| 2010 | 101.000% |
| 2011 | 101.000% |
| 2012 and thereafter | 100.000% |

**Mandatory Redemption:** The Issuer will be required to redeem the New First Lien Notes at a redemption price equal to 100% of the principal amount of New First Lien Notes to be redeemed (except in connection with a Change of Control, in which case, the redemption price will be 101%), plus accrued and unpaid interest and Additional Amounts, if any, thereon to the redemption date upon the occurrence of any of the following events:

- *Incurrence of Subordinated Indebtedness*: If the Issuer or any Guarantor (each, an "Obligor") incurs Subordinated Indebtedness under clause (g) of Section 4B.01 of the New First Lien Note Indenture, the Issuer shall, within 15 Business Days after the date of such incurrence, redeem an aggregate principal amount of New First Lien Notes equal to (x) 50% of the Net Cash Proceeds received from the first $7.0 million aggregate principal amount of such Indebtedness incurred and (y) 100% of the Net Cash Proceeds received from the incurrence of such Indebtedness in excess of $7.0 million aggregate principal amount.

- *Issuance or Sale of Equity Securities*: If any Obligor issues or sells equity securities (subject to certain exceptions described in the New First Lien Note Indenture), the Issuer shall, within 15 Business Days after the date of the issuance of such equity securities, redeem an aggregate principal amount of New First Lien Notes equal to 50% of the amount of the Net Cash Proceeds received from such issuance; provided that, so long as no Event of Default has occurred and is continuing either before or after giving effect thereto, the Issuer shall not be required to redeem any New First Lien Notes with respect to the first $10.0 million of Net Cash Proceeds received from the issuance of Qualified Equity Interests of Reorganized Holdings

to the extent that such Net Cash Proceeds are used to make a Permitted Acquisition, permitted Capital Expenditures or for general corporate purposes.

- *Sale of Assets*: If any Obligor consummates a Disposition (subject to certain exceptions specified in the New First Lien Note Indenture), the Issuer shall apply the Net Cash Proceeds received from such Disposition within 180 days after such receipt, to make a Permitted Acquisition, to replace the assets disposed of in the Dispositions or make a permitted Capital Expenditure, *provided* that the amount of Net Cash Proceeds that may be so applied shall not exceed $5 million in the aggregate; and to the extent such Net Cash Proceeds are not so applied within such 180-day period ("Excess Asset Sale Proceeds"), the Issuer shall, within 15 Business Days after such 180th day, redeem an aggregate principal amount of New First Lien Notes equal to 100% of such Excess Asset Sale Proceeds.

- *Proceeds of Casualty Events*: Upon the receipt of the proceeds of insurance, condemnation awards or other compensation in respect of any Casualty Event affecting any property of the Obligors, the Issuer shall apply the Net Cash Proceeds received, within 180 days after such receipt, to make a Permitted Acquisition, to replace the assets that were the subject of the Casualty Event or make a permitted Capital Expenditure; and to the extent such Net Cash Proceeds are not so applied within such 180-day period ("Excess Casualty Event Proceeds"), the Issuer shall, within 15 Business Days after such 360th day, redeem an aggregate principal amount of New First Lien Notes equal to 100% of such Excess Casualty Event Proceeds.

- *Extraordinary Receipts*: Upon the receipt of any Extraordinary Receipts (subject to certain exceptions specified in the New First Lien Note Indenture), the Issuer shall, within 15 Business Days of such receipt, redeem the New First Lien Notes in an aggregate principal amount equal to 100% of such Extraordinary Receipts; provided that, as long as no Event of Default shall have occurred and be continuing or otherwise arises as a result thereof, the Issuer shall not be required to redeem any New First Lien Notes with respect to the first $500,000 of Extraordinary Receipts to the extent that such Extraordinary Receipts are utilized for working capital purposes, to make permitted Capital Expenditures and for other purposes within 180 days after the date of the receipt thereof.

- *Change of Control*: Within 30 Business Days after the occurrence of a Change of Control, the Issuer shall redeem all

of the New First Lien Notes.

In the event the Issuer is required to redeem all or any part of the New First Lien Notes pursuant to the provisions described above under "Sale of Assets," "Proceeds of Casualty Events" or "Extraordinary Receipts," notwithstanding the foregoing provisions, the Issuer will not be required to redeem the New First Lien Notes until the amount of Net Cash Proceeds that is required to be used to redeem the New First Lien Notes pursuant to all such provisions is at least $1 million in the aggregate.

See Article Three of the New First Lien Note Indenture for the complete terms relating to optional and mandatory redemption of the New First Lien Notes.

All proceeds to be used in connection with mandatory redemptions described above will be applied, <u>first,</u> to redeem the New First Lien Notes until repaid in full and, <u>second,</u> to redeem the New Second Lien Notes.

| | |
|---|---|
| **Representation & Warranties:** | The Obligors make certain representations and warranties in the New First Lien Note Indenture. See Article Five of the New First Lien Note Indenture and related definitions. |
| **Certain Covenants** | The Obligors agree to comply with the affirmative covenants set forth in the New First Lien Note Indenture, including, but not limited to, providing annual and quarterly financial statements, notices of material events and other information within certain time periods (see Sections 4A.01 and 4A.02). For the full terms of these and other affirmative covenants, see Article Four A and related definitions of the New First Lien Note Indenture. |

The New First Lien Note Indenture also contains covenants that, among other things, restrict the ability of the Obligors and their subsidiaries to, among other things:

- incur indebtedness or make guarantees;
- pay dividends on or make other distributions with respect to, or repurchase, capital stock or make other restricted payments;
- allow liens to exist on their property;
- make investments;
- sell or otherwise dispose of their assets;
- consolidate or merge;
- acquire other businesses;
- make capital expenditures;

- enter into sale-leaseback transactions; and

- enter into transactions with affiliates.

The First Lien Note Indenture also contains certain financial maintenance covenants, including a leverage ratio covenant and an interest coverage ratio covenant. For the full terms and conditions of these and other negative and financial maintenance covenants, see Article Four B of the New First Lien Note Indenture and related definitions.

The financial covenants in the form of New First Lien Note Indenture are based on projections and circumstances existing as of the date hereof. In the event that such projections or circumstances change in any material manner from and after the date hereof, the Debtors may adjust the financial covenants to reflect such changes, provided, however, that any such adjustments shall only be made with the consent of the Requisite Plan Support Parties.

| | |
|---|---|
| **Events of Default:** | Events of Default under the New First Lien Note Indenture include, but are not limited to: the failure to pay principal, premium, interest and Additional Amounts, if any, on the New First Lien Notes when due; defaults or material breaches of representations and warranties under the New First Lien Note Indenture and any other Note Document; cross-defaults with respect to Material Indebtedness; certain insolvency or bankruptcy events; material judgment defaults; certain ERISA Events; actual or asserted impairment of any Note Guarantee, First Lien Note Security Document or any other Note Document or any security interest securing the New First Lien Notes. See Article Six of the New First Lien Note Indenture for the full terms of the Events of Default and the remedies available to holders of New First Lien Notes upon the occurrence thereof. |
| | All payments during an Event of Default shall be applied first to repay the New First Lien Notes in full, including all accrued and unpaid interest and Additional Amounts, if any, and all expenses, fees and costs thereon, and thereafter shall be applied to repay the New Second Lien Notes. |
| **Transfer and Listing** | It is expected that the New First Lien Notes will be issued pursuant to section 1145 of the Bankruptcy Code and will be exempt from the registration requirements of the Securities Act, and state and local securities laws. Accordingly, the New First Lien Notes may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in Section 1145(b) of the Bankruptcy Code, |

including an "affiliate" of the Issuer, in which case, an "underwriter" or "affiliate" many not resell any New First Lien Notes except in compliance with the registration requirements of the Securities Act or an exemption therefrom, including Rule 144 under the Securities Act. See "XII Certain Other Legal Consideration – C. Offers and Sales under Section 1145 of the Bankruptcy Code – 2. Subsequent Transfers of Securities."

The New First Lien Notes will not be listed on any securities exchange.

B.  *Description of the New Second Lien Notes*

The New Second Lien Notes will be issued by Reorganized Haights in an aggregate principal amount of $80 million less any Senior Note Cash Consideration. The terms and conditions of the New Second Lien Notes and the New Second Lien Note Indenture shall be substantially similar to the terms and conditions contained in the form of New Second Lien Note Indenture attached hereto as Exhibit G. A summary of certain of the principal terms of the New Second Lien Notes and the New Second Lien Note Indenture is set forth below. This summary does not purport to be a complete description of the terms and conditions thereof, certain terms and conditions of which have not yet been determined. Capitalized terms used in this Article VIII.B. "Description of New Second Lien Notes" but not otherwise defined in Annex II shall have the meanings assigned such terms in Exhibit G.

| | |
|---|---|
| **Title:** | Floating Rate Second Priority Secured Subordinated Notes Due 2014 |
| **Issuer:** | Reorganized Haights |
| **Principal Amount:** | $80 million (less any Senior Note Cash Consideration) |
| **Maturity:** | The New Second Lien Notes will mature approximately four years after the date the New Second Lien Notes are originally issued. No scheduled principal payments will be required prior to maturity. |
| **Interest:** | LIBOR plus 1300 basis points (13%) per annum (with a LIBOR floor of 3.0%). Interest shall be paid in cash, however, if Reorganized Holdings' Consolidated Net Cash Flow for the four consecutive fiscal quarters preceding any interest payment date for which financial statements are available is negative, then 100 basis points (1%) of the interest rate to be paid on such interest payment date (such amount being the "PIK Amount") may, at the Issuer's option, be paid by increasing the principal amount of the New Second Lien Notes or issuing additional New Second Lien Notes ("PIK Interest") in an aggregate principal amount equal to the PIK Amount. |
| | Interest shall be payable in arrears on the last day of the interest |

period selected by the Issuer (which may be one, two, three or six months) and at the end of every three months, in the case of interest periods of longer than three months, and upon any prepayment of the New Second Lien Notes. Interest shall be calculated on the basis of a 360-day year.

**Additional Amounts:** The Issuer may be required to make additional payments on the New Second Lien Notes in certain instances, including for breakage costs and gross-ups for tax withholding. For a full description of these payments and the terms and conditions of when they are due, see Section 4A.14 of the New Second Lien Note Indenture.

**Guarantors:** The New Second Lien Notes will be jointly and severally guaranteed on a senior secured basis by Reorganized Holdings and each of the Issuer's domestic subsidiaries (SNEP, LLC, Triumph Learning, LLC and Recorded Books, LLC).

In addition, within 90 days after the issue date, holders representing a majority of the aggregate principal amount of New Second Lien Notes may request the Issuer to cause its U.K. subsidiary, W.K. Howes Limited, to also become a Guarantor of the New Second Lien Notes.

**Collateral:** The New Second Lien Notes and the related Note Guarantees will be secured by a second-priority security interest (subject to certain permitted liens) in substantially all of the assets of the Issuer and the Guarantors, subject to certain important exceptions specified in the documents governing the security interest. The collateral securing the New Second Lien Notes and the related Note Guarantees will also secure the New First Lien Notes and related guarantees thereof, but the lien securing the New First Lien Notes and related guarantees will be senior to the lien securing the New Second Lien Notes and related Note Guarantees. Pursuant to the Intercreditor Agreement, any proceeds from any foreclosure or other remedial action taken with respect to the collateral will first be applied to repay the New First Lien Notes in full before any such proceeds are applied to repay the New Second Lien Notes. Pursuant to the terms of the Intercreditor Agreement and the indentures governing both the New First Lien Notes and the New Second Lien Notes, the first priority lien securing the New First Lien Notes may also secure, equally and ratably, up to $25 million of other senior indebtedness that the Issuer and the Guarantors may incur in the future under a revolving credit facility (referred to herein as "other first lien secured debt"), as permitted under such Indentures.

**Subordination:** Pursuant to the terms of the New Second Lien Note Indenture,

the New Second Lien Notes will be expressly subordinated in right of payment to the New First Lien Notes and up to $25 million of other first lien debt that the Issuer and the Guarantors may incur in the future. Accordingly, upon an event of default or in connection with any bankruptcy or insolvency proceedings involving the Issuer and the Guarantors, the New First Lien Notes and up to $25 million of other first lien debt that may be incurred in the future will be paid in full before any funds are applied to repay the New Second Lien Notes. Furthermore, the subordination provisions of New Second Lien Note Indenture limits the rights of the holders of the New Second Lien Notes vis-à-vis the holders of the New First Lien Notes (and any other first lien secured debt) as follows:

- upon any payment default under the New First Lien Note Indenture (or any other first lien secured debt), no payments may be made on the Second Lien Notes unless and until such default is cured or waived or the New First Lien Notes (or such other first lien secured debt) cease to exist;

- upon any other default under the New First Lien Note Indenture (or any other first lien secured debt) which (with or without notice, the passage of time or both) would permit the holders thereof to accelerate such indebtedness, the trustee under the New First Lien Note Indenture (or the representative under any other first lien secured debt) may issue a "payment blockage notice" and, unless such notice is waived or such indebtedness is accelerated, prohibits us from making any payments on the New Second Lien Notes until the earliest to occur of (i) the date on which such default is cured or waived or otherwise ceases to exist or such indebtedness is discharged or paid in full, (ii) 179 days pass after the date on which the payment blockage notice is received, and (iii) such payment blockage period shall have been voluntarily terminated; and

- upon an event of default under the New Second Lien Note Indenture (other than bankruptcy events of default), the holders of the New Second Lien Notes cannot accelerate the New Second Lien Notes until 5 business days after the date written notice of such acceleration is delivered to the trustee under the New First Lien Note Indenture;

**Ranking:** The New Second Lien Notes and the related Note Guarantees will be secured (second priority), unsubordinated obligations of

the Issuer and the Guarantors and will rank:

- junior in right of payment to the New First Lien Notes and the related guarantees thereof;

- junior in right of payment with any unsubordinated indebtedness up to $25 million of other first lien secured debt Guarantors may incur in the future under a revolving credit facility to the extent secured by the first-priority lien on the collateral securing the New First Lien Notes and the related guarantees thereof, as permitted by the New Second Lien Note Indenture and the Intercreditor Agreement;

- effectively senior in right of payment to the Issuer's and the Guarantors' unsecured and unsubordinated obligations to the extent of the value of the collateral securing the New Second Lien Notes and the related Note Guarantees, and, to the extent of any unsecured remainder after payment of the value of the collateral, the New Second Lien Notes and the related Note Guarantees will rank equally in right of payment with such other obligations of the Issuer and the Guarantors;

- senior in right of payment to subordinated indebtedness, if any, of the Issuer and the Guarantors; and

- structurally junior in right of payment to all indebtedness and other liabilities (including trade payables) of any subsidiaries of the Issuer or Restructured Holdings that do not guarantee the New Second Lien Notes.

**Optional Redemption:**

The New Second Lien Notes may be redeemed in whole or in part at any time or from time to time, at the Issuer's option, upon not less than 10 Business Days' nor more than 30 Business Days' prior notice, at the redemption prices set forth below (expressed as percentages of principal amount), plus accrued and unpaid interest and Additional Amounts, if any, on the New Second Lien Notes to be redeemed to the date of redemption, if redeemed during the twelve month period beginning on [date to be specified in the Second Lien Note Indenture] of the years indicated below:

| Year | Percentage |
|------|------------|
| 2010 | 103.000% |
| 2011 | 102.000% |
| 2012 | 101.000% |
| 2013 and thereafter | 100.000% |

**Mandatory**

Subject to the prior discharge of the New First Lien Notes, the

**Redemption:**     Issuer will be required to redeem the New Second Lien Notes at a redemption price equal to 100% of the principal amount of New Second Lien Notes to be redeemed (except in connection with a Change of Control, in which case, the redemption price will be 101%), plus accrued and unpaid interest and Additional Amounts, if any, thereon to the redemption date upon the occurrence of any of the following events:

- *Incurrence of Subordinated Indebtedness*: If the Issuer or any Guarantor (each, an "Obligor") incurs Subordinated Indebtedness under clause (g) of Section 4B.01 of the New Second Lien Note Indenture, the Issuer shall, within 15 Business Days after the date of such incurrence, redeem an aggregate principal amount of New Second Lien Notes equal to (x) 50% of the Net Cash Proceeds received from the first $10.0 million aggregate principal amount of such Indebtedness incurred and (y) 100% of the Net Cash Proceeds received from the incurrence of such Indebtedness in excess of $10.0 million aggregate principal amount.

- *Issuance or Sale of Equity Securities*: If any Obligor issues or sells equity securities (subject to certain exceptions described in the New Second Lien Note Indenture), the Issuer shall, within 15 Business Days after the date of the issuance of such equity securities, redeem an aggregate principal amount of New Second Lien Notes equal to 50% of the amount of the Net Cash Proceeds received from such issuance; provided that, so long as no Event of Default has occurred and is continuing either before or after giving effect thereto, the Issuer shall not be required to redeem any New Second Lien Notes with respect to the first $15.0 million of Net Cash Proceeds received from the issuance of Qualified Equity Interests of Reorganized Holdings to the extent that such Net Cash Proceeds are used to make a Permitted Acquisition, permitted Capital Expenditures or for general corporate purposes.

- *Sale of Assets*: If any Obligor consummates a Disposition (subject to certain exceptions specified in the New Second Lien Note Indenture), the Issuer shall apply the Net Cash Proceeds received from such Disposition within 180 days after such receipt, to make a Permitted Acquisition, to replace the assets disposed of in the Dispositions or make a permitted Capital Expenditure, *provided* that the amount of Net Cash Proceeds that may be so applied shall not exceed $7.5 million in the aggregate; and to the extent such Net Cash Proceeds are not so applied within such 180-day period ("Excess Asset Sale Proceeds"), the Issuer shall, within 15 Business Days after such 180th day, redeem an aggregate principal amount of New

Second Lien Notes equal to 100% of such Excess Asset Sale Proceeds.

- *Proceeds of Casualty Events*: Upon the receipt of the proceeds of insurance, condemnation awards or other compensation in respect of any Casualty Event affecting any property of the Obligors, the Issuer shall apply the Net Cash Proceeds received, within 180 days after such receipt, to make a Permitted Acquisition, to replace the assets that were the subject of the Casualty Event or make a permitted Capital Expenditure; and to the extent such Net Cash Proceeds are not so applied within such 180-day period ("Excess Casualty Event Proceeds"), the Issuer shall, within 15 Business Days after such 360th day, redeem an aggregate principal amount of New Second Lien Notes equal to 100% of such Excess Casualty Event Proceeds.

- *Extraordinary Receipts*: Upon the receipt of any Extraordinary Receipts (subject to certain exceptions specified in the New Second Lien Note Indenture), the Issuer shall, within 15 Business Days of such receipt, redeem the New Second Lien Notes in an aggregate principal amount equal to 100% of such Extraordinary Receipts; provided that, as long as no Event of Default shall have occurred and be continuing or otherwise arises as a result thereof, the Issuer shall not be required to redeem any New Second Lien Notes with respect to the first $750,000 of Extraordinary Receipts to the extent that such Extraordinary Receipts are utilized for working capital purposes, to make permitted Capital Expenditures and for other purposes within 180 days after the date of the receipt thereof.

- *Change of Control*: Within 30 Business Days after the occurrence of a Change of Control, the Issuer shall redeem all of the New Second Lien Notes.

- *Redemption of Notes for Previous PIK Interest Upon Positive Consolidated Net Cash Flow.* If at any time (i) the Issuer has previously paid PIK Interest on the Notes, (ii) the aggregate amount of all PIK Interest that has been made previously is greater than the aggregate principal amount of Notes that have been redeemed previously pursuant to this clause (such excess amount being, the "Outstanding PIK Amount"), and (iii) the Parent's Consolidated Net Cash Flow for the immediately preceding four consecutive fiscal quarters for which Consolidated financial statements of the Obligors are available is positive, then within 15 Business Days after the date the Obligors have delivered the quarterly or annual financial statements to the Trustee as required under the Indenture, the Issuer shall redeem an aggregate principal amount of Notes

equal to the amount of the Consolidated Net Cash Flow, but not to exceed the Outstanding PIK Amount, at a redemption price equal to 100% of the principal amount of Notes to be redeemed, plus accrued and unpaid interest and Additional Amounts, if any, thereon to the redemption date. The Issuer will not be required to redeem Notes pursuant to this provision until the aggregate principal amount of Notes that is required to be redeemed is at least $200,000.

In the event the Issuer is required to redeem all or any part of the New Second Lien Notes pursuant to the provisions described above under "Sale of Assets," "Proceeds of Casualty Events" or "Extraordinary Receipts," notwithstanding the foregoing provisions, the Issuer will not be required to redeem the New Second Lien Notes until the amount of Net Cash Proceeds that is required to be used to redeem the New Second Lien Notes pursuant to all such provisions is at least $1 million in the aggregate.

See Article Three of the New Second Lien Note Indenture for the complete terms relating to optional and mandatory redemption of the New Second Lien Notes.

Except in the case of any redemption described above under *"Redemption of Notes for Previous PIK Interest Upon Positive Consolidated Net Cash Flow,"* all proceeds to be used in connection with mandatory redemptions will be applied, first, to redeem the New First Lien Notes until repaid in full and, second, to redeem the New Second Lien Notes.

| | |
|---|---|
| **Representation & Warranties:** | The Obligors make certain representations and warranties in the New Second Lien Note Indenture. See Article Five of the New Second Lien Note Indenture and related definitions. |
| **Certain Covenants** | The Obligors agree to comply with the affirmative covenants set forth in the New Second Lien Note Indenture, including, but not limited to, providing annual and quarterly financial statements, notices of material events and other information within certain time periods (see Sections 4A.01 and 4A.02). For the full terms of these and other affirmative covenants, see Article Four A and related definitions of the New Second Lien Note Indenture. |

The New Second Lien Note Indenture also contains covenants that, among other things, restrict the ability of the Obligors and their subsidiaries to, among other things:

- incur indebtedness or make guarantees;
- pay dividends on or make other distributions with respect to, or repurchase, capital stock or make other restricted

payments;

- allow liens to exist on their property;

- make investments;

- sell or otherwise dispose of their assets;

- consolidate or merge;

- acquire other businesses;

- make capital expenditures;

- enter into sale-leaseback transactions; and

- enter into transactions with affiliates.

The Second Lien Note Indenture also contains certain financial maintenance covenants, including a leverage ratio covenant and an interest coverage ratio covenant. For the full terms and conditions of these and other negative and financial maintenance covenants, see Article Four B of the New Second Lien Note Indenture and related definitions.

The financial covenants in the form of New Second Lien Note Indenture are based on projections and circumstances existing as of the date hereof. In the event that such projections or circumstances change in any material manner from and after the date hereof, the Debtors may adjust the financial covenants to reflect such changes, provided, however, that any such adjustments shall only be made with the consent of the Requisite Plan Support Parties.

**Events of Default:** Events of Default under the New Second Lien Note Indenture include, but are not limited to: the failure to pay principal, premium, interest and Additional Amounts, if any, on the New Second Lien Notes when due; defaults or material breaches of representations and warranties under the New Second Lien Note Indenture and any other Note Document; cross-defaults with respect to Material Indebtedness; certain insolvency or bankruptcy events; material judgment defaults; certain ERISA Events; actual or asserted impairment of any Note Guarantee, Second Lien Note Security Document or any other Note Document or any security interest securing the New Second Lien Notes. See Article Six of the New Second Lien Note Indenture for the full terms of the Events of Default and the remedies available to holders of New Second Lien Notes upon the occurrence thereof.

All payments during an Event of Default shall be applied first to repay the New First Lien Notes in full, including all accrued and unpaid interest and Additional Amounts, if any, and all expenses,

|                          | fees and costs thereon, and thereafter shall be applied to repay the New Second Lien Notes. |
|--------------------------|---|
| **Transfer and Listing** | It is expected that the New Second Lien Notes will be issued pursuant to section 1145 of the Bankruptcy Code and will be exempt from the registration requirements of the Securities Act, and state and local securities laws. Accordingly, the New Second Lien Notes may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in Section 1145(b) of the Bankruptcy Code, including an "affiliate" of the Issuer, in which case, an "underwriter' or "affiliate" many not resell any New Second Lien Notes except in compliance with the registration requirements of the Securities Act or an exemption therefrom, including Rule 144 under the Securities Act. See "XII Certain Other Legal Consideration – C. Offers and Sales under Section 1145 of the Bankruptcy Code – 2. Subsequent Transfers of Securities."

The New Second Lien Notes will not be listed on any securities exchange. |

C.   *Description of New Common Stock, Exit Warrants and Reorganized Holdings Certificate of Incorporation*

1.   *Description of New Common Stock*

Pursuant to the Reorganized Holdings Certificate of Incorporation, 15,000,000 shares of common stock, par value $0.01 per share, will be authorized. All shares of New Common Stock, when issued pursuant to the Plan, will be fully paid and nonassessable. All of the capital stock rights described herein will be subject to dilution upon exercise of any Exit Warrants and other future issuances of capital stock, including issuances of shares of New Common stock to management.

Pursuant to Section 4.13 of the Plan, all Persons that are entitled to receive shares of New Common Stock under the terms of the Plan (including, but not limited to, the Rights Offering) or upon exercise of the Exit Warrants shall be required to become parties to the Voting Agreement, and such Persons shall not be deemed to own such shares or receive certificates therefor unless and until they have executed and returned their respective signature pages to the Voting Agreement. To the extent that any such Person fails to execute and return its signature page(s) to the Voting Agreement within one year following the Effective Date, the shares of New Common Stock that such Person otherwise would be entitled to receive shall be deemed undeliverable (pursuant to Section 6.5(b) of the Plan or otherwise) and shall be forfeited to the Reorganized Debtors. The New Common Stock also will be subject to substantial restrictions on transfer contained in the Reorganized Holdings Certificate of Incorporation.

2.   *Description of Exit Warrants*

If Class 5 Senior Discount Note Claims accepts the Plan, on or as soon as practicable after the Effective Date, Holders of Class 5 Senior Discount Note Claims will receive a Pro-Rata Share of Exit Warrants. A summary of certain of the principal terms of the Exit Warrants is set forth below. This summary does not purport to be a complete description of the terms of the Exit Warrants.

| | |
|---|---|
| Exercise Rights:................................ | The Exit Warrants, when exercised, shall entitle the holder thereof to purchase fully paid and non-assessable-shares of New Common Stock (subject to adjustment) at a price per share equal to the Exercise Price. |
| Term:......................................... | Exit Warrants must be exercised on or prior to the third anniversary of the Effective Date. |
| Exercise Price:............................... | Based on our estimation of the Exercise Price as calculated in Article VII.D. hereof, we project that the initial exercise price of each share of New Common Stock issued upon exercise of an Exit Warrant will be $7.52 per share (subject to adjustment). The formula for calculating the Exercise Price is: |

An amount equal to the quotient of: (1)(A) the sum of (i) $100,000,000 and (ii) the Senior Note Principal Amount, plus accrued but unpaid interest thereon through the Petition Date, less (B) the sum of (x) the consolidated Cash balance of the Reorganized Debtors on the Effective Date in excess of $15 million (as estimated on the Confirmation Date and verified to the reasonable satisfaction of the Requisite Plan Support Parties), (y) the aggregate principal amount of the New First Lien Notes or Alternative Financing, as applicable, and (z) the aggregate principal amount of the New Second Lien Notes; divided by (2) 9,000,000.

This is the same formula used to determine the Exercise Price in connection with the Rights Offering. See Article VII.D. "RIGHTS OFFERING—Subscription Price."

| | |
|---|---|
| Antidilution Adjustments............... | The Exit Warrants shall contain customary terms to prevent dilution from occurring due to any of the following undertaken by Reorganized Holdings after the Effective Date: |

- stock dividends, stock splits, reverse stock splits or other stock combinations;

- distributions Reorganized Haights of any rights, options or warrants to all or substantially all its stockholders entitling them for a period expiring within 60 days after a specified record date to subscribe for or purchase shares at a price per share less than the current market price per share on that record date; or

- distributions by Reorganized Haights to all or substantially all its stockholders any of its assets (including cash) or debt securities or other securities or any rights or warrants to purchase its assets, debt securities or other securities.

| | |
|---|---|
| Listing..................................... | It is currently anticipated that there will not be any public market for the Exit Warrants or the shares of New Common Stock issued upon the exercise thereof, and there is no present intention for the Exit Warrants or the shares of New Common Stock issued upon the exercise thereof to be listed on any principal securities exchange or market. |
| Restrictions on Transfer................. | Exit Warrants can be transferred only to Holders of New Common Stock or to other Holders of Exit Warrants. |
| Other Terms and Conditions................................. | Terms and conditions customary for securities of this nature. |

3. *Description of Reorganized Holdings Certificate of Incorporation*

Section 8.2 of the Plan provides, among other things, that it is a condition precedent to the effectiveness of the Plan that the Reorganized Holdings Certificate of Incorporation be duly

filed with the Delaware Secretary of State, unless such condition is waived pursuant to the terms of the Plan.

Certain principal terms of the Reorganized Holdings Certificate of Incorporation are summarized below. This summary does not purport to be a complete description of the terms of the Reorganized Holdings Certificate of Incorporation. Capitalized terms used in this Article VIII.C.3. "Description of Reorganized Holdings Certificate of Incorporation" but not otherwise defined in Annex II shall have the meanings assigned to such terms in the form of Reorganized Holdings Certificate of Incorporation attached hereto as Exhibit C.

| | |
|---|---|
| **Shareholder Voting and Approval Rights:** | Reorganized Holdings shall not, without first obtaining the approval of shareholders holding [____]%[6] or more of the then outstanding common stock of Reorganized Holdings consummate any consolidation, merger or other business combination or sale of all or substantially all of its assets with an unaffiliated third party. |
| | Supermajority Approval of the Common Stockholders shall be required to amend the Reorganized Holdings Certificate of Incorporation. |
| | Reorganized Holdings shall not (and shall not commit to), without the prior affirmative vote of at least five directors: (i) approve the annual operating budget and capital expenditure budget and, with respect to either such budget, approve any interim increase in aggregate spending (other than cost of goods sold) that exceeds 10% of the total amount of such budget, (ii) authorize, reserve for issuance or issue capital stock; (iii) elect, remove or set the compensation of certain officers; (iv) approve or enter into the acquisition of any of business or entity; (v) approve or enter into any asset sale or corporate restructuring; (vi) incur any indebtedness or grant any guarantee or lien in excess of $10,000,000; (vii) repurchase, redeem or otherwise acquire its own stock; (viii) declare or pay dividends or other distributions on any of its own stock (other than to a direct or indirect wholly-owned subsidiary); (ix) dissolve, liquidate or wind up; and (x) change the number of members of the Board. |
| **Tag Along Rights:** | Other than with respect to stock transfers to affiliates or public stock offerings, if a Common Stockholder proposes to sell a number of shares Common Stock of Reorganized Holdings representing 50% or more of the shares outstanding, such Common Stockholder shall give the Tag Along Sale Notice to Reorganized Holdings and the other Common Stockholders at least 20 Business Days prior to the closing of such sale. Each such other Common Stockholder shall have the right to |

---

[6] To be inserted in final version of Reorganized Holdings Certificate of Incorporation to be filed as a Plan Supplement.

|                                   |                                                                                                                                                                                                                                                                                                                                                                                                                  |
| --------------------------------- | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                                   | include the shares of Common Stock of Reorganized Holdings it holds, on a pro rata basis, in such proposed sale.                                                                                                                                                                                                                                                                                                    |
| **Drag Along Rights:**            | If a Common Stockholder proposes to sell shares of Common Stock of Reorganized Holdings representing an amount equal to more than [__]%[7] of the Common Shares then outstanding to any purchaser (other than its Affiliates), such Common Stockholder shall have the right to require the other Common Stockholders to include the shares of Common Stock of Reorganized Holdings they each individually hold, on a pro rata basis, in such proposed sale. |
| **Survival:**                     | The Tag Along Rights and Drag Along Rights shall not apply to, and shall be of no further force and effect following, an IPO.                                                                                                                                                                                                                                                                                        |
| **Shareholder Transfer Limitation:** | No Transfer of shares of Common Stock shall be effective, and any such Transfer shall be deemed null and void, if, as a result of any such Transfer, the record number of holders of Reorganized Holdings' equity securities would exceed 450.                                                                                                                                                                     |

### D.   *Description of Registration Rights Agreement*

On, or as soon as practicable after, the Effective Date, Reorganized Holdings will enter into the Registration Rights Agreement with certain recipients of shares of New Common Stock (solely to the extent that such shares represent at least 10% of the available New Common Stock) that, prior to the Effective Date, notifies us and counsel to the Informal Committee of Senior Notes, in writing, that such Person desires to be a party to the Registration Rights Agreement. The term sheet describing the terms and conditions for the Registration Rights Agreement is attached hereto as Exhibit D.

### E.   *Description of Intercreditor Agreement*

The relative rights and priorities of the holders of New First Lien Notes and the New Second Lien Notes will be governed by the terms of the Intercreditor Agreement, which will be in substantially the form attached hereto in Exhibit I.

### F.   *Description of Voting Agreement*

All parties receiving New Common Stock under the Plan or in the Rights Offering, or upon exercise of the Exit Warrants, shall become a party to the Voting Agreement, which will be in substantially the form attached hereto in Exhibit E, as a condition precedent to becoming a stockholder and receiving stock certificates.

Among other provisions, the Voting Agreement provides for the designation of directors to Reorganized Holding's Board of Directors. The Board shall consist of seven directors, one of

---

[7]   To be inserted in the final version of the Reorganized Holdings Certificate of Incorporation that shall be filed with the Plan Supplement.

which shall be an independent director and one of which shall be the CEO. Each Principal Stockholder (as defined in the Voting Agreement) shall have the right to fill one directorship for so long as it holds at least 10% of the outstanding shares of Common Stock (as defined in the Reorganized Holdings Certificate of Incorporation). In the event shares are distributed in exchange for the Senior Discount Notes pursuant to the terms of the Plan the holders of such shares shall have the right to fill one directorship until the Initial Meeting (as defined in the Reorganized Holdings Certificate of Incorporation).[8]

### G. *Description of Certain Retention Agreements with Financial Advisors*

Pursuant to the Houlihan Retention Agreement dated January 22, 2009 (as amended), we engaged Houlihan Lokey as our financial advisor in connection with the restructuring of our existing liabilities and indebtedness. In connection with the Solicitation and the Plan, the Houlihan Retention Agreement provides for (i) the payment of monthly fees ranging from of $150,000 to $175,000 per month from the start of the engagement, and increasing to $200,000 per month once we file for bankruptcy protection (the "Monthly Fees"), (ii) a transaction work fee of $3.025 million in connection with the proposed restructuring of our Senior Notes and Senior Discount Notes (the "Work Fee"), (iii) a restructuring transaction fee equal to one percent (1.00%) of the principal amount plus accrued but unpaid interest owed under the Secured Credit Agreement, as such indebtedness may be reduced by a financing (the "Credit Agreement Transaction Fee"), (iv) a financing transaction fee equal to 1.00% of the gross proceeds of amounts raised in the Rights Offering (the "Rights Offering Transaction Fee"), and (v) various other financing fees ranging from 1% to 5% of the amount raised depending upon the nature of the financing transaction. The Work Fee will be reduced by any Rights Offering Transaction Fee. A portion of our Monthly Fees will also be credited towards the Work Fee and other transaction fees. The Work Fee will be payable upon the earlier to occur of: (i) 180 days after the commencement of the solicitation or (ii) the effective date of the Plan. Consistent with the requirements of section 3(a)(9) of the Securities Act, the Work Fee will be deemed to be earned in full regardless of whether the consents or acceptances received in connection with the Solicitation are sufficient for the Plan to be confirmed pursuant to the Bankruptcy Code.

---

[8] This section is subject to modification to account for shares obtained by the Senior Discount Noteholders pursuant to the Rights Offering and as a distribution under Class 5 of the Plan (collectively, the "SDN Share Allocations"). It is proposed that if, immediately following the Effective Date, a Senior Discount Noteholder, solely by virtue of its SDN Share Allocation, would own (i) 14% or more of the then issued and outstanding shares of Common Stock, such Senior Discount Noteholder shall be deemed to be a Principal Stockholder and shall have the right to fill one directorship, (ii) 42% or more of the then issued and outstanding shares of Common Stock, such Senior Discount Noteholder shall be deemed to be a Principal Stockholder and shall have the right to fill three directorships and (iii) 51% or more of the then issued and outstanding shares of Common Stock, such Senior Discount Noteholder shall be deemed to be a Principal Stockholder and shall have the right to fill four directorships. If any directorships are granted hereunder, the class composed of the Senior Discount Noteholders shall not, as a class, be entitled to designate a director. If any Principal Stockholder shall hold less than 10% of the outstanding shares of Common Stock by virtue of a Senior Discount Noteholder's SDN Share Allocation, such Principal Stockholder shall lose its status as a Principal Stockholder.

H.  *Effect of Proposed Restructuring Transactions on Management Agreements*

Our President and Chief Executive Officer, Paul Crecca, is party to an Employment Agreement dated January 31, 2007, as amended on December 11, 2007, with the Company (the "Employment Agreement"). Pursuant to the Employment Agreement, Mr. Crecca has the right to terminate his employment for "Good Reason," as such term is defined in the Employment Agreement. The consummation of the proposed restructuring transactions described in this Disclosure Statement and the Plan may constitute a "Good Reason" because the current beneficial owners of Holdings' common stock will no longer be able to elect at least 50% of the members of the Board of Directors of Holdings. This change of control could be avoided if substantially all of the shares offered in the Rights Offering are sold to Eligible Holders of Senior Discount Note Claims.

Assuming the consummation of the Plan constitutes a change of control as defined in the Employment Agreement, Mr. Crecca could terminate his employment for Good Reason during the three month period that begins six months after the change of control occurs. If Mr. Crecca elects to terminate his employment with the Company for Good Reason, he would receive the following: (a) his salary through the date of termination and any accrued but unpaid vacation, bonus or other benefits, (b) a cash lump sum payment of a pro-rated annual cash bonus for the year in which termination occurs, such bonus (before pro-ration) equal to the greater of (i) the current year target amount or (ii) the actual bonus paid or payable for the prior year, (c) a cash lump sum payment equal to two times the sum of (i) his base salary (calculated at the salary level in effect at the time of termination, including the 2009 waived salary increase, plus (ii) an amount equal to the higher of the current year bonus that would be payable at the target level, or the actual bonus paid or payable for performance in the year prior to the year of termination, plus (iii) an amount equal to the annual cost of medical plan benefits under COBRA or similar plan. Mr. Crecca's current base salary is $435,000, and he is eligible for a minimum cash annual bonus equal to 50% of his base salary. In addition, Mr. Crecca is eligible for additional monthly payments equal to $25,000 during the twelve month period following such termination pursuant to his Noncompetition Agreement, dated January 31, 2007, with the Company.

# IX. POST-REORGANIZATION CAPITAL STRUCTURE

The following tables sets forth the consolidated debt and capitalization of Reorganized Holdings and its consolidated subsidiaries pre-transaction and post-restructuring, using the assumptions in the footnotes to the tables. All of the capital stock rights (below) will be subject to dilution upon the issuance of the Exit Warrants and other future issuances, including management awards. It is anticipated that as soon as reasonably practicable after the Effective Date, a management incentive plan shall be implemented for designated members of senior management.

| Pre-Transaction Capitalization | |
|---|---|
| *$ in millions* | Amount Outstanding |
| **Secured** | |
| Secured Credit Agreement[1] | $110.4 |
| **Unsecured** | |
| Senior Notes | 138.8 |
| Senior Note Accrued Interest[1] | 15.2 |
| Senior Discount Notes | 135.0 |
| Senior Discount Note Accrued Interest[2] | 16.5 |
| **Total Debt** | **$416.0** |
| **Equity Ownership:** | |
| Existing Common Stock and Warrant Holders | 100.0% |

| Post-Restructuring Capitalization | |
|---|---|
| *$ in millions* | Amount Outstanding |
| **Secured** | |
| New First Lien Notes | $100.0 |
| New Second Lien Notes | 80.0 |
| **Total Debt** | **$180.0** |
| **Equity Ownership**[3]: | |
| Senior Noteholders | 92.0% |
| Senior Discount Noteholders[4] | 8.0% |
| **Warrants:** | |
| Senior Discount Noteholders[4] | 10.0% |

---

(1) Projected as of 2/28/2010, assuming that is the Effective Date.
(2) Projected as of 1/11/2010, assuming that is the Petition Date.
(3) This capitalization table ignores the effect of any sales in the Rights Offering. Shares sold in the Rights Offering will be issued to former Senior Discount Noteholders and will reduce the number of shares issued to the Senior Noteholders.
(4) In the event that the Senior Discount Noteholders do not approve the proposed Plan, the 8% New Common Stock will revert to the Senior Noteholders and no Exit Warrants will be issued.

## X.  PROJECTIONS AND VALUATION ANALYSIS

### A.  *Consolidated Condensed Projected Financial Statements*

#### 1.  *Responsibility for and Purpose of the Projections*

As a condition to confirmation of a Plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. This standard is generally referred to as "feasibility". In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Prospective Debtors' management has analyzed the ability of the Prospective Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their business.

The Prospective Debtors believe that the Plan meets the Bankruptcy Code's feasibility requirement that Plan confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Prospective Debtors or any successor under the Plan.

#### 2.  *Pro Forma Financial Projections*

In connection with the development of the Plan, and for the purposes of determining whether the Plan satisfies the feasibility standard, the Prospective Debtors analyzed their ability to satisfy financial obligations while maintaining sufficient liquidity and capital resources. In this regard the Prospective Debtors, in consultation with their advisors, have prepared projected consolidated statements of income, consolidated statements of cash flows, and consolidated balance sheets of the Prospective Debtors for the fiscal years ending December 31, 2009, 2010, 2011, 2012, 2013, and 2014 (collectively, the "Projections").

The Projections assume that the prepackaged Plan will be implemented in accordance with its stated terms, that there will be no significant disputes in connection with the approval of the Plan and that the prepackaged restructuring will be completed by March 31, 2010.

The Company anticipates that for the periods after the Effective Date it will be required to apply the concepts of "Fresh Start Accounting," which are contained in the American Institute of Certified Public Accountants Statement of Position 90-7, "Financial Reporting by Entities in Reorganization Under the Bankruptcy Code." The adoption of Fresh Start Accounting requires the determination of the reorganization value of the entity that emerges from bankruptcy. Reorganization value generally approximates fair value of the entity before considering liabilities. The resulting reorganization value will be allocated among the individual categories of assets in the Projections. These allocations will be made based on asset appraisals by independent valuation experts. No Fresh Start Accounting adjustments have been included in the following Projections. For example, the allocation of the valuation among asset classes performed as part of Fresh Start Accounting will effect future depreciation, amortization, cost of goods sold and tax expenses that have not been reflected in the Projections. Adjustments made as a result of the application of Fresh Start Accounting will have a material affect on our reported results.

The Projections, which are set forth in <u>Exhibit J</u> to this Disclosure Statement, are based on a number of assumptions, and while the Prospective Debtors have prepared the Projections in good faith and believe the assumptions to be reasonable, it is important to note that the Prospective Debtors can provide no assurance that such assumptions will ultimately be realized. The Projections should be read in conjunction with the assumptions and qualifications outlined in Section X.A. herein, as well as with the risk factors described in Article II hereof, with the audited consolidated financial statements for the fiscal year ended December 31, 2008 contained in the 2008 Annual Report and the Third Quarter 2009 Quarterly Report. Because these documents contain important information, users of this document are encouraged to read them. The Prospective Debtors' 2008 Annual Report, as well as the Company's other SEC filings, are available free from the SEC at www.sec.gov. The Third Quarter 2009 Quarterly Report is attached hereto as <u>Exhibit H</u>.

The Projections were prepared by the Company's management in November 2009 and reflect the anticipated impact of the Plan and actual results through October 2009. Therefore, the Projections assume that the Plan will be implemented in accordance with its stated terms. The Projections are inherently uncertain as they are based on estimates and assumptions that rely on the forecast of key economic variables, including (but not limited to) unemployment, economic growth rates, tax receipts at the state and local government levels, relevant government budgetary spending levels, federal educational spending tied to the American Recovery and Reinvestment Act of 2009, demand for the Prospective Debtors' products and services, capital market conditions, working capital needs, capital and product development expenditures, and the Prospective Debtors' ability to maintain good customer and key vendor relations and appropriately manage the growth of their operations. Accordingly, such projections, estimates and assumptions are not necessarily indicative of current values (including equity value), or future performance, which may be significantly less favorable or more favorable than as set forth herein.

**THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE COMPANY OR ANY OTHER PERSON AS TO THE ACCURACY OF THE PROJECTIONS OR THAT ANY PROJECTIONS SET FORTH HEREIN WILL BE REALIZED.**

**THE PROJECTIONS WERE PREPARED BY THE COMPANY; THEY HAVE NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT ACCOUNTANTS. THE SIGNIFICANT ASSUMPTIONS USED IN THE PREPARATION OF THE PROJECTIONS ARE STATED BELOW.**

**THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.**

The following Projections are included herein:

- Projected Consolidated Balance Sheets of Reorganized Debtor as of December 31, for each of the fiscal years from 2009 through 2014.

- Projected Consolidated Statements of Income of Reorganized Debtor as of December 31, for each of the fiscal years from 2009 through 2014.
- Projected Consolidated Statements of Cash Flow of Reorganized Debtor as of December 31, for each of the fiscal years from 2009 through 2014.

The Projections have been prepared based on accounting principles consistent with those currently utilized by the Company in the preparation of its consolidated financial statements, unless noted in the following assumptions. The projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

**ALTHOUGH THE COMPANY BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT ANY PROJECTIONS WILL BE REALIZED.**

3.    *General Assumptions*

*FYE 2009-2014 PLAN PROJECTIONS – MAJOR ASSUMPTIONS*

The Projections assume certain specific economic and business conditions for the Projection Period, with the general assumptions based upon future industry supply/demand indicators, historic growth rates, and estimated directions of specific end markets based on information available in November 2009 when the Projections were completed. The assumptions take into account recent trends in educational media and publishing of both printed and recorded audio materials as a means to project future revenue growth/decline both organically through the Company's existing customer base, and entry into new markets. The Company is anticipating operating in an environment of shrinking school, library and municipal budgets and deteriorating economic conditions through 2010 and into the first half of 2011. In developing the Projections, the Company has forecasted these associated assumptions at the business unit-level.

*TRIUMPH LEARNING*

**Key Activities:**

- Triumph Learning's projections for 2009 are based on significant operational restructuring actions substantially completed in the last quarter of 2008 and the first half of 2009. Sufficiently concerned about the effect the growing recession would have on school budgets in 2009 and ultimately future period sales, in September 2008 management initiated an extensive effort to restructure Triumph Learning to reduce its operating costs, an effort which was expanded with the significant economic decline in the 4th quarter of 2008. Management identified and achieved cost savings in excess of $10 million, including a reduction in force of over 100 employees or approximately 25%, through the closure of secondary operating locations in Iowa City, Iowa and Austin, Texas with consolidation into its headquarters location in New York, New York, the consolidation of duplicate departmental functions, the restructuring and relocation of our Massachusetts-based customer service and product distribution center to a lower cost

facility, and the careful evaluation of all other personnel and operating expenses under an assumption of reduced sales volumes in 2009 and likely beyond.

**Revenues:**

- Due to anticipated continuing school budget constraints, during 2010, total *Triumph Learning* revenues are anticipated to decline by approximately 4.1% versus 2009. The American Recovery and Reinvestment Act of 2009, along with Triumph Learning's new product offerings, are expected to partially mitigate an otherwise greater than forecasted decline. In particular, revenues at Triumph Learning's *Coach* product line are projected to increase resulting from new print and electronic product releases in 2010. Triumph Learning's *Buckle Down* and *Options* product lines revenues are projected to decline in 2010 principally resulting from general market conditions.
- Projected revenues for 2011 are based on the assumption that projected 2010 revenues will be achieved, and that school market conditions will show improvement in the second half of 2011 (the first half of the 2011-2012 school year), and on that basis 2011 revenues are anticipated to improve by approximately 4.6%. This projected growth will be led by improved revenue in Triumph's *Coach* product line resulting from the continuing benefit of 2010 product releases in addition to new 2011 product launches. *Buckle Down* and *Options* are anticipated to be flat in 2011, an improvement over their 2010 projected declines, as general macro and school market economic conditions begin to improve, in addition to benefits from new product releases.
- Revenue projections for 2012 through 2014 are based on the underlying assumption that 2010 and 2011 projected revenues are achieved, and following that based on anticipated market conditions and product releases in each period respectively, however true visibility to those future factors is low.

**Expenses:**

- In 2010, total operating expenses for Triumph Learning are projected to increase approximately 5.1%, which includes approximately $1.5 million of investment costs related to accelerating development efforts and marketing of electronic products and our Options intervention product line. Excluding these investments, total operating expenses are projected to increase approximately 1.5% following 2009, when management eliminated approximately $10 million from Triumph Learning's cost structure through facility shut-downs and function consolidations in early 2009, wherein the add-back of necessary but reduced personnel to these consolidated functions did not occur until late 2009, with a full year expense effect in 2010.
- Operating expenses are expected to increase approximately 5.7% in 2011 relative to 2010 reflecting variable expense increases related to the projected revenue growth of approximately 4.6%, in addition to certain continued investments in our electronic products and Options product line.
- Operating expenses for 2012 through 2014 are projected to increase based on revenue growth and continuing growth investments, while projected to yield favorable operating leverage resulting in projected EBITDA margin improvements.

**Revenue Assumptions.** During 2009, Triumph Learning estimates approximately $70.1 million in revenues, down from $83.7 million the prior year. Revenues are then projected to decline to approximately $67.3 million in 2010 and ultimately increase to approximately $89.9 million in 2014.

**Net EBITDA Assumptions.** Net EBITDA for 2009 is projected to be approximately $15.0 million. Over the projected period Net EBITDA is expected to increase to approximately $18.8 million by 2014. Net EBITDA margin is projected to decline slightly from approximately 21.5% of total revenues during 2009 to approximately 21.0% during 2014, due to product mix and investments building our electronic products line.

**Product Development.** Product development investment expenditures, which are capitalized in our consolidated balance sheet, are projected to increase from approximately $8.6 million in 2009 to approximately $12.0 million in 2010, peaking at approximately $14.5 million in 2012-2013 primarily related to the anticipated cycle of tests revisions requiring new Coach and Buckle Down test-prep products and investments to continue building Triumph's electronic product lines.

## *RECORDED BOOKS*

### Key Activities:

- Recorded Books' projections for 2009 are based on numerous operational restructuring actions substantially completed in the first quarter of 2009. Management identified and achieved cost savings in excess of $3 million, including a reduction in force of over 35 employees or approximately 10%, through the careful evaluation of all personnel and other operating expenses wherever possible under an assumption of reduced sales volumes.

### Revenues:

- Approximately 66% of Recorded Books revenues result from the US and UK public library markets and approximately 16% from the US school market. In 2009, Recorded Books released several new and exciting digital products to the library market, and its Plugged-In to Reading product line achieved an exceptional reputation in the school market and is thus benefiting from federal stimulus funds for education. These successful new product initiatives for libraries and schools, and others not mentioned, as well as the importance of Recorded Books products to public library services, are expected to buffer Recorded Books against the anticipated budget pressures facing US and UK public libraries, allowing Recorded Books to project a modest 1.3% revenue decline for 2010.
- Projected revenues for 2011 are based on the assumption that projected 2010 revenues will be achieved, and that library and school market conditions will show improvement in the second half of 2011 (the first half of the 2011-2012 library and school year). On that basis, 2011 revenues are anticipated improve by approximately 8.8%, led by strong growth projected for Recorded Books school segment resulting from a significant expansion of its field sales force in 2010 to capitalize on the success of Plugged-In to

Reading and other new school product releases, and also reflecting growth in the library segment realized from the continued success of new electronic products.

- Revenue projections for 2012 through 2014 are based on the underlying assumption that 2010 and 2011 projected revenues are achieved, and following that based on anticipated market conditions and product releases in each period respectively, however true visibility to those future factors is low.

**Expenses:**

- In 2010, total operating expenses for Recorded Books are projected to increase approximately 3.7%, which includes approximately $1.5 million of investment costs related to the expansion of the school segment field sales force and technical resources for our many new electronic product releases. Excluding these investments, total operating expenses are projected to increase less than 1% following 2009 when management eliminated approximately $3 million from Recorded Books' cost structure. The small increase in total operating expenses excluding investments relative to revenue growth is attributable to marketing costs in support of new products.

- Operating expenses are expected to increase approximately 8.9% in 2011 relative to 2010 reflecting variable expense increases related to the projected revenue growth of approximately 8.8%, in addition to certain continued investments in our school segment and electronic products.

- Operating expenses for 2012 through 2014 are projected to increase based on revenue growth and continuing growth investments, while projected to yield favorable operating leverage resulting in projected EBITDA margin improvements.

**Revenue Assumptions**. During 2009, Recorded Books estimates approximately $78.8 million in revenues, down from approximately $87.4 million during the prior year. Revenues are then projected to decline slightly to approximately $77.8 million in 2010 and ultimately increase to approximately $105.1 million in 2014.

**Net EBITDA Assumptions.** Net EBITDA for 2009 is projected to be approximately $21.4 million. Over the projected period Net EBITDA is projected to increase to approximately $27.4 million by 2014. Net EBITDA margin is projected to decline slightly from approximately 27.1% of total revenues during 2009 to approximately 26.1% during 2014 resulting primarily from product mix changes over this period.

**Product Development.** Product development investment expenditures, which are capitalized in our consolidated balance sheet, are projected to increase from approximately $6.8 million in 2009, to approximately $7.4 million in 2010, and increasing each fiscal year with 2014 projected at approximately $9.0 million.

The Projections assume an Effective Date of December 31, 2009 with Allowed Claims and Allowed Interests treated as described in the Plan. If the Prospective Debtors do not emerge from Chapter 11 as currently scheduled, additional Administrative Expense will be incurred until such time as the Plan is confirmed and becomes effective. These Administrative Expenses could

significantly impact the Prospective Debtors' cash flows if the Effective Date is materially later than the Effective Date assumed in these Projections.

The Projections contain certain statements that are "forward-looking statements" within the meaning of the U.S. Private Securities Litigation Reform Act of 1995. Forward-looking statements can be identified by words such as "anticipates," "intends," "plans," "seeks," "believes," "estimates," "expects" and similar references to future periods. Examples of forward-looking statements include, but are not limited to, the Company's ability to successfully consummate a restructuring plan.

Forward-looking statements are based on the Company's current expectations and assumptions regarding the Company's business, the economy and other future conditions. Because forward-looking statements relate to the future, by their nature, they are subject to inherent uncertainties, risks and changes in circumstances that are difficult to predict. the Company's actual results may differ materially from those contemplated by the forward-looking statements. The Company cautions you, therefore, that you should not rely on any of these forward-looking statements as statements of historical fact or as guarantees or assurances of future performance. These risks and uncertainties include, but are not limited to, statements the Prospective Debtors make regarding: (i) the Company's ability to develop, prosecute, confirm and consummate one or more Chapter 11 plans of reorganization (See "Chapter 11 Reorganization" herein), (ii) the potential adverse impact of the Chapter 11 filing on the Company's operations, management and employees, (iii) risks associated with third parties seeking and obtaining court approval to terminate or shorten the exclusivity period for the Prospective Debtors to propose and confirm a plan of reorganization, to appoint a Chapter 11 trustee or to convert the cases to Chapter 7 cases, (iv) customer response to the Chapter 11 filing, (v) the adequacy of cash flows from operations and available cash to meet the Company's future liquidity needs, or (vi) the Company's continued viability, the Company's operations and results of operations. Additional important factors that could cause actual results to differ materially from those in the forward-looking statements include regional, national or global political, economic, business, competitive, market and regulatory conditions and include the following:

- factors impacting demand for the Company's products, such as budgetary constraints at the local government level for public schools and libraries, federal educational spending tied to the American Recovery and Reinvestment Act of 2009, and tax receipts collected by relevant local authorities;
- competition from other providers of state-specific assessment materials and unabridged audio books in the library market;
- technological changes driven by transition from distribution of physical content to digital forms;
- changes in educational and library spending patterns as a result of new legislation;
- pending, threatened or future legal proceedings; and

- other factors that are described in "Risk Factors," or are included with the Prospective Debtors' filings with the United States Bankruptcy Court for the District of Delaware.

A more complete discussion of these factors and other risks applicable to the Company's business is contained in Article II hereof and Item 1A of the Company's 2008 Annual Report and Part II, Item 1A of the Third Quarter 2009 Quarterly Report.

Any forward-looking statement made by the Prospective Debtors in the Projections, or on the Company's behalf by its directors, officers or employees related to the information contained herein, speaks only as of the date of the Projections. Factors or events that could cause the Company's actual results to differ may emerge from time to time, and it is not possible for the Company to predict all of them. The Company undertakes no obligation to publicly update any forward-looking statement, whether as a result of new information, future developments or otherwise.

The Prospective Debtors do not, as a matter of course, publish their business plans and strategies or projections or anticipated financial position or results of operations. Accordingly, the Prospective Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to holders of Claims or interests after the Confirmation Date, or to include such information in documents required to be filed with the Securities and Exchange Commission (if any) or otherwise make such information public.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD PUBLIC DISCLOSURE OR COMPLIANCE WITH PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH THE GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, PUBLISHED GUIDELINES OF THE SECURITIES AND EXCHANGE COMMISSION, THE RULES AND REGULATIONS PROMULGATED BY THE SECURITIES AND EXCHANGE COMMISSION REGARDING PROJECTIONS OR THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS REGARDING PROJECTIONS OR FORECASTS. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED OR REVIEWED BY INDEPENDENT CERTIFIED ACCOUNTANTS.**

**THE PROJECTIONS ARE ONLY AN ESTIMATE, AND ACTUAL RESULTS MAY VARY CONSIDERABLY FROM THE PROJECTIONS. IN ADDITION, THE UNCERTAINTIES WHICH ARE INHERENT IN THE PROJECTIONS INCREASE FOR LATER YEARS IN THE PROJECTION PERIOD, DUE TO INCREASED DIFFICULTY ASSOCIATED WITH FORECASTING LEVELS OF ECONOMIC ACTIVITY AND THE COMPANY'S PERFORMANCE AT MORE DISTANT POINTS IN THE FUTURE. CONSEQUENTLY, THE PROJECTED INFORMATION INCLUDED HEREIN SHOULD NOT BE REGARDED AS A REPRESENTATION BY THE PROSPECTIVE DEBTORS, THE PROSPECTIVE DEBTORS' ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED RESULTS WILL BE ACHIEVED. IMPAIRED CREDITORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THE FOLLOWING PROJECTIONS IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS SHOULD**

**CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE II OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

The Projections assume that (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganized Debtors, (iii) there will be no change in generally accepted accounting principles in the United States that will have a material effect on the reported financial results of the Reorganized Debtors, (iv) the application of "fresh start accounting" will not materially change the Prospective Debtors' revenue accounting procedures and (v) there will be no material contingent or unliquidated litigation or indemnity Claims applicable to the Reorganized Debtors. To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and considered reasonable by the Prospective Debtors when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors. Accordingly, the Projections are only an estimate and, therefore, necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should be read together with the information, the assumptions, qualifications and footnotes to tables containing the Projections (which include projected statements of operations, projected balance sheets and projected statements of cash flows) set forth herein, and the historical consolidated financial information (including the notes and schedules thereto) as set forth in Exhibit H to this Disclosure Statement and included in the Prospective Debtors' other financial statements as publicly filed with the SEC.

**SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.** The Projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act and the Exchange Act, as amended by the Private Securities Litigation Reform Act of 1995. "Forward-looking statements" in the Projections include the intent, belief or current expectations of the Prospective Debtors and members of their management team with respect to the timing of, completion of and scope of the current restructuring, reorganization plan, strategic business plan, bank financing, debt and equity market conditions and the Prospective Debtors' future liquidity, as well as the assumptions upon which such statements are based. Although the Prospective Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements. Important factors currently known to the Prospective Debtors' management that could cause actual results to differ materially from those contemplated by the forward-looking statements in the Projections include, but are not limited to, further adverse developments with respect to the Prospective Debtors' liquidity position or operations of the Prospective Debtors' business, adverse developments in the Prospective Debtors' efforts to obtain their funding and adverse developments in the bank financing or public or private markets for debt or equity

securities, adverse developments in the timing or results of the Prospective Debtors' strategic business plan (including the timeline to emerge from Chapter 11), the ability of the Prospective Debtors to retain and attract new customers and maintain favorable vendor relationships, the difficulty in controlling costs and expenses as presently contemplated, the ability of the Prospective Debtors to return their operations to profitability, the level and nature of any restructuring and other one-time charges, and the possible negative effects of changes in applicable legislation or enactment of new legislation that impacts the operation of Prospective Debtors' business.

B.   *Valuation*

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH TRADING VALUE, IF ANY MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZATION VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.

Houlihan Lokey has advised the Company with respect to the reorganization value of the Company on a going concern basis post-reorganization. Solely for purposes of the Plan, the estimated range of reorganization value of the Company was assumed to be $226.0 million to $255.0 million (with a midpoint value of $240.5 million) as of an assumed Effective Date of December 31, 2009. This estimated reorganization value is based on standard valuation analyses, including (i) a comparable companies analysis and (ii) a discounted cash flows analysis, each as described below. Furthermore, upon emergence, Reorganized Debtors will issue a proposed total debt of $180 million (including $100 million in New First Lien Notes and $80 million of New Second Lien Notes).

**HOULIHAN LOKEY'S ESTIMATE OF A RANGE OF ENTERPRISE VALUES DOES NOT CONSTITUTE AN OPINION AS TO FAIRNESS FROM A FINANCIAL PERSPECTIVE OF THE CONSIDERATION TO BE RECEIVED UNDER THE PLAN OR OF THE TERMS AND PROVISIONS OF THE PLAN. THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF DECEMBER 31, 2009, REFLECTS WORK PERFORMED BY HOULIHAN LOKEY ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE COMPANY AVAILABLE TO HOULIHAN LOKEY AS OF DECEMBER 1, 2009. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT HOULIHAN LOKEY'S CONCLUSIONS, HOULIHAN LOKEY DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.**

The foregoing estimate of the reorganization value of the Company is based on a number of assumptions, including a successful reorganization of the Company's business and finances in a timely manner, the implementation of the Company business plan, the achievement of the forecasts reflected in the Projections, consummation of the transactions as contemplated in the Plan (including the issuance of the New First Lien Notes and the New Second Lien Notes), the

continuing leadership of the existing management team, market conditions as of December 1, 2009 continuing through the assumed Effective Date of December 31, 2009, and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Projections prepared by the management of the Company and included in <u>Exhibit J</u> to this Disclosure Statement, Houlihan Lokey assumed that such Projections have been reasonably prepared in good faith and on a basis reflecting the currently available estimates and judgments of the Company as to the future operating and financial performance of the Company. Houlihan Lokey's estimate of a range of reorganization values assumes that the Projections will be achieved by the Company in all material respects, including revenue growth, operating margins, earnings and cash flow. Certain of the results forecasted by the management of the Company are significantly better than the recent historical results of operations of the Company. As a result, to the extent that the estimate of enterprise values is dependent upon the Company performing at the levels set forth in the Projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the Projections, such performance may have a material impact on the Projections and on the estimated range of values derived there from.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND EQUITY VALUE OF THE COMPANY, HOULIHAN LOKEY:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE COMPANY (BOTH ON A CONSOLIDATED AND BUSINESS UNIT BASIS) FOR THE MOST RECENT 3 YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE COMPANY, INCLUDING THE PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO HOULIHAN LOKEY BY THE COMPANY'S MANAGEMENT AND WHICH RELATE TO THE COMPANY'S BUSINESS AND ITS PROSPECTS;

- MET WITH CERTAIN MEMBERS OF THE COMPANY'S CORPORATE AND BUSINESS UNIT MANAGEMENT TO DISCUSS THE COMPANY'S OPERATIONS, FINANCIAL PERFORMANCE AND OPERATING TRENDS, COST-CUTTING MEASURES TAKEN AND CAPITAL EXPENDITURE PROGRAMS;

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT HOULIHAN LOKEY DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESSES OF THE COMPANY;